| | | |
|---|---|---|
| FRANK THOMAS, | § | |
| | § | MDL NO. 2543 |
| Plaintiff, | § | 1:14-MD-2543-JMF |
| | § | |
| v. | § | HON. JESSE M. FURMAN |
| | § | |
| GENERAL MOTORS, LLC, | § | CIVIL ACTION NO. 1:18-cv-06607 |
| | § | |
| Defendant. | § | AMENDED COMPLAINT |
| | § | |
| | § | JURY TRIAL DEMANDED |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

COMES NOW Plaintiff, FRANK THOMAS (hereinafter "Plaintiff"), through the undersigned counsel, and is hereby filing his Original Amended and Severed Complaint pursuant to MDL Order Nos. 144, 148, and 152. Plaintiff's lawsuit was filed in a multiple-plaintiff complaint, *Edwards et al. v. General Motors LLC*, 1:14-CV-06924, on July 16, 2015. Plaintiff would now respectfully show as follows:

## I.
## INTRODUCTION

1.　　This action arises out of a motor vehicle incident that occurred on March 3, 2009 (the "Subject Incident"). On that date, Plaintiff was driving his 2004 Chevrolet Malibu LS (VIN 1G1ZT548X4F223511) (the "Subject Vehicle")), on a city street in Decatur, Alabama, when he suddenly became unable to brake or steer and lost control of his vehicle while going into an intersection. Despite his attempts at evasive action, the Subject Vehicle collided with the side of another vehicle.

2.　　Plaintiff was injured as a result of the crash; specifically, he sustained back injuries and later underwent a knee replacement, injuries which led to him becoming fully and permanently disabled.

3. One or more vehicle safety defects manifested in the Subject Vehicle during the Incident and caused and/or contributed to the crash and Plaintiff's subsequent injuries. First, the Subject Vehicle contains an ignition switch which is prone to slipping into the "accessory" or "off" position without warning while the car is in motion, which turns off the engine and the car's vital engine systems. When this occurs, the vehicle's power steering and power braking systems are lost, and in the event of a crash, the airbags will not deploy when they should. Such disastrous system failures can be triggered by something as simple as a key chain attached to the vehicle's key or a bump in the road, which can lead to the vehicle's ignition switch to changing from the "run" position into the "accessory/off" position, with a corresponding loss of engine power, loss of power-steering, loss of power-brakes, and loss of airbag functionality. Yet, today New GM also admits to its customers that lightening the key chain may not totally alleviate the defective condition, as "rough road conditions or other jarring impact related events" *alone* could cause the vehicle to experience inadvertent switch rotation, followed by full loss of power, power-steering, power-braking, and airbag functionality.

4. Beginning in 2014, New GM finally began to acknowledge the existence and breadth of the Ignition Switch Defect ("ISD"). New GM would ultimately go on to recall approximately 29 million vehicles for this very defect; however, despite the defect actually being a GM-brand-wide problem (and possibly an industry-wide problem[1]), New GM did *not* recall the 2004 Chevrolet Malibu LS for the ISD and thus has never publicly acknowledged the existence of such problem in Plaintiff's vehicle. Regardless of whether or not the Subject Vehicle was included in of one of New GM's many ISD recalls, the fact of the matter is, the key can (and did) rotate out of the "RUN" position in the 2004 Chevrolet Malibu LS, and when such event occurs, the driver loses power

---

[1] *See, e.g.*, VTTI017690, at -7705 (stating that one of the Virginia Tech Transportation Institute's key take-aways from its 2014 GM-commissioned research was that this is an "[i]ndustry problem" and "[n]ot a low-torque issue"); VTTI017514, at -7517.

steering, power brakes, and airbag functionality. The bottom line is, like the Chevrolet Cobalt and so many other GM vehicles, the Chevrolet Malibu is defectively designed in that it presents a single-point-of-failure in which the power-braking, power-steering, and airbag systems are all reliant upon power-moding messages from the Ignition Switch, a component which can (and does) fail at random, thereby creating an unreasonably dangerous condition, which in and of itself constitutes a safety defect—regardless of whether or not New GM decided to include that vehicle model in its ISD recall campaigns.

5.      In addition, or in the alternative, a defect in the Subject Vehicle's Body Control Module ("BCM") and/or the Electronic Power Steering Assist ("EPS") system caused Plaintiff to lose control of the Subject Vehicle and ultimately crash and sustain personal injuries.

6.      The Subject Vehicle was manufactured by General Motors Corporation ("Old GM"). In June of 2009, Old GM filed for bankruptcy. On July 9, 2009, the United States Bankruptcy Court for the Southern District of New York ("Bankruptcy Court") approved the sale of substantially all of Old GM's assets pursuant to a Master Sales and Purchase Agreement ("Agreement"). The Agreement became effective on July 10, 2009. The Agreement approved the sale of Old GM's assets to Defendant General Motors LLC ("New GM").

7.      With respect to claims involving personal injury, death, and property damage, among certain other claims, in Old GM manufactured vehicles, New GM expressly assumed liability for certain conduct and liabilities of Old GM, and moreover New GM is liable under principles of successor liability under Alabama law. It is under this egis that Plaintiff brings the present causes of action against defendant New GM.

## II.
## PARTIES

8.      Plaintiff is, and was at all times relevant hereto, a resident of Decatur, Alabama.

9.      Defendant New GM is a citizen of Delaware and Michigan, and does business in all

fifty U.S. states, including Alabama. General Motors LLC's principal place of business is in Detroit, Michigan.

10.    General Motors Corporation ("Old GM") was a Delaware corporation with its headquarters in Detroit, Michigan. Prior to July 10, 2009, Old GM, through its various entities, designed, manufactured, marketed, distributed, and sold Chevrolet, Pontiac, Saturn, and other "GM" brand automobiles, including Plaintiff's 2006 Pontiac G6, in all fifty U.S. states and indeed worldwide.

11.    In June of 2009, Old GM filed for bankruptcy. On July 9, 2009, the Bankruptcy Court approved the sale of substantially all of Old GM's assets pursuant to a Master Sales and Purchase Agreement ("Agreement"). The Agreement became effective on July 10, 2009. The Agreement approved the sale of Old GM's assets to Defendant New GM.

12.    The Agreement defines Defendant's "Purchased Assets" as:

> (xiv)    all books, records, ledgers, files, documents, correspondence, lists, plats, specifications, surveys, drawings, advertising and promotional materials (in whatever form or medium), including Tax books and records and Tax Returns used or held for use in connection with the ownership or operation of the Purchased Assets or Assumed Liabilities, including the Purchased Contracts, customer lists, customer information and account records, computer files, data processing records, employment and personnel records, advertising and marketing data and records, credit records, records relating to suppliers, legal records and information and other data;

> (xv)    all goodwill and other intangible personal property arising in connection with the ownership, license, use or operation of the Purchased Assets or Assumed Liabilities; . . . .

AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT at Section 2.2.

13.    Along with the Purchased Assets, New GM also expressly took on a range of liabilities. "Liabilities" is defined in the Agreement as "any and all liabilities and obligations of every kind and description whatsoever, whether such liabilities or obligations are known or unknown, disclosed or undisclosed, matured or unmatured, accrued, fixed, absolute, contingent,

determined or undeterminable, on or off-balance sheet or otherwise, or due or to become due, including Indebtedness and those arising under any Law, Claim, Order, Contract or otherwise."

14.     New GM also undertook responsibility for compliance with a wide range of laws and other regulations, including:

> (a)     From and after the Closing, Purchaser [Defendant New GM] shall comply with the certification, reporting, and recall requirements of the National Traffic and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by Seller [Old GM].

> (b)     From and after the Closing, Purchaser [Defendant New GM] shall be responsible for the administration, management and payment of all Liabilities arising under (i) express written warranties of Sellers [Old GM] . . . (ii) Lemon Laws.

15.     Pursuant to the Agreement and other orders of the Bankruptcy Court, Defendant New GM purchased the assets of Old GM and hired many, if not most, of Old GM's employees including, on information and belief, most of the same senior-level management, officers, and directors, many of whom carried over knowledge of the defects described herein, in their continued employment capacity at New GM. Indeed, Plaintiff asserts that New GM is but a mere continuation of Old GM under Alabama law, in accordance with this Court's prior successor liability rulings.[2]

---

[2] *See In re Gen. Motors LLC Ignition Switch Litig.*, 14-MC-2543 (JMF), 2017 WL 6509256, at *2-3 (S.D.N.Y. Dec. 19, 2017), *on reconsideration in part*, 14-MC-2543 (JMF), 2018 WL 1989572 (S.D.N.Y. Apr. 25, 2018) (internal citations omitted) ("[T]here is no dispute that New GM continued Old GM's business and operations by, *inter alia*, assuming franchise agreements, maintaining contracts with suppliers, retaining their principal executive offices, and continuing to produce Old GM's automobiles. Second, pursuant to a liquidation plan, Old GM dissolved nine months after New GM acquired the bulk of its assets. Third, New GM assumed critical liabilities, including product liability, warrant, and recall obligations, as well as responsibilities under employee benefit plans, in order to continue normal business operations. And finally, after the sale of Old GM, New GM held itself out as the continuation of Old GM by, for example, maintaining the logos of well-known automobile brands. At a minimum, Plaintiffs demonstrate that there are genuine issues of material fact with respect to each of the factors in Alabama's [mere continuation exception] multi-factor test."); *see also In re Gen. Motors LLC Ignition Switch Litigation*, 2017 WL 3382071, at *9 (Aug. 3, 2017) (noting the parties' agreement that the substantive laws of the state of Alabama would apply to the analysis of Alabama successor liability claims). In the alternative, New GM is subject to one or more of the other successor liability theories under Alabama law, including but not limited to the continuity-of-enterprise exception and the *de facto* merger exception. *See In re Gen. Motors LLC*

16.     All causes of action and attributions of liability are directed solely against Defendant New GM. Allegations pertaining to Old GM are included herein because (a) with respect to claims involving personal injury, death, and property damage, among certain other claims, in Old GM manufactured vehicles, New GM expressly assumed liability for certain conduct and liabilities of Old GM; (b) New GM also acquired knowledge of Old GM's activities and the common defects in many GM-brand vehicles, including the serious safety defects identified herein, via the mind of the employees, officers, managers, books, and records obtained and/or acquired as a result of the Purchase Agreement and subsequent Sale Order, as further defined by the Orders, Judgments, and/or Decisions of the United States Bankruptcy Court for the Southern District of New York in *Motors Liquidation Company, et al.*, *f/k/a General Motors Corp., et al.*, Case No. 09-50026 (REG); and (c) as discussed further below, New GM is mere continuation of Old GM within the meaning of that term under Alabama successor liability law.  Thus, the conduct, knowledge and duties of Old GM are part of the foundation for the liabilities assumed by New GM, as Plaintiff bases his claims on a crash involving an Old GM vehicle which, due to Old-to-New GM employees' wrongful, negligent actions and inactions, caused Plaintiff personal injury and property damage and New GM is, therefore, liable to Plaintiff.

17.     At all times relevant to the claims in this lawsuit, Old GM and New GM were in the business of developing, manufacturing, and marketing cars throughout the United States generally, and specifically in Plaintiff's state of citizenship.

**III.**
**JURISDICTION AND VENUE**

---

*Ignition Switch Litig.*, 14-MC-2543 (JMF), 2017 WL 6509256, at *2-3 (S.D.N.Y. Dec. 19, 2017), *on reconsideration in part*, 14-MC-2543 (JMF), 2018 WL 1989572 (S.D.N.Y. Apr. 25, 2018).

18.     This Court has diversity jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000.00 and the Plaintiff and Defendant New GM are citizens of different states.[3]

19.     Plaintiff's filing of this Complaint in this district does not alter the choice-of-law analysis and does not constitute a waiver of her right to transfer to another district at the conclusion of the pretrial proceedings in this case. Plaintiff has filed this Complaint in this district in order to advance the efficient and orderly resolution of claims arising from Defendant's conduct and its attendant nationwide devastating effects.   To be sure, by directly filing in the Southern District of New York, Plaintiff is not acquiescing to New York jurisdiction nor waiving the right to seek remand to a transferor court of proper jurisdiction when the Court is prepared to grant such relief.

## IV.
## FACTUAL ALLEGATIONS

**A.     The March 10, 2009 Incident**

20.     On March 10, 2009, Plaintiff was driving his 2004 Chevrolet Malibu LS (VIN 1G1ZT548X4F223511) (the "Subject Vehicle")), on a city street in Decatur, Alabama, when he suddenly lost control of his vehicle while entering an intersection.  Unable to steer, brake, or control the Subject Vehicle, Plaintiff collided into the side of another vehicle. Plaintiff sustained serious and permanent knee and back injuries as a result of the crash.

21.     Upon information and belief, this tragic incident occurred due to the unreasonably dangerous, defective nature of the Subject Vehicle.  Specifically, the accident and failure of vehicle safety systems affecting the controllability of the vehicle, including anti-lock brakes and electric power steering assist, were caused by the Subject Vehicle's defective ignition switch system.  In the

---

[3] By directly filing in the Southern District of New York, Plaintiff is not acquiescing to New York jurisdiction nor waiving the right to seek remand to a transferor court of proper jurisdiction when the Court is prepared to grant such relief.

alternative, Plaintiff's crash and resulting injuries were caused by a separate defect in the Subject Vehicle's electric power steering ("EPS") system and/or a defect in the Subject Vehicle's Body Control Module ("BCM") (hereinafter the "EPS Defect" and "BCM Defect," respectively), safety defects which also affect vehicle controllability and user safety.

**B.     The Ignition Switch Defect: Old GM and New GM Concealed a Known Defect in Plaintiff's and Other Vehicles**

a.     _The ISD-Defective Vehicles and Their Common Design Flaws_

22.     Plaintiff's personal injury claims involve an ISD-Defective Vehicle, specifically a 2004 Chevrolet Malibu LS (VIN 1G1ZT548X4F223511).   As used in this Complaint, "ISD-Defective Vehicles" refers to the following vehicles sold in the United States, which were equipped at the time of sale with an ignition switch system sharing a common defective design:

- 2005-2009 Buick Lacrosse;

- 2006-2011 Buick Lucerne;

- 2003-2014 Cadillac CTS;

- 2000-2005 Cadillac Deville;

- 2006-2011 Cadillac DTS;

- 2004-2006 Cadillac SRX;

- 2010-2014 Chevrolet Camaro;

- 2011-2013 Chevrolet Caprice;

- 2005-2010 Chevrolet Cobalt;

- 2006-2011 Chevrolet HHR;

- 2000-2014 Chevrolet Impala;

- 1997-2005 Chevrolet Malibu Classic;

- 2004 Chevrolet Malibu LS;

- 2000-2007 Chevrolet Monte Carlo;

- 1999-2004 Oldsmobile Alero;

- 1998-2002 Oldsmobile Intrigue;

- 2005-2010 Pontiac G5;

- 2006 Pontiac G6;

- 2008-2009 Pontiac G8;

- 1999-2005 Pontiac Grand Am;

- 2004-2008 Pontiac Grand Prix;

- 2006-2010 Pontiac Solstice;

- 2003-2007 Saturn Ion; and

- 2007-2010 Saturn Sky.

23. The Subject Vehicle falls within that group of ISD-Defective Vehicles, and in fact bares the same detent plunger part number as vehicles subject to NHTSA ISD Recall Nos. 14V047 and 14V394.[4] Moreover, the Subject Vehicle has the same SDM[5] and single-point-of-failure design as vehicles subject to NHTSA ISD Recall No. 14V047 such as the Chevrolet Cobalt, which is a principle subject of New GM's admissions in the May 2014 Valukas Report ("Valukas") and the September 17, 2015 Statement of Facts ("SOF") attached to New GM's September 17, 2015 Deferred Prosecution Agreement ("DPA") with the U.S. Department of Justice.[6] Further, the 2004 Malibu LS

_____

[4] See GM-MDL2543-402147938.
[5] See, e.g., GM-MDL2543-000823609 (indicating that the 2004 SDM-Epsilon was installed in 2004 Model Year Malibu and Malibu Maxx vehicles); GM-MDL2543-000830320, at p. 19 row 15 (indicating same).
[6] See, e.g., SOF ¶ 44 ("As noted, the too-easy movement of the Defective Switch from the Run to the Accessory or Off position resulted in an unexpected shutoff of the engine and—as both the February 2005 Preliminary Information and the 2005 Service Bulletin properly described—a 'loss of electrical system[s].' These electrical systems included power steering and power brakes. They also included the sensing diagnostic module or 'SDM,' which controlled airbag deployment. Internal GM documents reflect that although the impact of an engine shutoff on the SDM was not on GM engineers' minds, certain employees within GM understood no later than 2001 the natural connection between a loss of electrical systems and non-deployment of airbags: if the ignition switch turned to Off or Accessory, the SDM would 'drop,' and the airbags would therefore be disabled. If a crash then ensued, neither the driver nor any passengers could have the protection of an airbag."); id. at ¶¶ 45-47 ("[T]he deadly effects of the Defective Switch on airbag non-deployment began manifesting themselves early on, in crashes about which GM was made aware contemporaneously. .

is part of the GM "Epsilon Platform Architecture" family, as are many of the ISD-Defective Vehicles that *have* been subject to ISD recalls to date, and further shares the vehicles' "GMLAN" electrical architecture as well.[7]

24.     The ignition switches in the ISD-Defective Vehicles contain several common switch points, including "run" (or "on"), "off," and "accessory."  Under normal operation, at the "run" position, the vehicle's motor engine is running and electrical systems have been activated; at the "accessory" position, the vehicle motor is off, and electrical power is generally only supplied to the vehicle's entertainment system, ventilation system, or other "accessory" systems; and at the "off" position, both the vehicle's engine and electrical systems are turned off.  In most vehicles, a driver must intentionally and manually turn the key in the ignition to move to these various positions.

25.     In the ISD-Defective Vehicles, the ignition switch may suddenly and without warning move from the "run" to the "accessory" or "off" position while the vehicle is in motion. New GM has attributed this to a number of catalysts, including a detent plunger in the ignition switch which does not generate sufficient torque to keep key in its proper position while the vehicle is in motion. But put simply, the ignition switch fails to stay in the "run" position when it is supposed to stay in the "run" position.

26.     In addition, the ISD-Defective Vehicles contain an ignition cylinder, with the key position of the lock module on the steering column and an ignition key with a slot for a key ring at the top.  By design, the ignition switch in many of the ISD-Defective Vehicles was placed low on

---

. . The Cobalt SDM data . . . reflected a number of non-deployments accompanied by a power mode status recording of Accessory or Off."); *id.* at ¶ 49 ("In October 2006, two more teenagers died, also in a 2005 Cobalt, in Wisconsin.  The airbags in the vehicle failed to deploy when they should have, and the police officer who examined the crashed vehicle noted in a February 2007 report on the incident that the ignition switch 'appeared to have been in the accessory position . . . preventing the airbags from deploying.'"); *id.* at ¶ 51 ("In September 2008, another crash, this one involving a 2006 Cobalt, killed two people. The airbags failed to deploy when they should have. GM sent the crashed car's SDM to the Company's SDM supplier for examination. In May 2009, the SDM supplier reported that the power mode status was at one point during the crash recorded as Off, and that this was one of two possible explanations for the failure of the airbags to deploy.").

[7] *See*, *e.g.*, GM-MDL2543-002073462, at -3466; GM-MDL2543-000934972, at sheet 6.

the steering column, making it easy for a driver of regular height to inadvertently impact the ignition switch with his or her knee while operating the vehicle. Such an impact may jar the ignition switch and cause it to move from the "run" to the "accessory" or "off" position and cause a sudden loss of vehicle power.

27.     The ignition switch in the ISD-Defective Vehicles is prone to fail during ordinary and foreseeable driving situations (such as traveling across bumpy or uneven roadways, or when the vehicle experiences extreme jarring movements). When the ignition switch "fails," and the ignition switch moves from the "run" to the "accessory" or "off" position during ordinary operation of the vehicle, the power to the vehicle is terminated (even at highway speeds), and the vehicle loses power steering and power brakes, which suddenly and without warning makes the vehicle difficult to control.

28.     Each of the ISD-Defective Vehicles also contains an airbag system that is disabled when the ignition switch on the vehicles fails during ordinary and foreseeable driving situations. Thus, as a result of the defective design of the ISD-Defective Vehicles, a driver whose ignition switch fails may suddenly and without warning experience a vehicular power failure that also disables the vehicle's airbags, power steering, and power brakes. Such a failure may occur unexpectedly and during normal operation of the vehicle.

29.     The ignition switch systems at issue are defective in at least three major respects. First, the switches are simply weak and/or prone to inadvertent rotation; the torque, i.e., force, required to move the switches out of "run" and into the "accessory" position is too low, which causes inadvertent switch rotation. Second, because many of the ISD-Defective Vehicles' ignition switches are placed low on the steering column, a driver's knee can easily bump the key (or the hanging keychain attachments) and cause the switches to inadvertently move from the "run" to the "accessory" or "off" position. Third, when the ignition switches move from the "run" to the

"accessory" or "off" position, vehicles lose power, disabling critical safety systems such as power brakes, power steering, and airbags even if the vehicles are traveling at high speeds. This single point of failure is particularly dangerous given the susceptibility of the switch to inadvertent rotation due to, among other things, low torque, knee-key events, the use of a slotted head key design and/or heavy keys, and switch location.

30. The ignition switch controls the vehicle's power mode. Power mode is controlled by the ignition switch signaling to the Power Mode Master ("PMM") what power mode the vehicle is in, and the PMM broadcasts the power mode status to the rest of the vehicle.[8] The PMM functionality is typically implemented in the Body Control Module ("BCM"). Old-to-New GM employee Vipul Modi, Global Lead Engineer responsible for airbag electronics, explained the role of the ignition switch in relation to other vehicle control systems:

Q. And when you say the power mode message, what does that mean?

A. In the architecture, Epsilon architecture, BCM was getting the input from the ignition switch. BCM reads that input and decides what power mode to be used by the rest of the modules on the vehicle; so it tells the other modules that the vehicle is in run power mode or crank power mode or off or accessory power mode.

Q. All right. And does the BCM communicate that to the SDM?

A. And other modules, that's correct.[9]

---

[8] DLPH_MDL_0003479 at -3495 ("The PMM [Power Mode Master or BCM] shall broadcast the system power mode message over the Class 2 bus whenever it determines a system power mode change… All ignition switch signals (Off/Run/Crank, Accessory, and Run/Crank) processed by the PMM for determination of the system power mode shall be directly routed from the ignition switch to the PMM."). *See also* GM-MDL2543-000888453 at 8459 ("The Power Mode Master (PMM) or Backup Power Mode Master (BPMM) shall communicate the system power mode – PMM and backup system power mode – BPMM to all GMLAN modules via GMLAN signals. The PMM and BPMM shall be responsible for determining and broadcasting the system power mode and backup system power mode signals respectively. The determination is done by processing power mode information such as Ignition Switch…"); V. Modi MDL Dep. at 30:5-16.
[9] V. Modi Dep. at 30:5-16.

31.     This is shown in Figure 1 below (regarding the SDM-Epsilon's communication system, which exists in the Subject Vehicle as well):[10]



**Fig. 1 – Ignition to BCM to SDM Communication**

32.     Modern motor vehicles have become very computerized, relying just as much on software and electronics as mechanical hardware components.  The ignition switch is similar to a computer's "on" or "off" button.   The ignition switch has three primary (3) modes: (1) "RUN" or "on" or "crank" mode; (2) Accessory "ACC" mode; and (3) "OFF" or "Lock." The ignition switch is arguably the most important safety feature because it is responsible for the control of numerous other safety features in the ISD-Defective Vehicles.  Because of the importance of the ignition switch and its responsibility over other safety features, it is crucial that it be designed properly.  Moreover, because of its range of responsibilities, efforts should be undertaken to make sure that the ignition switch cannot operate as a single point of failure for other vehicle control systems.

33.     The ignition switch is responsible for controlling multiple vehicle controls, including safety critical functions, in the GM-brand Vehicles.  Unfortunately, the design of the ignition switch system in the ISD-Defective Vehicles was defective and dangerous because of its inherent

---

[10] *See*, *e.g.*, GM-MDL2543-000823609 (indicating that the 2004 SDM-Epsilon was installed in 2004 Model Year Malibu and Malibu Maxx vehicles).

susceptibility to inadvertently rotating out of "RUN" while the vehicle is in motion. When the ignition switch moves out of "RUN" into either "ACC" or "OFF" mode, numerous other safety critical systems are affected. For example, in a June 27, 2014 PowerPoint presentation by New GM, titled "Unintended Ignition Switch Rotation," New GM explained:

> "Effect of the Condition: If the key ring is carrying added weight and the vehicle goes off road or experiences some other jarring event, it may unintentionally move the key away from the "run" position. If this occurs, engine power, power steering and power braking will be affected, increasing the risk of a crash. The timing of the key movement out of the "run" position, relative to the activation of the sensing algorithm of the crash event, may result in the airbags not deploying, increasing the potential for occupant injury in certain kinds of crashes."[11]

34.    This is shown in Figure 2[12] below:



Fig. 2 – SDM Behavior When Power Mode Changes

35.    Numerous reports of the driver's knee bumping the Ignition Switch out of the RUN position into ACC or OFF have been reported as well, including employees driving the vehicle prior to production as part of the Captured Test Fleet (CTF).[13]

36.    Old GM and New GM marketed airbags and seat belts as critical safety systems and have acknowledged that airbag non-deployment is a safety hazard. New GM classifies "loss of airbag deployment" and "occupant crash protection degradation" as a "GM Vehicle Level Hazard" which

---

[11] GM-MDL2543-300772976.
[12] (GM-MDL2543-002074781 at -4793.
[13] Valukas Report at 58-63.

is a "Potential Product Safety Issue[] impacting the customer."[14] Airbags, power steering, and power brakes are "critical systems" because of "the way that they affect how the vehicle operates" as it relates to safety.[15]

37.    The airbags and seat belt pretensioners in the ISD-Defective Vehicles are controlled by a Sensing and Diagnostic Module ("SDM").[16]

38.    SDMs have internal sensors and remote sensors that detect crash events. The SDM is designed to deploy the appropriate airbags for the corresponding type of crash event and fires the seatbelt pretensioners at all the required times.[17]

39.    Another function of SDMs is to record data related to vehicle and restraint performance in a crash event. This function is known as the Event Data Recorder ("EDR").[18]

40.    The SDM communicates with other vehicle control modules via the vehicles Serial Data Communication System ("SDCS").[19]

41.    When the ignition switch goes from RUN to ACC or OFF mode, the airbags will not deploy. "**This is common with all GM SDM designs**."[20]

42.    Old GM and New GM designed its SDMs in such a way that, as a general rule, they do not have the ability to deploy if the ignition switch is in ACC mode.[21]

43.    Old-to-New GM engineer Vipul Modi, Global Lead Engineer responsible for airbag electronics, testified:

> Q.    Were you aware of any airbag system in any General Motors automobile that functioned differently, that is to say that would deploy the airbags

---

[14] GM-MDL2543-301429264.
[15] D. Carey MDL Dep. at 138:25-139:18.
[16] GM-MDL2543-004826846. *See also* GM-MDL2543-003327048 and GM-MDL2543-301024225, at -5533.
[17] GM-MDL2543-003125636.
[18] GM-MDL2543-400281524.
[19] *See, e.g.,* GM-MDL2543-001553898; GM-MDL2543-000888453; DLPH_MDL_0003479.
[20] GM-MDL2543-003122245.
[21] K. Anderson Dep. in *Melton vs. GM*, Aug. 16, 2013, at 49:13-50:3; 51:9-13. *See also* Modi MDL Depo., at 23:10-24:7 (airbags in the GM Vehicles only deploy when the ignition switch is in RUN position).

when the ignition was in the accessory or off position or were all the systems functioning the same way?

A.      It's the same way. All the -- all the systems were designed with the same philosophy. There's a caveat or additional feature that during the crash, if switch changes, then it ignores that.[22]

44.      For all of the ISD-Defective Vehicles, GM has acknowledged that if inadvertent rotation occurs while the vehicle is in motion, "engine power, power steering and power braking may be affected, increasing the risk of a crash,"[23] or some variation thereof.[24]

45.      The SDM is also responsible for functionality of the seat belt pretensioners in a crash. "If a crash event or rollover is detected by the internal sensors in the SDM or remote sensors, it deploys the appropriate airbags for the type of crash and seat belt pretensioner, all at the required times."[25]

46.      There are some minor differences between the SDMs in the ISD-Defective Vehicles, but for purposes of the safety risk posed by the ignition switch defect, the differences are immaterial and the overall functionality (i.e., non-deployment of the airbags and pretensioners if the ignition switch moves to ACC or OFF) is the same. The intended capabilities and function of the SDMs in the affected vehicles was explained in one GM document as follows:

> The SDM is an onboard electronic module which functions to continuously monitor the air bag system in the car while the ignition is on, to deploy the air bags, and to record certain crash and airbag system data in deployment and non-deployment level crash events. The SDM also functions as an energy reserve for air bag deployment should a vehicle lose power during an accident. . . The SDM senses vehicle decelerations, such as those experienced when the vehicle is in a frontal or near frontal

---

[22] V. Modi MDL Dep. at 27:14-22.

[23] GM 573 Ltr. to NHTSA re: Recall No. 14V346, Jun. 19, 2014, GM-MDL2543-100917206; GM Ltr. to NHTSA re: Recall No. 14V394, Jul. 2, 2014, GM-MDL2543-100270485; GM 573 Ltr. to NHTSA re: Recall No. 14V400, Jul. 3, 2014, GM-MDL2543-100687234.

[24] *See* GM 573 Ltr. to NHTSA re: Recall No. 14V355, Jun. 20, 2014, GM-MDL2543-100607720 (emphasis added) ("If [inadvertent rotation] occurs, engine power, power steering and power braking *will* be affected, increasing the risk of a crash"); SOF ¶ 4 ("If [inadvertent switch rotation] occurs, the driver loses the assistance of power steering and power brakes. And if a collision occurs while the switch is in the Accessory or Off position, the vehicle's safety airbags may fail to deploy—increasing the risk of death and serious injury in certain types of crashes in which the airbag was otherwise designed to deploy").

[25] GM-MDL2543-003125636.

collision. In these types of impacts, the occupant's motion will be primarily forward into the seat belt and frontal airbag.

If the SDM senses that the vehicle is stopping very quickly (1.5 — 2.0 g's of deceleration), the sensing algorithm will be activated and this point in time is considered 'algorithm enable.' Once the algorithm is enabled, the SDM will monitor vehicle inputs and perform calculations to determine if airbags should be deployed. In order for the frontal airbags to deploy, the vehicle must exceed a pre-determined deployment threshold. This threshold will be exceeded when the SDM experiences a sufficient level of longitudinal deceleration to warrant deployment of the frontal airbags.

The SDM has the functionality that governs airbag deployment. The SDM takes the position of the ignition switch as an input when deciding to deploy an airbag. The SDM is designed to provide the ability to command airbag deployment when the ignition switch is in 'run' and 'crank' positions, and not in the 'accessory' and 'off' positions.

In the recalled Saturn Ion vehicles, the ignition switch position governs the power supply to the SDM. Moving the ignition switch from the 'run' position to the 'accessory' or 'off' positions will turn off the primary power supply to the SDM. Without primary power supply to the SDM, it will operate off energy reserve.

In the recalled vehicles other than Saturn Ion, the SDM is powered directly by the battery and the ignition switch position is an input to the SDM. Movement of the ignition switch from the 'run' position to the 'accessory' or 'off' positions will be detected by the Body Control Module (BCM). The BCM broadcasts the vehicle's power mode status ('off', 'accessory', 'run', and 'crank') over the vehicle communications network to the SDM and other control modules on the vehicle. The SDM uses the ignition position information as an input to the airbag sensing algorithm.

In both SDM systems (i.e., the Ion system and the system used by the other recalled vehicles), air bag sensing algorithms are enabled and sensing for a crash event when the vehicle's key is in 'run', and will command deployment if required.

If the switch moves out of the 'run' position after a crash event has begun and the air bag sensing algorithm has been activated, then the SDM will ignore the ignition state change and the sensing algorithm will remain active and continue to function, sense the crash, and command deployment of the restraints, if necessary.

Alternatively, if the ignition switch moves out of the 'run' position before a crash event has begun, and therefore before the air bag sensing algorithm has been activated, the SDM detects the vehicle is in 'off' or 'accessory' and disables the sensing algorithm, so that the SDM would not command airbag deployment. If the

switch moves out of run momentarily, the sensing algorithm will reinitialize and be available to deploy an airbag within 3 seconds.[26]

    b.    <u>GM Admissions Regarding the ISD-Defective Vehicles and Their Common Design Flaws</u>

47.    By way of the Statement of Facts attached to New GM's September 17, 2015 Deferred Prosecution Agreement with the U.S. Department of Justice, New GM has admitted the following:

    a.    "GM [] affirmatively misled consumers about the safety of GM cars afflicted by the defect."[27]

    b.    "[C]ertain employees within GM understood no later than 2001 the natural connection between a loss of electrical systems and non-deployment of airbags: if the ignition switch turned to Off or Accessory, the SDM would 'drop,' and the airbags would therefore be disabled. If a crash then ensued, neither the driver nor any passengers could have the protection of an airbag."[28]

    c.    In 2001-2002, Old-to-New GM design release engineer Ray DeGiorgio knew that the ignition switch originally installed in Recall 14V047 vehicles did not meet specification but approved the switch for use anyway.[29]

    d.    Before the defective switch in the 14V047 vehicles went into production in 2002, "certain GM engineers knew that it was prone to movement out of the Run position; testing of a prototype showed that the torque return between the Run and Accessory positions fell below GM's own internal specifications."[30]

---

[26] GM-MDL2543-004826846.
[27] SOF ¶ 2.
[28] *Id.* at ¶ 44. In addition, though not expressly delineated in the SOF, New GM has acknowledged that this statement is not simply limited to the "Defective Switch" vehicles referenced in the SOF; indeed, the SDM logic discussed in this SOF paragraph applies to more than just the group of vehicles labeled as having the "Defective Switch" in the SOF. *See, e.g.*, *supra* ¶¶ 29-30; 38-45.
[29] *See* SOF ¶¶ 19-28.
[30] *Id.* at ¶ 5.

e. "[F]rom in or about the spring of 2012 through in or about February 2014, GM failed to disclose a deadly safety defect to its U.S. regulator [NHTSA]. It also falsely represented to consumers that vehicles containing the defect posed no safety concern."[31]

f. "From approximately the spring of 2012, certain GM personnel knew that the Defective Switch presented a safety defect because it could cause airbag non-deployment associated with death and serious injury."[32]

g. "Inside GM, certain personnel responsible for shepherding safety defects through GM's internal recall process delayed [the initial 14V047] recall until GM could fully package, present, explain, and handle the deadly problem, taking affirmative steps to keep the Defective Switch matter outside the normal process."[33]

h. "The PI Investigator, the PI Senior Manager, the GM Safety Attorney, the GM Safety Director" delayed the recall "to develop the optimal remedy for the defect condition and set with precision the scope of the anticipated recall."[34]

i. "GM overshot the [federal] five-day regulatory reporting requirement for safety defects by approximately 20 months. And throughout this 20-month period, GM failed to correct its 2005 statement that the Defective Switch posed no 'safety' problem."[35]

---

[31] *Id.* at ¶ 3.
[32] *Id.* at ¶ 7.
[33] *Id.* at ¶ 9.
[34] *Id.* at ¶ 78.
[35] *Id.* at ¶ 115.

48. The same defective condition described in the Statement of Facts to the Deferred Prosecution Agreement exists in more than just the group of ISD-Defective Vehicles that have been recalled to date.[36]

49. The "corporate common" ignition switches installed in many of the ISD-Defective Vehicles shared the same essential characteristics that led to susceptibility to inadvertent rotation under the same or similar circumstances: low torque, knee-key contact, heavy key rings, and/or the vehicle experiencing an off road or other jarring event.[37]

50. As early as 2003, Old-to-New GM engineer Ray DeGiorgio and fellow Old-to-New GM engineers knew that many of the vehicles now recognized as having inadvertent ignition switch rotation issues were exhibiting unintended switch rotation – and consequential moving stalls – out in the field.[38]

51. In 2003, Old GM learned of a customer complaint regarding intermittent shut offs in a 2003 Pontiac Grand Am (a vehicle later recalled under NHTSA Recall No. 14V400) from a

---

[36] *See, e.g.*, GM-MDL2543-003122245 (explaining that when the ignition switch goes from RUN to ACC or OFF while the vehicle is in motion the airbags will not deploy and that "[t]his is common with all GM SDM designs;" Old-to-New GM airbag engineer V. Modi MDL Dep. at 23:10-24:7 (explaining how airbags in GM Vehicles only deploy when the ignition switch is in the RUN position); *id.* at 27:14-22 ("Q. Were you aware of any airbag system in any General Motors automobile that functioned differently, that is to say that would deploy the airbags when the ignition was in the accessory or off position or were all the systems functioning the same way? A. It's the same way. All the – all the systems were designed with the same philosophy. There's a caveat or additional feature that during the crash, if switch changes, then it ignores that."). *See also* Old-to-New GM engineer K. Anderson Dep. in *Melton v. GM LLC et al.*, Aug. 16, 2013, at 49:13-50:3; 51:9-13 (Old-to-New GM engineer Kathy Anderson testifying that GM designed its SDMs in such a way that they do not have the ability to deploy airbags if the ignition switch is in ACC mode); *id.* at 40:5-8 ("When a vehicle goes from run to accessory, it's my understanding that your ABS system becomes inactive"); W. Chase MDL Dep. at 77:24-78:3 (Old-to-New GM engineer William "Bill" Chase testifying that when the key moves out of RUN the vehicle loses power steering assist).

[37] *See, e.g.*, E. Mattson Tr. at 130:24-132:4 (emphasis added) (testifying that the Delta ignition switch developed for use in NHTSA Recall 14V047 vehicles was "*extremely similar*" to the Catera switch installed in 2003-07 Cadillac CTS and 2004-2006 Cadillac SRX vehicles included in Recall 14V394, as well as the Epsilon platform ignition switch installed in Recall 14V400 vehicles and others).

[38] *See, e.g.*, GM-MDL2543-300349456 at -9458-59 (Old GM engineer Rob Ezze explaining to DeGiorgio in June 2003 that this "[c]orp common switch . . . [and] those other cars you mentioned do have the same condition out in the field. Our Brand Quality Manager and others have evaluated vehicles in the field and shown them to all have the same condition possible"); GM-MDL2543-300349484 (Feb. 23, 2017 B. Thompson Dep. Ex. 15).

Michigan dealership, which could be recreated "upon driving over a speedbump at approximately 30-35 mph."[39]

52.     In connection with this, Old-to-New GM engineers recognized that there was an "ignition key turn effort issue" in GM "N car" platform vehicles.[40]

53.     Old-to-New GM engineers designated the low turn effort issue in the N car a "severity level 3," which meant that it was a "[m]oderate build concern . . . with NO CUSTOMER IMPACT."[41]

54.     At the time, Old-to-New GM engineers considered re-tooling and design changes to address the low ignition switch turn effort being seen in early model year "N cars," but these changes were ultimately rejected because "[they] were high tooling" and involved "long tool time." One Old-to-New GM engineer even stated that he had "recommended a higher spring rate from day one."[42]

55.     On May 22, 2003, Old GM issued a voicemail to dealerships describing the inadvertent switch rotation experienced by a Pontiac Grand Am customer. Old GM sent out a voicemail to GM dealerships (but *not* consumers) identifying the issue as follows:

> This information goes out to Chevrolet, Oldsmobile and Pontiac dealers and concerns the 1999 through 2003 Chevrolet Malibu, Oldsmobile Alero and Pontiac Grand Am. This voicemail provides information about a condition that may be driving no trouble found claims on customer vehicles on part replacements such as BCMs, ignition lock cylinders, ignition switches and also some PCMs, ABS modules, door lock modules, restraint control system and theft security system replacements. We were able to capture a customer's vehicle for the complaint of intermittent vehicle shuts off while driving. At times this vehicle would start up and then shut off for no apparent reason. Sometimes no codes would set and sometimes multiple codes would set. In both instances the vehicle would immediately restart. The customer had brought the vehicle in to the dealership four times. On the first three trips the condition could not be duplicated. On the fourth trip back the dealership service manager noticed the customer's excess size key ring and mass. The condition was duplicated using the customer's full key ring, which was not left at the dealership on prior visits. The actual cause of this customer's condition was that over bumps the mass and weight of the customer's key ring forces the dash mounted key lock cylinder switch out of its switch detent and allows the key to rotate back one sixteenth of an inch from the on

---

[39] Jul. 16, 2014 New GM 573 Letter to NHTSA (superseding the Jul. 3, 2014 573 letter) re: NHTSA Notification Campaign No. 14V440, GM-MDL2543-100134696, at -4697.
[40] GM-MDL2543-300349484 (Feb. 23, 2017 B. Thompson Dep. Ex. 15).
[41] *Id.*
[42] *Id.*

position towards the accessory position. This amount of key movement will shut the vehicle off and create this customer's complaint. *Also, when the vehicle is started and the key is quickly released between the ignition lock spring and weight and mass of the key chain, the key can snap back just past the on position detent and allow the engine to shut off.* Noting the size of the customer's key ring, replacing the ignition lock cylinder with another one of the same would not have corrected this issue. Additionally, when the ignition is turned off in this type of manner, depending on which module is communicating on the data line at the time, is dependent on whether or not DTC codes will set and which codes will set. The DTCs that set most consistently during this condition was usually the communication or serial data codes DTC U1040, U1088, U1255, C1298, B, as in boy, 2958 and/or B, as in boy, 2960. As we investigated this condition further we also found that it was not uncommon for customers to have a number of items attached to their key rings. In many instances, especially when the vehicle was in for service overnight, the customer usually left only the vehicle key and key fob. Large key rings with multiple items attached can also be responsible for customer complaints of the vehicle shuts off while shifting into park on column mounted ignition lock cylinders. This is caused when the customer is shifting from a drive gear upward into park and an item on the key ring hits the ignition lock cylinder key tabs on the way up and moves the switch back out of the on detent position. Please be aware that these conditions can be caused by excessive key size and mass from the customer's key ring, and attention to this detail should be paid to allow you to better and more properly diagnose the customer's complaint. I also wanted to thank Rob Maziac, the service manager at Art Moran, in Michigan, for his efforts here in assisting General Motors with this issue. And many of you others who have taken the time out of your busy schedules and assisted us in the identification on many other issues. I appreciate your time. Thanks.[43]

56. New GM is aware of at least three (3) deaths and eight (8) injuries linked to the ignition switch defect manifesting itself in the 14V400-recalled vehicles.[44]

57. New GM has admitted that there are ignition switches in vehicles subject to the 14V400 recall, including the 1997-2005 Chevrolet Malibu, 1999-2004 Oldsmobile Alero, 1999-2005 Pontiac Grand Am, and 2004-2008 Pontiac Grand Prix, that are below General Motors' own target torque specification.[45]

---

[43] GM-MDL2543-300732516 and -300732518.
[44] *See* J. Boyer death & injury chart for the ISD-recalled vehicles (sent to New GM CEO M. Barra on Jul. 15, 2014), GM-MDL2543-100130345 & -100130348.1; Jun. 26, 2014 SFADA presentation regarding the 14V400-recalled vehicles, GM-MDL2543-300772976, at -2976.
[45] *See, e.g.*, K. Turski Oct. 5, 2015 Dep. at 66:10-69:8, 49; GM-MDL2543-300773211 (acknowledging that a "root cause" of the 14V400 recall was that "[t]he ignition switch torque performance may be below target curve"); Feb. 9, 2017 B. Thompson Dep. at 108-09 (discussing how the ignition system torque for many of the 14V400-recalled vehicles measured below GM's own specifications)

58.     In 2005, after Old-to-New GM employee Laura Andres' complaint to DeGiorgio about a moving stall in an Epsilon platform vehicle (a 2006 Chevrolet Impala), which she considered to be a "serious safety problem," DeGiorgio refused to take any action, despite evidence that the stall was the result of a detent problem related to the "design of the switch" that had been seen in other vehicle platforms.[46]

59.     Ms. Andres responded via email a few days later stating:

> I think this is a serious safety problem, especially if this switch is on multiple programs. I'm thinking big recall. I was driving 45 mph when I hit the pothole and the car shut off, and I had a car driving behind me that swerved around me. I don't like to imagine a customer driving with their kids in the back seat on I-75 and hitting a pothole, in rush hour traffic. I think you should seriously consider changing this part to a switch with a stronger detent."[47]

60.     In her e-mail, which copied numerous Old-to-New GM engineers, Ms. Andres also commented: "I picked up the vehicle from repair. No repairs were done. . . . The technician said there is nothing they can do to repair it. He said it is just the design of the switch. He said other switches, like on the trucks, have a stronger detent and don't experience this."[48]

61.     No Problem Resolution Tracking System (PRTS) report was ever opened in response to Ms. Andres's concerns, rather, DeGiorgio concluded that there was no problem with the switches, and Old GM (and later on New GM) chose not to investigate into the matter any further prior to 2014.[49]

62.     From 2001 to 2014, Old GM and New GM received numerous reports from consumers regarding complaints, crashes, injuries, and deaths linked to the safety defect associated with the ISD-Defective Vehicles.[50]

---

[46] See Feb. 9, 2017 B. Thompson Rule 30(b)(6) Dep. re: NHTSA Recall 14V355 at 108:2-9; GM-MDL2543-000881742.
[47] GM-MDL2543-000881742.
[48] Id.
[49] See Feb. 9, 2017 B. Thompson Rule 30(b)(6) Dep. re: NHTSA Recall 14V355 at 105-06, 123; Dec. 3, 2015 L. Andres Dep. at 123-24.
[50] See, e.g., GM-MDL2543-00011834-35; GM-MDL2543-103483847-48 (July 2009 complaint about intermittent stalling in 2007 Impala; GM TAC advised dealer to remove extra keys from ring); GM-MDL2543-103518149-51 (August 2007 complaint about stalling in 2006 Impala; GM TAC advised dealer to remove excess keys from ring); GM-

63.     New GM determined that the ignition switch defect in the ISD-Defective Vehicles later subject to NHTSA Recall No. 14V355 resulted in nine (9) crashes, one (1) fatality, and seven (7) injuries; in addition, 23 vehicles in the TREAD inventory "were concluded to have unintended key rotation," while "666 additional vehicles were determined potentially relevant to the condition."[51]

64.     Likewise, New GM has admitted that the ISD manifested in at least fifty-four (54) crashes involving vehicles subject to the 14V047 recall in which death or serious injury occurred as a result.[52]

65.     While New GM has never publicly acknowledged (via recall or otherwise) that the ISD has the potential to manifest in the 2004-05 Malibu LS, Old GM was aware of such incidents occurring in that particular make and model year vehicle well before Plaintiff's May 2007 crash.  For example:

- July 14, 2004:[53] 2004 Chevrolet Malibu (NHTSA ID No. 10081953):
  - VEHICLE EXPERIENCED AN ONGOING PROBLEM WITH STALLING WHILE DRIVING. THIS OCCURRED TWICE A WEEK. VEHICLE HAD BEEN TO THE DEALER ON TWO SEPARATE OCCASIONS, AND DEALER REPLACED THE IGNITION SWITCH, BUT PROBLEM RECURRED. VEHICLE WAS TAKEN A SECOND TIME TO DEALER, WHO WAS UNABLE TO DUPLICATE THE PROBLEM. *AK[54]

- August 16, 2004: 2004 Chevrolet Malibu (NHTSA ID No. 10087966):
  - WHILE DRIVING, THE VEHICLE CUT OFF. THE DEALER COULD NOT FIND ANY DEFECTS. *JB

- August 23, 2004: 2004 Chevrolet Malibu (NHTSA ID No. 10089418):

---

MDL2543-103515612-13 (July 2005 complaint about intermittent stalling in 2002 DeVille; GM TAC advised dealer to "suspect the ignition switch per past cases"); Mar. 16, 2017 J. Reiss Dep. at 212-21.

[51] GM-MDL2543-100176340, 100176342-34 (Jun. 13, 2014 SFADA Presentation, slides 1, 3-5) (Feb. 9, 2017 B. Thompson Dep. Ex. 5); Feb. 9, 2017 B. Thompson Dep. Ex. 3, Tab 2 (final version dated June 15, 2014); *see also* Feb. 9, 2017 B. Thompson Dep. at 160-62, 169 (Thompson discussing this data); GM-MDL2543-301554330-76, at 301554331 (presenting similar data).

[52] *See* GM-MDL2543-400240098, New GM's Apr. 25, 2014 Supplemental, Restated and Consolidated Response to NHTSA's March 4, 2014 Special Order.

[53] In the following customer complaints, the date listed is the date upon which Old GM or New GM received notice of the complaint.

[54] GM-MDL2543-401910595.

- WHILE TRAVELING AT ANY SPEED VEHICLE STALL[S]. . . CONSUMER HAD SEVERAL CLOSE CALLS OF BEING REAR ENDED. VEHICLE WAS SERVICED SEVERAL TIMES, BUT PROBLEM RECURRED. *AK

- May 31, 2005: 2004 Chevrolet Malibu (NHTSA ID No. 10123684):
  - THE CAR CUT OFF WHILE I WAS DRIVING AND IN HEAVY TRAFFIC MORE THAN ONCE. THERE WAS NO WARNING THAT THIS WOULD HAPPEN. THE CAR WAS SERVICED BEFORE FOR THIS PROBLEM BUT IT CONTINUED TO HAPPEN. I HAVE HAD 3 RECALLS, THE HORN FUSE HAS BEEN REPLACED TWICE, AND THE BLINKER IS CURRENTLY OUT. THE STEERING [COLUMN] HAS ALSO BEEN REPLACED. THIS CAR WAS SUPPOSED TO BE A NEW CAR.[55]

- February 7, 2005: 2004 Chevrolet Malibu (NHTSA ID No. 10107076):
  - WHILE DRIVING VEHICLE WILL JUST STALL. . . . CONSUMER HAS TAKEN THE VEHICLE IN SEVERAL TIMES. DEALER HAD THE VEHICLE ELEVEN DAYS, AND THEY COULD NOT FIND ANYTHING WRONG WITH IT. *AK *JB.
- January 2, 2009: 2006 Pontiac G6 (NHTSA ODI No. 10253610): TL*THE CONTACT OWNS A 2006 PONTIAC G6. WHILE DRIVING APPROXIMATELY 70 MPH ON NORMAL ROAD CONDITIONS AND PROCEEDING TO TURN LEFT, THERE WAS AN UNEXPECTED LOSS OF POWER STEERING AND THE ENGINE STALLED. THE ENGINE RESTARTED AND THE POWER STEERING RETURNED. THE ENGINE STALLED INTERMITTENTLY ON TEN SEPARATE OCCASIONS. THE VEHICLE WAS TAKEN TO AN AUTHORIZED DEALER, BUT THEY COULD NOT DUPLICATE THE FAILURE. THE VEHICLE HAS NOT BEEN REPAIRED. THE VIN WAS UNKNOWN. THE FAILURE MILEAGE WAS 43,000 AND CURRENT MILEAGE WAS 64,000. MINNEAPOLIS MN Failure Date: 09/09/2008.[56]

- 2007 Pontiac G6, Better Business Bureau (BBB) Case No. PGM0939213:[57]
  - Apr. 16, 2008: "**Cust sts**: Intermittent engine stall while driving—Hot or cold—while driving at approximately 30 MPH. Customer concern not duplicated. Road tested for approximately 60 miles. Could not duplicate customer concern. . . ."
  - May 8, 2008: "**Cust sts:** Check for intermittent stalling—driving at 30 MPH, hot or cold, 2 days after filling tank. . ."
  - Jun. 8, 2009: "**Cust sts:** Car stalls when driving. . . ."

66.     Even after Plaintiff's crash, Old GM and New GM continued to become aware of moving stalls attributable to inadvertent switch rotation in the Subject Vehicle and similar ISD-Defective Vehicles.  For example:

[55] GM-MDL2543-300675234, at -5259.
[56] GM-MDL2543-007207880, at row 10962.
[57] GM-MDL2543-401592371, at -2371-72.

- May 26, 2011: 2004 Chevrolet Malibu (NHTSA ID No. 10461103):
  - SINCE PURCHASING THE VEHICLE (USED), THERE HAVE BEEN MORE THAN 12 INSTANCES WHERE THE CAR CUTS OUT WHILE DRIVING. THIS HAS OCCURRED AT SPEEDS AS HIGH AS 55 MPH. THERE IS A TOTAL LOSS OF POWER AND THE CAR MUST BE BROUGHT TO A ROLLING STOP OUTSIDE OF THE TRAFFIC FLOW. ALSO, THERE HAVE BEEN WEEKLY INSTANCES OF THE CAR FAILING TO START. THIS HAS SINCE INCREASED TO DAILY. THE KEY WILL ONLY START THE IGNITION WHEN THE DASH LIGHTS (BATTERY, OIL, ETC) ARE ON, AND THEY ARE ON AND OFF COMPLETELY AT RANDOM. SOMETIMES I HAVE TO WAIT UP TO 10 MINUTES WITH THE KEY PARTIALLY TURNED BEFORE THE LIGHTS COME ON AND I CAN TURN IT THE REST OF THE WAY AND START THE CAR. THE OTHER ELECTRICAL ISSUE THAT HAS HAPPENED IS THAT THE BLOWER FAN HAS GONE ON AND OFF AND THE POWER WINDOWS HAVE GONE ON AND OFF. *JS[58]

- September 14, 2011: 2006 Pontiac G6 (NHTSA ODI No. 10425391):
  - TL* THE CONTACT OWNS A 2006 PONTIAC G6 GT. THE CONTACT STATED THAT WHILE DRIVING 5 MPH AND ABOVE, THE VEHICLE WOULD STALL WITHOUT WARNING. THE VEHICLE WAS TAKEN TO AN INDEPENDENT MECHANIC WHERE THEY ADVISED HIM THAT THE AIR BAG SENSOR NEEDED TO BE REPLACED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS CONTACTED AND THEY OFFERED NO ASSISTANCE. . . . THE FAILURE MILEAGE WAS APPROXIMATELY 41,000.[59]

- August 1, 2012: 2005 Pontiac G6 (NHTSA ID No. 10607095):
  - TL* THE CONTACT OWNS A 2005 PONTIAC G6. THE CONTACT STATED THAT WHILE DRIVING APPROXIMATELY 25 MPH, THE VEHICLE STALLED WITHOUT WARNING. THE VEHICLE WAS TAKEN TO THE DEALER WHO WAS UNABLE TO DUPLICATE THE FAILURE. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 130,000.

67.     Moreover, both Old GM and Defendant New GM were aware of many instances of ISD-induced airbag non-deployment in vehicles equipped with the SDM-Epsilon, in crashes where the airbag *should have* deployed but did not.

68.     Indeed, "the deadly effects of the Defective Switch on airbag non-deployment began manifesting themselves early on, in crashes about which GM was made aware contemporaneously.

---

[58] GM-MDL2543-304818347, at sheet 1 row 2841.
[59] GM-MDL2543-300766757, at row 267.

. . . The Cobalt SDM data . . . reflected a number of non-deployments accompanied by a power mode status recording of Accessory or Off."[60]

69.    "In October 2006, two more teenagers died, also in a 2005 Cobalt, in Wisconsin.  The airbags in the vehicle failed to deploy when they should have, and the police officer who examined the crashed vehicle noted in a February 2007 report on the incident that the ignition switch 'appeared to have been in the accessory position . . . preventing the airbags from deploying.'"[61]

70.    "In September 2008, another crash, this one involving a 2006 Cobalt, killed two people. The airbags failed to deploy when they should have. GM sent the crashed car's SDM to the Company's SDM supplier for examination. In May 2009, the SDM supplier reported that the power mode status was at one point during the crash recorded as Off, and that this was one of two possible explanations for the failure of the airbags to deploy."[62]

71.    Both Old GM and Defendant New GM recognized that the defect was not limited to simply a low torque issue.[63] Old-to-New GM employees,[64] while in their employment capacity at both Old GM and New GM, were aware of safer alternative designs, but chose not to employ them due to cost and to avoid disclosure of the defective ignition switch and its tragic consequences.  And while Defendant New GM has recalled millions of vehicles for defective ignition switches, it knew – and its own engineering documents reflect – that the defect transcends the low torque switch that was originally installed in vehicles subject to ignition switch defect-related NHTSA recalls.  Thus, Defendant New GM's recall of the Defective Vehicles has been, to date, incomplete and inadequate, and it underscores Defendant New GM's ongoing fraudulent concealment and misrepresentation of

---

[60] SOF at ¶¶ 45-47.
[61] *Id.* at ¶ 49.
[62] *Id.* at ¶ 51.
[63] In fact, New GM has *now* asserted that torque measurements merely "flavor[] a discussion" on the Ignition Switch Defect but are not determinative of the existence of a defect. *See* Apr. 6, 2018, J. Fedullo Dep. at 110:5-114:7.
[64] As used herein, the term "Old-to-New GM employees" refers to employees who were employed by Old GM and continued in their same employment capacity (i.e., performed the same job-related tasks, held the same responsibilities, and/or continued their employment in general) as employees at New GM.

the nature and extent of the defects. Defendant New GM has long known of and understood the ignition switch defect and failed to fully remedy the problems associated with this defect.

72.     Plaintiff's 2004 Chevrolet Malibu LS contained the defective ignition switch system and airbag system described in this Amended Complaint. The ignition switch defect precludes drivers and occupants of the ISD-Defective Vehicles, such as this Plaintiff, from proper and safe use of their vehicles, reduces vehicle occupant protection, and endangers Subject Vehicle occupants as well as those in vehicles around them. Further, because Old GM (and Defendant New GM after it) concealed the existence of the ignition switch defect as defined herein, no driver or owner of the ISD-Defective Vehicles, including Plaintiff, knew, or could reasonably have discovered, the ignition switch defect prior to the Subject Incident.

   c.   *New GM Finally Issues Recalls Related to Ignition Switch Defects – But Does NOT Recall Plaintiff's Vehicle*

73.     On February 7, 2014, New GM, in a letter from Carmen Benavides, Director of Product Investigations and Safety Regulations for New GM, notified the NHTSA that it was conducting what it internally referred to as New GM Recall No. 13454 for certain 2005-2007 model year Chevrolet Cobalts and 2007 model year Pontiac G5 vehicles. In its February 7, 2014, letter to NHTSA, New GM represented that as replacement ignition switches became available, GM would replace the ignition switches on *those* Defective Vehicles.[65]

74.     New GM Recall No. 13454 was given NHTSA Recall Campaign No. 14V-047. The 14V-047 recall notice reported that the ignition switch "may turn off" in certain GM-brand vehicles, and that "[t]his defect can affect the safe operation of the airbag system." New GM advised that until the defect was repaired, "customers should remove all items from their key rings, leaving only the

---

[65] For the later-recalled ISD-Defective Vehicles, New GM only provided a key insert as the recall repair, and did not replace the defective ignition switches themselves. And, obviously, for certain GM-brand vehicles with the same defective single-point-of-failure design (including the Subject Vehicle), neither Old GM nor New GM ever provided *any* retroactive fix whatsoever.

ignition key. The key fob (if applicable) should also be removed from the key ring." The 14V-047 recall campaign initially involved 619,122 model year 2005-07 Chevrolet Cobalt and 2007 Pontiac G5 vehicles. New GM later increased the recall to include an additional 748,024 model year 2006-07 Chevrolet HHR and Pontiac Solstice vehicles and 2003-2007 Saturn Ion vehicles and 2007 Saturn Sky vehicles. Approximately a month later, New GM again expanded the recall to include 2008-2010 Chevrolet Cobalt, Saturn Sky, and Pontiac G5 and Solstice, as well as 2008-2011 Chevrolet HHR vehicles.

75.     On February 19, 2014, a request for timeliness query of New GM's Safety Recall 13454 was sent to NHTSA. The timeliness query pointed out that New GM had failed to recall all of the vehicles with the defective ignition switches. The February 19, 2014 request for timeliness query also asked NHTSA to investigate New GM's failure to fulfill its legal obligation to report the safety-related defects in the ISD-Defective Vehicles to NHTSA within five days of discovering the defect.

76.     On February 24, 2014, New GM in a letter from Carmen Benavides, informed NHTSA it was expanding the 14V-047 recall to include the 2006-2007 model year ("MY") Chevrolet HHR and Pontiac Solstice, 2003-2007 MY Saturn Ion, and 2007 MY Saturn Sky vehicles. New GM included a defect chronology as an attachment to the February 24, 2014 letter. In the chronology, New GM **for the first time** admitted that Old GM previously authorized a change in the ignition switch. Specifically, New GM stated:

> On April 26, 2006, the GM design engineer responsible for the Cobalt's ignition switch signed a document approving changes to the ignition switch proposed by the supplier, Delphi Mechatronics. The approved changes included, among other things, the use of a new detent plunger and spring that increased torque force in the ignition switch. This change to the ignition switch was not reflected in a corresponding change in the part number for the ignition switch. GM believes that the supplier began providing the re-designed ignition switch to GM at some point during the 2007 model year.[66]

---

[66] GM-MDL2543-002443075 at -3076.

77.     New GM then produced documents in response to Congressional requests leading up to the hearings on April 1 and 2, 2014.  Among the documents produced by New GM is a document titled, "GENERAL MOTORS COMMODITY VALIDATION SIGN-OFF," dated April 26, 2006. According to this document, Delphi had met all of the sign-off requirements in order to produce a new ignition switch for certain Old GM vehicles. New GM has acknowledged that the ignition switch in the Cobalt was included in this design change.  Much like the aforementioned Engineering Work Orders relating to the 14V400-recalled vehicles, the design change included a new detent plunger "to increase torque force in the switch."  Old-to-New GM engineer Ray DeGiorgio's signature is on this page as the Old GM authorized engineer who signed off on this change to the ignition switch. This Old GM Commodity Validation Sign-Off shows that DeGiorgio repeatedly perjured himself during his deposition on April 29, 2013.  DeGiorgio perjured himself in order to fraudulently conceal evidence from Plaintiff that Old GM had signed off on the change in the ignition switch so that the Plaintiff, and ultimately a jury, would never know that Old GM was changing the switches in 2007 and later model year ISD-afflicted vehicles and concealing these changes.

78.     Notably, though, DeGiorgio had done the *exact same thing* with respect to the ignition switches in the vehicle group subject to the 14V400 recall. In July 2003, DeGiorgio approved a running change to increase the detent plunger force on the ignition switch installed in the Chevrolet Malibu, Pontiac Grand Am, and the Oldsmobile Alero beginning in model year 2004, without recalling or fixing the prior model years.[67] In March 2004, DeGiorgio approved an increase to the detent plunger force on an additional model vehicle subject to NHTSA Recall 14V400 (the Pontiac Grand Prix) without changing the part number and without taking measures to ensure that the old switch would not be used to service vehicles subject to NHTSA Recall 14V400.[68]   Thereafter,

---

[67] *See* GM-MDL2543-300232728.
[68] *See* GM-MDL2543-300301398.

DeGiorgio continued in his same employment role at New GM, and carried the aforementioned knowledge with him into said capacity at New GM.

79.    By spring 2014, the Ignition Switch Defect recall expansions began in full force. First, in June 2014, New GM recalled the 2010-2014 Chevrolet Camaro vehicles as part of NHTSA Safety Recall Campaign Number 14V346.  According to New GM, in those vehicles, the ignition switch was defective such that the driver may accidentally hit the switch with his/her knee, unintentionally knocking the key out of the run position, turning off the engine.  If the key is not in the run position, as amply described above, the airbags may not deploy in a crash, increasing the risk of injury, and it could cause engine power, power steering, and power braking loss, increasing the risk of a crash. This knee-key rotation risk was equally present in the previously recalled ISD vehicles.[69]

80.    Later in June 2014, New GM recalled another 3.1 million vehicles as part of NHTSA Campaign Number 14V355 for inadvertent switch rotation defects that may cause the ignition switch to turn off.  The 2005-2009 Buick LaCrosse, 2006-2011 Buick Lucerne, 2000-2005 Cadillac DeVille, 2006-2011 Cadillac DTS, 2006-2014 Chevrolet Impala, and 2006-2007 Chevrolet Monte Carlo vehicles were included.  "In the affected vehicles, the weight on the key ring and road conditions or some other jarring event may cause the ignition switch to move out of the run position, turning off the engine."  If the key is not in the run position, as amply described above, the airbags may not deploy in a crash, increasing the risk of injury, and it could cause engine power, power steering, and

---

[69] *See, e.g.*, Valukas Report at 57 n. 219 (emphasis added) ("GM employees were also having problems with their own MY 2004 Ions. A January 9, 2004 Report received from GM employee Gerald A. Young stated, 'The ignition switch is too low.  *All other keys and the key fob hit on the driver's right knee*. The switch should be raised at least one inch toward the wiper stalk,' characterizing it as 'a basic design flaw that should be corrected if we want repeat sales.'  In a February 19, 2004 Report, GM employee Onassis Matthews stated: "The location of the ignition key was in the general location where my knee would rest (I am 6'3" tall, not many places to put my knee).  On several occasions, I inadvertently turn [sic] the ignition key off with my knee while driving down the road.  For a tall person, the location of the ignition key should be moved to a place that will not be inadvertently switched to the off position.'  Finally, in an April 15, 2004 Report, GM employee Raymond P. Smith reported experiencing a one-time inadvertent shut-off: 'I thought that my knee had inadvertently turned the key to the off position.'").

power braking loss, increasing the risk of a crash. This exact sort of rotation risk was present in the vehicles that were previously recalled for the ISD.[70]

81.     In July 2014, New GM recalled another 6.7 million vehicles as part of NHTSA Campaign Number 14V400 for inadvertent switch rotation defects.  The 2000-2005 Chevrolet Impala and Monte Carlo, 1997-2003 Chevrolet Malibu, 2004-2005 Malibu Classic, 1999-2004 Oldsmobile Alero, 1998-2002 Oldsmobile Intrigue, 1999-2005 Pontiac Grand Am, and 2004-2008 Pontiac Grand Prix vehicles were included.  Again, the same defect language appeared in the recall notice: "If the key ring is carrying added weight and the vehicle goes off road or experiences some other jarring event, it may unintentionally move the key away from the 'run' position. If this occurs, engine power, power steering and power braking may be affected, increasing the risk of a crash. The timing of the key movement out of the 'run' position. . . may result in the airbags not deploying."[71] If the key is not in the run position, as amply described above, the airbags may not deploy in a crash, increasing the risk of injury, and it could cause engine power, power steering, and power braking loss, increasing the risk of a crash.

82.     Also in July 2014, New GM recalled certain vehicles as part of NHTSA Campaign Number 14V394 for inadvertent switch rotation defects. The 2003-2014 Cadillac CTS vehicles manufactured August 16, 2001 to April 28, 2014, and 2004-2006 Cadillac SRX vehicles manufactured March 20, 2003 to August 11, 2006 were included.  Once again, New GM described the defect as follows: "If the key ring is carrying added weight and the vehicle goes off road or experiences some other jarring event, or if the driver unintentionally bumps the key ring or items attached to the key ring with their knee, he key may unintentionally move away from the 'run'

---

[70] *See, e.g.*, Feb. 7, 2014, GM 573 Ltr. to NHTSA re: Recall No. 14V047, GM-MDL2543-000959894 (emphasis added) ("If the torque performance is not to specification, ***and the key ring is carrying added weight or the vehicle goes off road or experiences some other jarring event***, the ignition switch may inadvertently be moved out of the 'run' position to the 'accessory' or 'off' position.").
[71] Jul. 3, 2014, GM 573 Ltr. to NHTSA re: Recall No. 14V400, GM-MDL2543-100687234.

position.  If this occurs, engine power, power steering and power braking may be affected, increasing the risk of a crash. The timing of the key movement out of the 'run' position . . . may result in the airbags not deploying."[72]

83.    In September 2014, New GM recalled certain vehicles as part of NHTSA Campaign Number 14V540.  The 2011-2013 Chevrolet Caprice vehicles manufactured from October 15, 2010 to December 6, 2013 and 2008-2009 Pontiac G8 vehicles manufactured July 25, 2007, to February 18, 2009 were included.  New GM characterized this ISD recall as being of the knee-key variety, which of course Old and New GM had seen and known about for more than a decade:[73] "General Motors has decided that a defect which relates to motor vehicle safety exists in 2011-2013 model year (MY) Chevrolet Caprice and 2008-2009 Pontiac G8 vehicles.  There is a risk, under certain conditions, that some drivers may bump the ignition key with their knee and unintentionally move the key away from the 'run' position. . . . If this occurs, engine power, and power braking will be affected and power steering may be affected, increasing the risk of a crash.  The timing of the key movement out of the 'run' position. . . may result in the airbags not deploying."[74]

84.    Indeed, despite knowing about this design defect for years, neither Old GM nor New GM issued any recall until 2014, and even then New GM only included *some* groups of ISD-Defective Vehicles.

85.    New GM has tried to characterize the later-recalled ISD vehicles as having a different defect than the vehicles included in the Delta Ignition Switch recall (14V-047), even though these recalls are aimed at addressing the same defects and safety risks as those that gave rise to the other ignition switch defect recalls.

---

[72] Jul. 2, 2014, GM 573 Ltr. to NHTSA re: Recall No. 14V394, GM-MDL2543-100270485.
[73] *See supra* n. 69 and corresponding text.
[74] Sept. 4, 2014, GM Part 573 Submission to NHTSA re: Recall No. 14V540, GM-MDL2543-301700168.

86. New GM has attempted to portray the later-recalled ISD-Defective vehicles as being different from the originally-recalled ISD-Defective Vehicles in order to deflect attention from the severity and pervasiveness of the ISD, to try to provide a story and plausible explanation for why it did not recall these millions of other vehicles much earlier, and to avoid providing new, stronger ignition switches as a remedy. Instead, its recall repair for the later-recalled ISD-Defective vehicles is a key insert changing the keyhead opening from a slot to a hole, something that Old GM had considered doing on the Delta Ignition Switch vehicles back in 2005; however, this design change – which would have cost approximately 50 cents per vehicle – was rejected by Old-to-New GM engineers like Lori Queen and Ray DeGiorgio due to cost considerations.

87. From its inception, New GM had full knowledge of the defects with the ignition switch and airbag system, and Old GM's failure to disclose those defects to NHTSA and the public. Had Old GM acted as soon as it acquired knowledge of the ignition switch defect, Plaintiff would likely not have been involved in an accident on May 10, 2007.

88. Rather than promptly recalling the Defective Vehicles, however, New GM fraudulently concealed the existence of the safety defects in the Subject Vehicles. Moreover, New GM continued to manufacture vehicles with the ignition switch defect after the bankruptcy sale. Indeed, hundreds of thousands of the vehicles manufactured by New GM have since been recalled due to the ignition switch defect.

89. Old and New GM engineers identified several ways to attempt to fix the ignition switch problem over the years. Unsurprisingly, these solutions echoed solutions that Old GM engineers had proposed years before the bankruptcy sale – solutions of which Old-to-New GM engineers such as Ray DeGiorgio, Alberto Manzor, David Trush, and Lori Queen were well aware – but had decided not to implement because of cost concerns. For example, New GM engineers proposed adding a shroud to prevent a driver's knee from contacting the key, modifying the key and

lock cylinder to orient the key in an upward facing orientation when in the "run" position, and adding a push button to the lock cylinder to prevent it from slipping out of run. New GM ultimately rejected each of these ideas.

90. New GM's years long internal "investigation" into the Defective Vehicles—as well as all of the Old GM documents that were included in the "Purchased Assets" from the bankruptcy sale—provided New GM with actual knowledge of the full breadth of the ignition switch defect, something which Old GM engineers had clearly grasped long ago.[75] Notwithstanding these facts, Old GM and New GM continued to fraudulently conceal the nature and extent of the defects from the public, inducing customers to purchase Defective Vehicles with no knowledge of the existence of these serious and uniform defects, and no provision to avoid the safety risks of operating the Defective Vehicles.

91. Moreover, as noted above, throughout the entirety of its corporate existence, New GM received numerous and repeated complaints of moving engine stalls and/or power failures in the ISD-Defective Vehicles. These complaints are yet more evidence that New GM was fully aware of the ignition switch defect and should have timely announced a recall much sooner than it did.

92. New GM was aware of these problems year after year and nationwide, as reflected not only by the internal documents reflecting knowledge and cover-up at high levels, but also in hundreds of customer complaints recorded in Old GM's and New GM's internal complaint logs and documents. New GM received and reviewed complaints of safety issues from customers with ISD-Defective Vehicles in nearly every state nationwide. Documents produced by New GM show that

---

[75] *See, e.g.*, GM-MDL2543-003122245 (explaining that when the ignition switch goes from RUN to ACC or OFF while the vehicle is in motion the airbags will not deploy and that "[t]his is common with all GM SDM designs;" Old-to-New GM airbag engineer V. Modi MDL Dep. at 23:10-24:7 (explaining how airbags in GM Vehicles only deploy when the ignition switch is in the RUN position); *id.* at 27:14-22 ("Q. Were you aware of any airbag system in any General Motors automobile that functioned differently, that is to say that would deploy the airbags when the ignition was in the accessory or off position or were all the systems functioning the same way? A. It's the same way. All the – all the systems were designed with the same philosophy. There's a caveat or additional feature that during the crash, if switch changes, then it ignores that.").

New GM was aware of customer complaints of stalling in ISD-Defective Vehicles in many of these states and ultimately did nothing about them. These complaints, of course, are in addition to the multiple non-deploy incidents of which Old GM and New GM became aware and even investigated from at least 2005 to the present.

> d.    *Old GM Violated Duties to Plaintiff, and New GM is Liable for Said Violations*

93.    An automaker should never place profits above safety and should never conceal from consumers or the public any defects that exist in its vehicles. New GM's Vehicle Safety Chief, Jeff Boyer, recently proclaimed that "Nothing is more important than the safety of our customers in the vehicles they drive." *GM Announces New Vehicle Safety Chief*, *available at* http://democrats.energycommerce.house.gov/sites/default/files/documents/Testimony-Barra-GM-Ignition-Switch-Recall-2014-4-1.pdf.

94.    Indeed, the first priority of a car manufacturer should be to ensure that its vehicles are safe and, in particular, have safe, operable ignition systems, airbags, power-steering, power brakes, and other safety features that can prevent or minimize the threat of death or serious bodily harm in a collision. In addition, a car manufacturer must take all reasonable steps to ensure that once a vehicle is running, it operates safely, and its critical safety systems (such as engine control, braking, steering, and airbag systems) work properly until such time as the driver shuts down the vehicle. Moreover, a manufacturer that is aware of a dangerous design defect that causes its vehicle to shut down during operation, its power steering to revert to manual steering, its airbags not to deploy, or other potentially catastrophic system failure, must promptly disclose and remedy such defects.

95.    An automobile manufacturer is under a duty to use reasonable care in the design of a vehicle to avoid subjecting the user to unreasonable risk of injury in the event of a collision.

96.    Old GM had ongoing obligations under the Safety Act.

97.     The Safety Act and related regulations require the quarterly submission to NHTSA of "early warning reporting" data, including incidents involving death or injury, claims relating to property damage received by the manufacturer, warranty claims paid by the manufacturer, consumer complaints, and field reports prepared by the manufacturer's employees or representatives concerning failure, malfunction, lack of durability, or other performance issues. 49 U.S.C. § 30166(m)(3); 49 C.F.R. § 579.21. Manufacturers must retain for five years all underlying records on which the early warning reports are based and all records containing information on malfunctions that may be related to motor vehicle safety. 49 C.F.R. §§ 576.5 to 576.6.

98.     The Safety Act further requires immediate action when a manufacturer determines or should determine that a safety defect exists. *United States v. General Motors Corp.*, 574 F. Supp. 1047, 1050 (D.D.C. 1983). A safety defect is defined by regulation to include any defect that creates an "unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle" or "unreasonable risk of death or injury in an accident." 49 U.S.C. § 30102(a)(8). Within five days of learning about a safety defect, a manufacturer must notify NHTSA and provide a description of the vehicles potentially containing the defect, including "make, line, model year, [and] the inclusive dates (month and year) of manufacture," a description of how these vehicles differ from similar vehicles not included in the recall, and "a summary of all warranty claims, field or service reports, and other information" that formed the basis of the determination that the defect was safety related. 49 U.S.C. § 30118(c); 49 C.F.R. § 573.6(b)-(c). Then, "within a reasonable time" after deciding that a safety issue exists, the manufacturer must notify the owners of the defective vehicles. 49 C.F.R. §§ 577.5(a), 577.7(a). Violating these notification requirements can result in a maximum civil penalty of $15,000,000. 49 U.S.C. § 30165(a)(1).

99.     On July 9, 2009, the United States Bankruptcy Court approved the sale of substantially all of Old GM's assets to New GM, which retained the vast majority of Old GM's senior

and management level executives and engineers who knew that Old GM had manufactured and sold millions of vehicles afflicted with an ignition switch defect. Those employees' knowledge regarding the ignition switch defect is imputed to New GM, whenever obtained.

100. "At the time of the Sale, Old GM was issued 10 percent of New GM's common stock, and six of New GM's thirteen directors were previously directors of Old GM."[76]

101. On or around the day of its formation as an entity, New GM acquired, *inter alia*, the knowledge of the contents of Old GM's "files" and company "documents." To that end, New GM independently had knowledge of the safety-related defects contained in Old GM's files, including numerous engineering reports, investigative reports, failure analyses, technical service bulletins, and other documentation concerning the defective ignition switch and airbag systems described herein.

102. Defendant New GM also had ongoing obligations under the Safety Act to monitor both Old GM and New GM vehicles on the road, to make quarterly reports to NHTSA, and to maintain all relevant records for five years. Defendant New GM explicitly accepted Safety Act responsibilities for Old GM vehicles in § 6.15 of the Sale Agreement through which it acquired substantially all of Old GM's assets.

103. Old GM and Defendant New GM used several processes to identify safety issues, including the Transportation Recall Enhancement, Accountability and Documentation ("TREAD") database and Problem Resolution Tracking System ("PRTS"). The TREAD database, used to store the data required for the quarterly NHTSA early warning reports, was the principal database used by Old and New GM to track incidents related to Old and New GM vehicles. The database included information from (i) customer service requests; (ii) repair orders from dealers; (iii) internal and external surveys; (iv) field reports from employees who bought Old and New GM vehicles and from Captured Test Fleet reports; (v) complaints from the OnStar call center; and (vi) a database

---

[76] *See In re Gen. Motors LLC Ignition Switch Litig.*, 14-MC-2543 (JMF), 2017 WL 6509256, at *5–6 (S.D.N.Y. Dec. 19, 2017), on reconsideration in part, 14-MC-2543 (JMF), 2018 WL 1989572 (S.D.N.Y. Apr. 25, 2018).

maintained by Old and New GM legal staff to track data concerning complaints filed in court. A TREAD reporting team would conduct monthly database searches and prepare scatter graphs to identify spikes in the number of accidents or complaints related to various Old and New GM vehicles. The PRTS is a database that tracks engineering problems identified in testing, manufacturing, through warranty data, and through customer feedback. The PRTS process involves five steps: identification of the issue; identification of the root cause; identification of a solution; implementation of the solution; and feedback.

104. The same employees carried out the TREAD Act obligations at Old GM and Defendant New GM, thus they not only retained the knowledge they acquired at Old GM—they were in fact required to do so. This further supports the propriety of imputing the knowledge of Old GM employees to New GM, even where that knowledge stems in part from their performance of the same or similar roles at Old GM.

105. In setting forth the knowledge and conduct of Old GM in connection with the ignition switch and other defects set forth herein, Plaintiff alleges that New GM is liable for the actions of Old GM under theories of successor liability under Alabama law, and under *In Matter of Motors Liquidation Co.*, 829 F.3d 135 (2d Cir. 2016), *cert. denied sub nom. Gen. Motors LLC v. Elliott*, 137 S.Ct. 1813, 197 L.Ed.2d 758 (2017). In addition, the knowledge and conduct of Old GM is generally important and relevant because it is imputed to Defendant New GM under governing principles of agency law.

106. From the day of its formation as a corporate entity, through the knowledge of Old GM employees familiar with this information who continued on at New GM after the bankruptcy sale and Old GM documents retained in New GM's files, New GM acquired notice and full knowledge of the ignition switch defect in Old GM vehicles.

107. New GM acquired knowledge of the defects in the Defective Vehicles on or shortly after July 11, 2009, when the Bankruptcy Sale was finalized. On that date, it acquired knowledge of the following facts through the knowledge of personnel who transferred from Old GM as well as through databases and documents that transferred to New GM, as discussed above:

a. New GM knew that, in January of 2003, Old GM opened an internal investigation after it received complaints from a Michigan GM dealership that a customer had experienced a power failure while operating his model year 2003 Pontiac Grand Am.

b. New GM knew that, during the investigation, Old GM's Brand Quality Manager for the Grand Am visited the dealership and requested that the affected customer demonstrate the problem. The customer was able to recreate the shutdown event by driving over a speed bump at approximately 30-35 mph.

c. New GM knew that the customer's key ring was allegedly quite heavy. It contained approximately 50 keys and a set of brass knuckles.

d. New GM knew that in May 2003, Old GM issued a voicemail to dealerships describing the defective ignition condition experienced by the customer in the Grand Am. Old GM identified the relevant population of the Affected Vehicles as the 1999-2003 Chevrolet Malibu, Oldsmobile Alero, and Pontiac Grand Am.

e. New GM knew that Old GM did not recall these vehicles. Nor did it provide owners and/or lessees with notice of the defective condition. Instead, its voicemail directed dealerships to pay attention to the key size and mass of the customer's key ring.

f. New GM knew that, on July 24, 2003, Old GM issued an engineering work order to increase the detent plunger force on the ignition switch for the 1999-2003 Chevrolet Malibu, Oldsmobile Alero, and Pontiac Grand Am vehicles. Old GM engineers allegedly increased the detent plunger force and changed the part number of the

ignition switch. The new parts were installed beginning in the model year 2004 Malibu, Alero, and Grand Am vehicles.

g. New GM knew that Old GM issued a separate engineering work order in March 2004 to increase the detent plunger force on the ignition switch in the Pontiac Grand Prix. Old GM engineers did not change the part number for the new Pontiac Grand Prix ignition switch.

h. New GM knew that Old-to-New GM design engineer Ray DeGiorgio signed the work order in March 2004 authorizing the part change for the Grand Prix ignition switch. Ray DeGiorgio maintained his position as design engineer with New GM.

i. New GM knew that, on or around August 25, 2005, Laura Andres, an Old GM design engineer (who remains employed with New GM), sent an email describing ignition switch issues that she experienced while operating a 2006 Chevrolet Impala on the highway. Ms. Andres' email stated, "While driving home from work on my usual route, I was driving about 45 mph, where the road changes from paved to gravel & then back to paved, some of the gravel had worn away, and the pavement acted as a speed bump when I went over it. The car shut off. I took the car in for repairs. The technician thinks it might be the ignition detent, because in a road test in the parking lot it also shut off."

j. New GM knew that Old GM employee Larry S. Dickinson, Jr. forwarded Ms. Andres' email on August 25, 2005 to four Old GM employees. Mr. Dickinson asked, "Is this a condition we would expect to occur under some impacts?"

k. New GM knew that on August 29, 2005, Old GM employee Jim Zito forwarded the messages to Ray DeGiorgio and asked, "Do we have any history with the ignition switch as far as it being sensitive to road bumps?"

l. New GM knew that DeGiorgio responded the same day, stating, "To date there has never been any issues with the detents being too light," despite the fact that he *was* aware of issues with the detents being too light in the ignition switches on multiple vehicle platforms.

108. Old GM also knew that NHTSA believed that in most, if not all vehicles, the airbag systems were operable for several seconds following a power loss. Thus, Old GM knew that NHTSA was mistaken and neither Old GM nor New GM did anything to correct NHTSA's mistaken belief.

109. From 2002 to the present, first Old GM and then New GM received numerous reports from consumers regarding complaints, crashes, injuries, and deaths linked to this safety defect, and New GM was aware of all of them. The following are just a handful of examples of some of the reports known to New GM.

110. Old GM and New GM knew of a September 16, 2002 complaint filed with NHTSA regarding a 2002 Oldsmobile Intrigue involving an incident that occurred on March 16, 2002, in which the following was reported:

WHILE DRIVING AT 30 MPH CONSUMER RAN HEAD ON INTO A STEEL GATE, AND THEN HIT THREE TREES. UPON IMPACT, NONE OF THE AIR BAGS DEPLOYED. CONTACTED DEALER. PLEASE PROVIDE FURTHER INFORMATION. *AK **NHTSA ID Number**: 8018687.

111. Old GM and New GM knew of a June 30, 2003 complaint filed with NHTSA regarding a 2001 Oldsmobile Intrigue which involved the following report:

CONSUMER NOTICED THAT WHILE TRAVELING DOWN HILL AT 40-45 MPH BRAKES FAILED, CAUSING CONSUMER TO RUN INTO THREES AND A POLE. UPON IMPACT, AIR BAGS DID NOT DEPLOY. *AK **NHTSA ID Number**: 10026252.

112.    Old GM and New GM knew of a March 11, 2004 complaint with NHTSA regarding a 2003 Oldsmobile Alero incident that occurred on July 26, 2003, in which the following was reported:

> THE VEHICLE DIES. WHILE CRUISING AT ANY SPEED, THE HYDRAULIC BRAKES & STEERING FAILED DUE TO THE ENGINE DYING. THERE IS NO SET PATTERN, IT MIGHT STALL 6 TIMES IN ONE DAY, THEN TWICE THE NEXT DAY. THEN GO 4 DAYS WITH NO OCURRENCE, THEN IT WILL STALL ONCE A DAY FOR 3 DAYS. THEN GO A WEEK WITH NO OCURRENCE, THEN STALL 4 TIMES A DAY FOR 5 DAYS, ETC., ETC. . . . AT HIGH SPEEDS, IT IS EXTREMELY TOO DANGEROUS TO DRIVE. WE'VE TAKEN IT TO THE DEALER, UNDER EXTENDED WARRANTY, THE REQUIRED 4 TIMES UNDER THE LEMON LAW PROCESS. THE DEALER CANNOT ASCERTAIN, NOR FIX THE PROBLEM. IT HAPPENED TO THE DEALER AT LEAST ONCE WHEN WE TOOK IT IN. I DOUBT THEY WILL ADMIT IT, HOWEVER, MY WIFE WAS WITNESS. THE CAR IS A 2003. EVEN THOUGH I BOUGHT IT IN JULY 2003, IT WAS CONSIDERED A USED CAR. GM HAS DENIED OUR CLAIM SINCE THE LEMON LAW DOES NOT APPLY TO USED CARS. THE CAR HAS BEEN PERMANENTLY PARKED SINCE NOVEMBER 2003. WE WERE FORCED TO BUY ANOTHER CAR. THE DEALER WOULD NOT TRADE. THIS HAS RESULTED IN A BADLUCK SITUATION FOR US. WE CANNOT AFFORD 2 CAR PAYMENTS / 2 INSURANCE PREMIUMS, NOR CAN WE AFFORD $300.00 PER HOUR TO SUE GM. I STOPPED MAKING PAYMENTS IN DECEMBER 2003. I HAVE KEPT THE FINANCE COMPANY ABREAST OF THE SITUATION. THEY HAVE NOT REPOSSED AS OF YET. THEY WANT ME TO TRY TO SELL IT. CAN YOU HELP? *AK **NHTSA ID NUMBER:** 10061898.

113.    Old GM and New GM knew of an August 23, 2004 complaint filed with NHTSA regarding a 2004 Chevrolet Malibu incident that occurred on June 30, 2004, in which it was reported that:

> WHILE TRAVELING AT ANY SPEED VEHICLE STALLED. WITHOUT CONSUMER HAD SEVERAL CLOSE CALLS OF BEING REAR ENDED. VEHICLE WAS SERVICED SEVERAL TIMES, BUT PROBLEM RECURRED. *AK. **NHTSA ID Number:** 10089418.

114.    Old GM and New GM knew of another report in August 2004 involving a 2004 Chevrolet Malibu incident that occurred on August 3, 2004, in which it was reported that:

> WHEN DRIVING, THE VEHICLE TO CUT OFF. THE DEALER COULD NOT FIND ANY DEFECTS. *JB. **NHTSA ID Number:** 10087966.

115.    Old GM and New GM knew of an October 23, 2004 complaint with NHTSA regarding a 2003 Chevrolet Monte Carlo, in which the following was reported:

> VEHICLE CONTINUOUSLY EXPERIENCED AN ELECTRICAL SYSTEM FAILURE. AS A RESULT, THERE WAS AN ELECTRICAL SHUT DOWN WHICH RESULTED IN THE ENGINE DYING/ STEERING WHEEL LOCKING UP, AND LOSS OF BRAKE POWER.*AK **NHTSA ID Number:** 10044624.

116.    Old GM and New GM knew of an April 26, 2005 complaint filed with NHTSA involving a 2005 Pontiac Grand Prix, pertaining to an incident that occurred on December 29, 2004, in which the following was reported:

> 2005 PONTIAC GRAND PRIX GT SEDAN VIN #[XXX] PURCHASED 12/16/2004. INTERMITTENTLY VEHICLE STALLS/ LOSS OF POWER IN THE ENGINE. WHILE DRIVING THE VEHICLE IT WILL SUDDENLY JUST LOSES POWER. YOU CONTINUE TO PRESS THE ACCELERATOR PEDAL AND THEN THE ENGINE WILL SUDDENLY TAKE BACK OFF AT A GREAT SPEED. THIS HAS HAPPENED WHILE DRIVING NORMALLY WITHOUT TRYING TO ACCELERATE AND ALSO WHILE TRYING TO ACCELERATE. THE CAR HAS LOST POWER WHILE TRYING TO MERGE IN TRAFFIC. THE CAR HAS LOST POWER WHILE TRYING TO CROSS HIGHWAYS. THE CAR HAS LOST POWER WHILE JUST DRIVING DOWN THE ROAD. GMC HAS PERFORMED THE FOLLOWING REPAIRS WITHOUT FIXING THE PROBLEM. 12/30/2004 [XXX]- MODULE, POWERTRAIN CONTROL-ENGINE REPROGRAMMING. 01/24/2005 [XXX]- SOLENOID, PRESSURE CONTROL-REPLACED. 02/04/2005 [XXX]-MODULE, PCM/VCM-REPLACED. 02/14/2005 [XXX]- PEDAL, ACCELERATOR-REPLACED. DEALERSHIP PURCHASED FROM CAPITAL BUICK-PONTIAC-GMC 225-293-3500. DEALERSHIP HAS ADVISED THAT THEY DO NOT KNOW WHAT IS WRONG WITH THE CAR. WE HAVE BEEN TOLD THAT WE HAVE TO GO DIRECT TO PONTIAC WITH THE PROBLEM. HAVE BEEN IN CONTACT WITH PONTIAC SINCE 02/15/05. PONTIAC ADVISED THAT THEY WERE GOING TO RESEARCH THE PROBLEM AND SEE IF ANY OTHER GRAND PRI WAS REPORTING LIKE PROBLEMS. SO FAR THE ONLY ADVICE FROM PONTIAC IS THEY WANT US TO COME IN AND TAKE ANOTHER GRAND PRIX OFF THE LOT AND SEE IF WE CAN GET THIS CAR TO DUPLICATE THE SAME PROBLEM. THIS DID NOT IMPRESS ME AT ALL. SO AFTER WAITING FOR 2-1/2 MONTHS FOR PONTIAC TO DO SOMETHING TO FIX THE PROBLEM, I HAVE DECIDED TO REPORT THIS TO NHTSA. *AK *JS INFORMATION REDACTED PURSUANT TO THE FREEDOM OF INFORMATION ACT (FOIA), 5 U.S.C. 552(B)(6) NHTSA ID Number: 10118501.

117.     Old GM and New GM knew of a May 31, 2005 complaint filed with NHTSA regarding a 2004 Chevrolet Malibu incident that occurred on July 18, 2004, in which it was reported that:

> THE CAR CUT OFF WHILE I WAS DRIVING AND IN HEAVY TRAFFIC MORE THAN ONCE. THERE WAS NO WARNING THAT THIS WOULD HAPPEN. THE CAR WAS SERVICED BEFORE FOR THIS PROBLEM BUT IT CONTINUED TO HAPPEN. I HAVE HAD 3 RECALLS, THE HORN FUSE HAS BEEN REPLACED TWICE, AND THE BLINKER IS CURRENTLY OUT. THE STEERING COLLAR HAS ALSO BEEN REPLACED. THIS CAR WAS SUPPOSED TO BE A NEW CAR. **NHTSA ID Number**: 10123684.

118.     Old GM and New GM knew of a June 2, 2005 complaint filed with NHTSA regarding a 2004 Pontiac Grand Am incident that occurred on February 18, 2005, in which it was reported that:

> 2004 PONTIAC GRAND PRIX SHUTS DOWN WHILE DRIVING AND THE POWER STEERING AND BRAKING ABILITY ARE LOST.*MR *NM. **NHTSA ID Number**: 10124713.

119.     New GM knew of an August 26, 2005 complaint filed with NHTSA regarding a 2004 Pontiac Grand Am incident that occurred on August 26, 2005, in which the following was reported:

> WHILE DRIVING MY 2004 PONTIAC GRAND AM THE CAR FAILED AT 30 MPH. IT COMPLETELY SHUT OFF LEAVING ME WITH NO POWER STEERING AND NO WAY TO REGAIN CONTROL OF THE CAR UNTIL COMING TO A COMPLETE STOP TO RESTART IT. ONCE I HAD STOPPED IT DID RESTART WITHOUT INCIDENT. ONE WEEK LATER THE CAR FAILED TO START AT ALL NOT EVEN TURNING OVER. WHEN THE PROBLEM WAS DIAGNOSED AT THE GARAGE IT WAS FOUND TO BE A FAULTY "IGNITION CONTROL MODULE" IN THE CAR. AT THIS TIME THE PART WAS REPLACED ONLY TO FAIL AGAIN WITHIN 2 MONTHS TIME AGAIN WHILE I WAS DRIVING THIS TIME IN A MUCH MORE HAZARDOUS CONDITION BEING THAT I WAS ON THE HIGHWAY AND WAS TRAVELING AT 50 MPH AND HAD TO TRAVEL ACROSS TWO LANES OF TRAFFIC TO EVEN PULL OVER TO TRY TO RESTART IT. THE CAR CONTINUED TO START AND SHUT OFF ALL THE WAY TO THE SERVICE GARAGE WHERE IT WAS AGAIN FOUND TO BE A FAULTY "IGNITION CONTROL MODULE". IN ANOTHER TWO WEEKS TIME THE CAR FAILED TO START AND WHEN DIAGNOSED THIS TIME IT WAS SAID TO HAVE "ELECTRICAL PROBLEMS" POSSIBLE THE "POWER CONTROL MODULE". AT THIS TIME THE CAR IS STILL UNDRIVEABLE AND UNSAFE FOR TRAVEL. *JB **NHTSA ID Number:** 10134303.

120. Old GM and New GM knew of a December 10, 2008 complaint filed with NHTSA regarding a 2004 Oldsmobile Alero and an incident that occurred on December 10, 2008, in which the following was reported:

> I WAS DRIVING DOWN THE ROAD IN RUSH HOUR GOING APPROX. 55 MPH AND MY CAR COMPLETELY SHUT OFF, THE GAUGES SHUT DOWN, LOST POWER STEERING. HAD TO PULL OFF THE ROAD AS SAFELY AS POSSIBLE, PLACE VEHICLE IN PARK AND RESTART CAR. MY CAR HAS SHUT DOWN PREVIOUSLY TO THIS INCIDENT AND FEEL AS THOUGH IT NEEDS SERIOUS INVESTIGATION. I COULD HAVE BEEN ON THE HIGHWAY AND BEEN KILLED. THIS ALSO HAS HAPPENED WHEN IN A SPIN OUT AS WELL THOUGH THIS PARTICULAR INCIDENT WAS RANDOM. *TR **NHTSA ID Number:** 10251280.

121. Old GM and New GM knew of a March 31, 2009 complaint filed with NHTSA regarding a 2005 Chevrolet Malibu incident that occurred on May 30, 2008, in which the following was reported:

> TL*THE CONTACT OWNS A 2005 CHEVROLET MALIBU. THE CONTACT STATED THAT THE POWER WINDOWS, LOCKS, LINKAGES, AND IGNITION SWITCH SPORADICALLY BECOME INOPERATIVE. SHE TOOK THE VEHICLE TO THE DEALER AND THEY REPLACED THE IGNITION SWITCH AT THE COST OF $495. THE MANUFACTURER STATED THAT THEY WOULD NOT ASSUME RESPONSIBILITY FOR ANY REPAIRS BECAUSE THE VEHICLE EXCEEDED ITS MILEAGE. ALL REMEDIES AS OF MARCH 31, 2009 HAVE BEEN INSUFFICIENT IN CORRECTING THE FAILURES. THE FAILURE MILEAGE WAS 45,000 AND CURRENT MILEAGE WAS 51,000. **NHTSA ID Number**: 10263716.

122. The defects did not get any safer and the reports did not stop when Old GM ceased to exist. To the contrary, New GM continued receiving the same reports involving the same defects. For example, in September 2010, New GM executives, including Executive Vice President and President of General Motors North America Alan Batey,[77] former New GM Chairman of the Board and CEO of General Motors LLC Daniel Akerson,[78] President of General Motors LLC Dan

---

[77] See https://www.gm.com/company/leadership/corporate-officers.html (last accessed May 17, 2018).
[78] Id.

Ammann,[79] and New GM's Vice President of Global Vehicle Program Management Terry Woychowski,[80] received customer emails regarding stalling incidents involving a 2000 Chevrolet Malibu and a 2003 Chevrolet Malibu traveling at highway speeds. In describing one such incident, the owner of the 2000 Malibu wrote the following:

> "We spent approximately $648 in March 2009 with a GM dealership, because the car stalled on the highway, practically killing our family of five. . . . It again nearly killed our family of five on August 28, 2010! The dealership states that we are 'out of warranty.' Before initiating a 'class-action lawsuit' with other individuals that have experienced this identical issue, I would like to request [that] you . . . correct this 'issue.'"[81]

123. A few days later, while driving his other Chevrolet Malibu (the 2003 model year), the vehicle owner stated, "[T]he 2003 Chevy Malibu stalled in the left hand lane of the freeway in the identical manner that the 2000 Chevy Malibu did on August 28, 2010. . . . We therefore cannot use either the 2003 or the 2000 Malibu on the freeway."[82]

124. In a prophetic follow-up email dated September 7, 2010, the owner of the Malibu explained to the New GM representatives, "**As discussed, curiously enough, the solution to both stalling issues was a brand new ignition switch for each car**."[83]

125. On February 26, 2014, New GM was reminded of a complaint filed with NHTSA involving a 2004 Pontiac Grand Prix, concerning an incident that occurred on May 10, 2005 (and of which Old GM became contemporaneously aware), in which the following was reported:

> TL – THE CONTACT OWNS A 2004 PONTIAC GRAND PRIX. THE CONTACT STATED THAT WHILE DRIVING AT VARIOUS SPEEDS AND GOING OVER A BUMP, THE VEHICLE WOULD STALL WITHOUT WARNING. THE VEHICLE WAS TAKEN TO THE DEALER. THE TECHNICIAN WAS UNABLE TO DIAGNOSE THE FAILURE. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE VEHICLE WAS NOT REPAIRED. THE VIN WAS NOT

---

[79] *Id.*
[80] Sept. 9, 2010, email chain with D. Amman, D. Akerson, A. Batey, M. Reuss, T. Woychowski, et al. re: "Highway Stalling Issue email of 8/29/10," GM-MDL2543-402227584, at -7584.
[81] *Id.* at -7589.
[82] *Id.* at -7588.
[83] *Id.* at -7587.

AVAILABLE. THE FAILURE MILEAGE WAS 12,000 AND THE CURRENT MILEAGE WAS 82,000. KMJ **NHTSA ID Number:** 10566118.

126.    On March 13, 2014, New GM became aware of a complaint filed with NHTSA involving a 2006 Pontiac Grand Prix and an incident that occurred on February 27, 2014, in which a driver reported:

> I WAS DRIVING HOME FROM WORK AND WHEN I TURNED A CORNER, THE ENGINE CUT OUT. I BELIEVE IT WAS FROM THE KEY FLIPPING TO ACCESSORY. I'VE HEARD THAT THIS HAS CAUSED CRASHES THAT HAVE KILLED PEOPLE AND WOULD LIKE THIS FIXED. THIS IS THE FIRST TIME IT HAPPENED, BUT NOW I'M WORRIED EVERY TIME I DRIVE IT THAT THIS IS GOING TO HAPPEN AND I DON'T FEEL SAFE LETTING MY WIFE DRIVE THE CAR NOW. WHY ARE THE 2006 PONTIAC GRAND PRIX VEHICLES NOT PART OF THE RECALL FROM GM? **\*TR NHTSA ID Number: 10569215.**

127.    At least as early as April 8, 2014, New GM became aware of a complaint filed with NHTSA regarding a 2003 Chevrolet Impala and an incident that occurred on August 14, 2011, in which the following was reported:

> I HAVE HAD INCIDENTS SEVERAL TIMES OVER THE YEARS WHERE I WOULD HIT A BUMP IN THE ROAD AND MY CAR WOULD COMPLETLY SHUT OFF. I HAVE ALSO HAD SEVERAL INCIDENTS WHERE I WAS TRAVELING DOWN THE EXPRESSWAY AND MY CAR TURNED OFF ON ME. I HAD TO SHIFT MY CAR INTO NEUTRAL AND RESTART IT TO CONTINUE GOING. I WAS FORTUNATE NOT TO HAVE AN ACCIDENT. **NHTSA ID Number:** 10578158.

128.    Old GM and New GM were aware of these problems year after year and nationwide, as reflected not only by internal documents reflecting knowledge and cover-up at high levels, but also in hundreds of customer complaints recorded in Old GM's and New GM's internal complaint logs and documents. Documents produced by New GM show that Old GM and New GM were aware of customer complaints of stalling ISD-Defective Vehicles across the country and ultimately did nothing about them. These complaints, of course, are in addition to the multiple non-deploy incidents of which New GM became aware, which Old GM investigated from at least as early as 2005, and

which New GM investigated from on or around the date of its inception in 2009, and yet no recalls were issued for the ISD-Defective Vehicles until 2014 – and even then, not *all* of the affected vehicles were recalled.

e. *Old GM's Marketing Represented to the Public that the ISD-Defective Vehicles Were Safe, and New GM Did Nothing to Correct These Representations – Indeed, It* Reinforced *Them*

129. In a section called "safety," Old GM's Chevrolet website stated:

**OUR COMMITMENT**

Your family's safety is important to us. Whether it's a short errand around town or a cross-country road trip, Chevrolet is committed to keeping you and your family safe — from the start of your journey to your destination. That's why every Chevrolet is designed with a comprehensive list of safety and security features to help give you peace of mind. Choose from the safety features below to learn more about how they work, and which Chevy vehicles offer them.

130. An Old GM print advertisement exclaimed in bold print, "**At GM, Safety Isn't One Thing, It's Everything**."[84]

131. A 2006 GM brand-wide marketing brochure contained a page dedicated to safety. The page was titled, "YOUR SAFETY AND SECURITY. IT'S OUR PRIORITY." Old GM then promised: "General Motors is the only automotive manufacturer committed to offering a full range of cars, trucks, and SUVs with GM continuous safety: protection before, during and—thanks to OnStar—after vehicle collisions."[85]

132. Old GM touted safety for the Malibu and Malibu Maxx, stating in a brochure that "Safety is built into the heart of the all-new 2004 Chevrolet Malibu sedan and Malibu Maxx extended sedan," specifically highlighting airbags.[86]

---

[84] GM-MDL2543-301025786.
[85] GM-MDL2543-301443177.
[86] GM-MDL2543-302128438.

133.    In sum, Old GM touted the safety of its vehicles to increase sales, but, when the time came for the company to stay true to its words, Old GM did not disclose its knowledge about the dangerous Key System defects to its customers, including the Plaintiff. And, more importantly, New GM did nothing to correct any such representations, and indeed only propounded them with additional safety representations made by New GM about GM-brand vehicles.[87]

134.    Old GM's concealment and obfuscation was all the more blatant given the simultaneous internal protocol being enforced within Old GM.  In the 2005 iteration of its annual "Vehicle Recall Awareness Presentation,"[88] Old GM instructed its employees to avoid using the following "judgment" words in their descriptions of vehicle problems:

| | | |
|---|---|---|
| always | detonate | maniacal |
| annihilate | disemboweling | mutilating |
| apocalyptic | enfeebling | never |
| asphyxiating | evil | potentially-disfiguring |
| bad | evicscerated [sic] | power [sic] keg |
| Band-Aid | explode | problem |
| big time | failed | safety |
| brakes like an "X" car | flawed | safety related |
| cataclysmic | genocide | serious |
| catastrophic | ghastly | spontaneous combustion |

_____

[87] _See_, _e.g._, GM-MDL2543-401298621 at -8646 (2010 Chevy-brand vehicle brochure proclaiming, "Chevrolet is a leader in technologies that make driving easy, safe, and entertaining"); GM-MDL2543-101495318 (2011 New GM radio advertisement stating, in pertinent part: "...Proud moments of being the ones who put you first, with safety-conscious cars including IIHS 2011 top safety picks like Chevy Malibu..."); GM-MDL2543-101494809 (2010 New GM television advertisement touting, "There are sixteen Chevy models with a five-star frontal crash safety rating.  That's peace of mind for every size family."); GM-MDL2543-101494843, New GM television advertisement depicting extensive crash testing of Chevrolet brand vehicles and touting the Chevrolet brand by stating, in pertinent part, "Everyone deserves a car they can count on.  A car that keeps going when others might quit. A car that stands strong when you need it most, and expects to handle the unexpected.  At Chevrolet, we created a team of Red-X engineers who are obsessed with quality.  Red-X torture tests every car down to the smallest detail.  We're pushing the limits every single day, and for one reason: our mission is to build the best cars and trucks in the world..."); GM-MDL2543-101494865 (New GM television advertisement asserting that Chevy vehicles are "among the safest on earth"); GM-MDL2543-006788829, New GM brand-wide television advertisement, at 0:55-1:04 (Screen text reading, "Nobody offers more cars and trucks that can help save your life before, during and after a crash," followed by images of the General Motors brand logos (Chevrolet, Pontiac, Buick, Cadillac, GMC, Saturn, Saab, and Hummer), followed by screen text reading, "Only GM"); GM-MDL2543-006816884 (New GM product representative responding to Yahoo forum inquiry dated 1/14/12: "The Malibu has a sleek design, offers a plush roomy interior, is fuel efficient and most importantly, is safe!  The Malibu is a Consumers Digest Best Buy and is a Top Safety Pick by the Insurance Institute for Highway Safety."); GM-MDL2543-301449729 at -9745 (October 2013 New GM publication touting multiple model years of the Chevrolet Malibu as being "Top Safety Picks").
[88] GM-MDL2543- 001533678.

| | | |
|---|---|---|
| Challenger | grenadelike | startling |
| chaotic | grisly | suffocating |
| Cobain | gruesome | suicidal |
| condemns | Hindenburg | terrifying |
| Corvair-like | hobbling | Titanic |
| crippling | horrific | tomblike |
| critical | impaling | unstable |
| dangerous | inferno | widow-maker rolling sarcophagus (tomb or coffin) |
| deathtrap | Kevorkianesque | Words or phrases with biblical connotation |
| debilitating | lacerating | |
| decapitating | life-threatening | |
| defect | maiming | |
| defective | mangling | |

135.     Instead of using commonsense language, Old GM employees were advised in Orwellian fashion to use specific words to avoid disclosure and documentation of the material safety risks associated with Old GM products, and in so doing furthered the cover-up and fraud through intentional (and misleading) word substitutions, such as:

- "Issue, Condition [or] Matter" instead of "**Problem**"

- "Has Potential Safety Implications" instead of "**Safety**"

- "Does not perform to design" instead of "**Defect/Defective**"

136.     Old GM knew its defective vehicles were killing and/or maiming its customers, but it nonetheless instructed its employees to avoid words like "defect" or "safety"—words that accurately described the issues.  Instead of publicly admitting the dangerous safety defects in its vehicles, Old GM repeatedly blamed accidents on driver error.

137.     Upon information and belief, Old GM's policy against "judgment" words, and linguistic obfuscation in general, was adopted and continued on by New GM after the bankruptcy sale.

138.     As will be shown at trial, all the foregoing actions, inactions, and knowledge of Old GM in all the preceding paragraphs was inherited by or is imputable to New GM within the meaning

of the Orders, Judgments, and/or Decisions of the United States Bankruptcy Court for the Southern District of New York in *Motors Liquidation Company, et al., f/k/a General Motors Corp., et al.*, Case No. 09-50026 (REG), and through principles of successor liability under Alabama law.

### C. The BCM Defect

139.     In addition, or in the alternative, Plaintiff's accident was caused by the "BCM Defect." In 2014, New GM announced that 2.4 million vehicles, including Plaintiff's 2004 Chevrolet Malibu, contained a safety defect adversely affecting the controllability and brake system functionality of said vehicles. As used herein, the "BCM-Defective Vehicles" includes vehicles subject to NHTSA Recall No. 14V-252, which involved over 2.4 million GM-brand vehicles that were recalled for common safety defects stemming from their braking and Body Control Module connection systems. The models affected by the 14V-252 Recall are: 2004-2012 Chevrolet Malibu, 2004-2007 Chevrolet Malibu Maxx, 2005-2010 Pontiac G6, and 2007-2010 Saturn Aura.

140.     When the BCM Defect manifests, the brake lamps may fail to illuminate when the brakes are applied or illuminate when the brakes are not engaged; moreover, the same defect can disable, *inter alia*, traction control, Electronic Stability Control ("ESC"), and panic brake assist operation, thereby increasing the risk of collisions and injuries.[89]

141.     New GM has now identified "fretting corrosion in the [Body Control Module] C2 connector [as] the root cause" of the BCM Defect.[90] More specifically, according to New GM, the BCM Defect originates in the Body Control Module connection system. "Increased resistance can develop in the [Body Control Module] connection system and result in voltage fluctuations or intermittency in the Brake Apply Sensor (BAS) circuit that can cause service brakes lamp

---

[89] New GM Notification Campaign No. 14V-252 dated May 28, 2014, at 1.
[90] *Id.* at 2.

malfunction."[91] The result is brake lamps that may illuminate when the brakes are not being applied, and that may *not* illuminate when the brakes *are* being applied. This increases the likelihood of drivers who are behind the Defective Vehicles to misinterpret/rely upon erroneous or lacking brake lamp illumination, thereby increasing the risk of a crash.

142. The same defect can also cause the vehicle to get stuck in cruise control if it is engaged, or cause cruise control to not engage, and may also disable the traction control, electronic stability control, and panic-braking assist features.[92]

143. Traction control, ESC, and panic brake assist are all critical safety features in any motor vehicle. As General Motors has noted, the Insurance Institute for Highway Safety (IIHS) and the National Highway Traffic Safety Administration (NHTSA) have found that ESC systems "could have the potential to reduce single vehicle fatal crashes by 50% or more."[93] By law, all passenger cars, trucks, vans and SUVs with a gross vehicle weight under 10,000 pounds are required to have ESC.[94] Crashes are prevented by ESC, as ESC allows drivers to maintain control of their vehicles in emergency or panic situations.

144. Old GM designed the defective BCM system that is the subject of this complaint, and both Old GM and New GM manufactured BCM-Defective Vehicles.

145. Old GM investigated the BCM Defect early on. For example, in June 2005, the owner of a 2005 Pontiac G6 reported the following to NHTSA's Office of Safety Defects (ODI):

- DT: THE BRAKE LIGHTS ARE CONTINUALLY ON, OTHER DRIVER[S] THINK THE CONSUMER IS BRAKING AT ALL TIMES. THE VEHICLE HAS BEEN TO THE DEALER 7 TIMES AND CHANGED SWITCHES IN THE FOOT PEDALS AND BRAKES. THEY SAY IT HAS CODES OF BRAKE SLIPPING AND THEY STILL CANNOT CORRECT THE PROBLEM. *JB.[95]

---

[91] New GM Notification Campaign No. 14V-252 dated May 28, 2014, at 1.
[92] *Id.*
[93] Exhibit MDL-1956 (GM-MDL2543-401904307).
[94] *See* FMVSS 126, 49 CFR Parts 571 & 585, *Federal Motor Vehicle Safety Standards; Electronic Stability Control Systems; Controls and Displays*, available at https://www.nhtsa.gov/sites/nhtsa.dot.gov/files/fmvss/ESC_FR_03_2007.pdf (last visited Apr. 28, 2018).
[95] GM-MDL2543-300674363, row 2.

146.    As another example, a 2006 Pontiac G6 vehicle owner submitted a Vehicle Owner

Questionnaire ("VOQ") in March 2007 stating the following:

- BRAKE LIGHTS NOT FUNCTIONING PROPERLY! BRAKE LIGHTS EITHER WAS
  ON ALL THE TIME OR FLICKERED. THE DEALER HAS BEEN GREAT BY PUTTING
  ME IN ALT TRANSPORTAION, BUT SEEMED THE PROBLEM ONLY EXISTED
  WITH ME FOR THEY DID NOT HAVE THE PROBLEM WITH THE CAR WHILE IN
  THEIR POSSESION, BUT WHEN I PICKED UP MY CAR THE PROBLEM WAS AGAIN
  THERE. THEY HAVE REPLACED THE BRAKE LIGHT SWITCH, ABS MODULE,
  AND REPROGRAMMED THE BCM. BUT THE PROBLEM STILL EXISTED. VERY
  DANGEROUS, NO ONE COULD TELL WHEN STOPPING, SLOWING OR GOING OR
  JUST RIDING THE BRAKES. THIS HAS TO BE ADDRESSED. *AK[96]

147.    On June 11, 2007, a 2006 Pontiac G6 vehicle owner submitted a VOQ stating the

following:[97]

- SERVICE TRACTION CONTROL WARNING APPEARED FOLLOWED BY ENGINE,
  OIL AND OTHERS WITH 'REDUCING POWER ENGINE' WARNING. THEN
  DROPPED TO NO RPMS AND ENGINE STALLED –UNPREDICTABLY. *AK

148.    June 9, 2008: 2007 Pontiac G6 (NHTSA ID No. 10233102):

- I'VE HAD MY 2007 PONTIAC G6 IN THE SHOP SEVERAL TIMES FOR BRAKE
  "ISSUES". THEY CHANGED PADS, ROTORS AND TOLD ME THEY COULDN'T
  STOP THE SQUEAKING AND THAT THE STRANGE "JUMPING" THE BRAKES
  SEEMED TO DO WAS "NORMAL" FOR ABS - WHICH I KNOW IS NOT CORRECT
  AS I HAVE OWNED MANY CARS WITH ABS THAT DIDN'T FEEL LIKE THIS.
  RECENTLY, THE TRACTION CONTROL LIGHT CAME ON, THE BRAKES FAILED,
  THE EMERGENCY BRAKE FAILED AND WE HIT THE BACK OF ANOTHER CAR.
  GM SENT AN ENGINEER OUT TO LOOK AT THE EVENT DATA RECORDER;
  HOWEVER, WOULD NOT PROVIDE ME WITH A COPY OF THE REPORT (THEY
  SAID IT WAS "PROPRIETARY"). THEY ARE REFUSING TO FIX MY CAR AND
  WHEN I ASKED WHY THE TRACTION CONTROL LIGHT CAME ON, THEIR
  "PROFESSIONAL" TOLD ME "I DON'T KNOW - I WASN'T THERE!". I'VE SEEN
  SEVERAL COMPLAINTS ON EDMUNDS.COM ABOUT THE ROTORS, OVER-
  HEATING PROBLEMS AND THE NEED TO HAVE THEM REPLACED WITH NON-
  GM PARTS TO (HOPEFULLY) FIX THE PROBLEM. THIS IS A MAJOR SAFETY
  CONCERN FOR ME AND I INTEND TO DISPOSE OF THE CAR AS SOON AS

---

[96] GM-MDL2543-301983730, at -3737 (NHTSA ODI VOQ No. 10186123).
[97] NHTSA ID No. 10192948.

POSSIBLE. *TR[98]

149. In 2008, Old GM formalized its findings of elevated warranty claims for brake light defects in model year 2005 and 2006 vehicles built in January 2005, and found "fretting corrosion in the [Body Control Module] C2 connector was the root cause" of the problem.[99] Old GM and its part supplier Delphi "decided that applying dielectric grease to the [Body Control Module] C2 connector would be an effective countermeasure to the fretting corrosion."[100] Beginning in November of 2008, Old GM began applying dielectric grease in its vehicle assembly plants, to vehicles it was manufacturing *going forward*.[101]

150. On December 4, 2008, Old GM issued a Technical Service Bulletin ("TSB") recommending the application of dielectric grease to the Body Control Module C2 connector for the MY 2005-2009 Pontiac G6, 2004-2007 Chevrolet Malibu/Malibu Maxx, 2008 Malibu Classic, and 2007-2009 Saturn Aura vehicles.[102] One month later, in January 2009, Old GM recalled only a small subset of the vehicles with the BCM Defect – 8,000 MY 2005-2006 Pontiac G6 vehicles built during the month of January 2005.[103]

151. Not surprisingly, the brake light problem was far from resolved.

152. In October 2010, New GM released an updated TSB regarding "intermittent brake lamp malfunctions," and added MY 2008-2009 Chevrolet Malibu/Malibu Maxx vehicles to the list of vehicles for which it recommended the application of dielectric grease to the Body Control Module C2 connector.[104]

153. Meanwhile, New GM was continuing to receive BCM-Defect-related complaints

---

[98] GM-MDL2543-002522510, at row 3691.
[99] New GM Notification Campaign No. 14V-252 dated May 28, 2014, at 2.
[100] *Id.*
[101] *Id.* at 3.
[102] *Id.* at 2.
[103] *Id.* This recall did not include Plaintiff's Vehicle. *See* February 2009 GM Safety Recall Bulletin No. 08317 (listing affected VIN range).
[104] New GM Notification Campaign No. 14V-252 dated May 28, 2014, at 2.

from drivers of the 2004 Chevrolet Malibu. For example, on January 21, 2011, the owner of a 2004 Malibu reported the following BCM-related failure (NHTSA ID No. 10378211):

- I WAS DRIVING THE CHEVY MALIBU WHEN A CAR BEHIND ME ABOUT REAR END ME. I STOPPED AND THEY TOLD ME THAT I HAD A BREAK LIGHT OUT. I TRIED REPLACING BULBS AND THE WHOLE ASSEMBLY AND NOTHING WORKED. . . .[105]

154.    In September 2011, New GM received an information request from Canadian authorities regarding brake light defect complaints in GM brand vehicles that had not yet been recalled. Then, in June 2012, NHTSA provided New GM with additional complaints "that were outside of the build dates for the brake lamp malfunctions on the Pontiac G6" vehicles that had been recalled.[106]

155.    In February 2013, NHTSA opened a "Recall Query" in the face of 324 complaints "that the brake lights do not operate properly" in Pontiac G6, Malibu, and Aura vehicles that had not yet been recalled.[107]

156.    In response, New GM asserts that it "investigated these occurrences looking for root causes that could be additional contributors to the previously identified fretting corrosion," but that it continued to believe that "fretting corrosion in the [Body Control Module] C2 connector" was the "root cause" of the brake light defect.[108]

157.    In June 2013, NHTSA upgraded its "Recall Query" concerning the BCM Defect to an "Engineering Analysis."[109]

158.    In August 2013, New GM was tracking an elevated warranty rate for Body Control Module C2 connectors in vehicles built *after* Old GM had begun applying dielectric grease to BCM

---

[105] GM-MDL2543-300974650, at sheet 1 row 5882.
[106] *Id.*
[107] *Id.* at 3.
[108] *Id.*
[109] *Id.*

C2 connectors at its assembly plants in November 2008.[110] By November 2013, New GM concluded that "the amount of dielectric grease applied in the assembly plant starting November 2008 was insufficient….[111]"

159. Finally, in March 2014, "[New] GM engineering teams began conducting analysis and physical testing to measure the effectiveness of potential countermeasures to address fretting corrosion. As a result, New GM determined that additional remedies were needed to address fretting corrosion."[112]

160. On May 7, 2014, New GM finally decided to conduct a safety recall for the more than 2 million vehicles affected by the BCM Defect – nearly seven years after Plaintiff's accident. Under 49 C.F.R. § 573.6, Old GM had a duty no later than 2008 and New GM had a duty no later than 2009, when each entity clearly was aware of the BCM Defect, to disclose the defect in the Subject Vehicles. Rather than comply with its legal obligations, New GM continued to fraudulently conceal this defect from the public and the U.S. government.

161. Both Old and New GM failed to act upon and concealed knowledge of the BCM Defect for years, and did not even consider implementing available countermeasures (other than the application of grease that had proven ineffective) until March 2014.

### D. The EPS Defect

162. In addition, or in the alternative, the Subject Incident underlying the present action was caused or contributed to by a defect in the Electronic Power Steering assist system (the "EPS Defect"). As used herein, the "EPS-Defective Vehicles" include vehicles subjected to NHTSA Recall No. 14V-153 involving over 1.3 million GM vehicles that were recalled for common defects in the Electric Power Steering ("EPS") assist system. The models affected by the 14V-153 Recall

---

[110] *Id.*
[111] *Id.*
[112] *Id.* at 4.

are: 2004-2006, 2008-2009 Chevrolet Malibu, 2004-2006 Chevrolet Malibu Maxx, 2009-2010 Chevrolet HHR, 2010 Chevrolet Cobalt, 2008-2009 Saturn Aura, 2004-2007 Saturn Ion, and 2005-2009 Pontiac G6.

163. The Cobalt, HHR, and Ion share a common vehicle platform (the so-called "Z-Car" platform, which technically includes both Delta *and* Kappa platform vehicles). The Malibu, Aura, and G6 share the Epsilon platform (also sometimes called the "A-Car" platform). As New GM described the defect, "[t]he subject vehicles equipped with electric power steering (EPS) may experience a sudden loss of power steering assist that could occur at any time while driving," with the result that steering could require greater driver effort at low speeds and "could result in an increased risk of a crash." When EPS is lost, a message is usually displayed on the Driver Information Center ("DIC") and a chime sounds to "notify" the driver, however such notification can hardly truly be considered "notice" when an individual is driving an automobile and suddenly loses the ability to properly steer. The defect can be caused by oil intrusion into the motor case which shorts the commutator and disables the EPS motor; the same short can also be caused by sulfur contamination to the EPS resistors, which also disables EPS functionality. When the defective condition manifests, power steering assist is completely lost.

164. To date, Old GM and New GM have designed, manufactured, marketed and/or sold more than a million automobiles installed with defective steering systems in General Motors brand vehicles, including Plaintiff's 2006 Pontiac G6 (manufactured by Old GM).

165. Old and New GM were aware of the Power Steering Defect long before the 2014 recall (NHTSA Recall No. 14V-153), and Old GM was aware of the EPS Defect well before Plaintiff's crash in May 2007. In 2003, GM began receiving customer complaints regarding loss of power steering in Ions. It did not investigate, but NHTSA opened a Preliminary Investigation into the 2004 Malibu and informed GM that "[t]his office has received eight (8)

reports of electric power steering failure in MY 2004 Chevrolet Malibu vehicles." In response to NHTSA's information request, Old GM identified two factors contributing to EPS malfunction—electrical noise and grease contamination of torque and position sensor.

166. As of May 18, 2004, Old GM reported 1,552 customer complaints and 3,786 warranty claims for steering column/motor replacement in 2004 Malibus and Ions. At this time, it was Old GM's position that vehicles without power steering could be "steered in a safe and controlled manner" – a position later at odds with New GM's 2014 decision to recall these vehicles because of a defect affecting motor vehicle safety.

167. In July 2004, NHTSA upgraded its review of the 2005 Malibu loss of EPS to an Engineering Analysis, advising Old GM that NHTSA had received 1,818 complaints of a malfunction, failure, or unsatisfactory performance of the EPS system in the 2005 Malibu, with seven crashes/fires and two injuries. An internal GM Field Performance Evaluation Report prepared in 2004 indicated that "[t]he GM Lead Design Release Engineer discovered the condition during a review of Technical Assistance Center (TAC) cases in November 2003, when the rate of loss of power steering assist documented (TAC cases) in the Technical Assistance System was about two to three occurrences per week. By the end of December 2003, the rate was approximately 50 TAC cases per week."

168. In 2004, Old GM instituted a "Customer Satisfaction Program" for 2004 Malibus in which dealers were instructed to "inspect the steering column, and if necessary, replace it" if a customer came in with a complaint. The letters informing consumers of the Customer Satisfaction Program did not advise them that a defect affecting motor vehicle safety existed, as would be done in a safety recall. NHTSA closed its preliminary investigation in May 2005, noting that it would "continue to monitor complaints and other information relating to the alleged defect in the subject vehicles and take further action in the future if warranted by the

circumstances." Despite acknowledging the problem, Old GM did not initiate a recall, although these vehicles would be included in Recall No. 14V-153 ten years later.

169.     Although the Malibu shared the same vehicle "platform" as the Aura and G6, with all three models having substantially similar power steering systems, Old GM took no action with respect to the Aura and G6 at the time of the November 2004 Customer Satisfaction Program for the Malibu. But in April 2007, NHTSA opened a Preliminary Investigation into a potential EPS defect in 2005-06 Pontiac G6s, reporting 4,145 complaints potentially related to failure of the EPS system (including nine crashes/fires and one injury incident). In its response to NHTSA's information request, Old GM reported 1,886 complaints and 4,651 warranty claims potentially associated with a loss of power steering in model year 2005 through 2006 Pontiac G6s. Old GM maintained that no safety issue was presented, but ultimately extended warranty coverage for the 2005-06 Pontiac G6 and 2005 Chevrolet Malibu and Malibu Maxx to replace the steering column assembly; however, no safety recall was initiated. Like the 2004 Malibus, the 2005 G6 (as well as some 2006 G6s and all 2008-09 G6s) would be recalled ten years later as part of Recall 14V-153.

170.     In the June-September 2006, Old-to-New GM engineer Steven Oakley opened two PRTS files regarding GM's investigation into loss of power steering assist in Chevrolet Cobalt and Pontiac Pursuit vehicles. Old GM assigned the issue a severity level of 2, which encompasses issues that could cause the customer to return the vehicle to the dealership or cause excessive cost or labor impact at the assembly plant, but is *not* a safety issue. The file indicates that GM investigators conducted a warranty part return review on July 27, 2006, to analyze returned Cobalt and Pursuit steering columns that were replaced due to complaints of inoperative EPS. Old-to-New GM warranty specialist William Chase noted that 25% of the warranty complaints for 2006 Cobalts and Pursuits were for inoperative power steering. These investigations were ultimately closed without action, and in doing so, the investigative

"champion" and supplier quality manager Samuel Dowdell explained that, "The failure could not be reproduced. Based on the test results I am closing this PRTS without action."

171.    In August 2007, Old GM issued Technical Service Bulletin #07-02-32-007 to dealers (but *not* consumers) providing them with "diagnostic tips" for when "Z-Car" platform customers came in complaining of inoperative power steering. The Bulletin was entitled, "Diagnostic Tips for Power Steering Inoperative/Steering Wheel Hard to Turn, Power Steering Message Displayed on DIC, DTCs C0176, C0475, C0476, C0550, U2105, U2107 Set – (Aug 20, 2007)," and applied to the 2005-08 Chevrolet Cobalt, 2006-08 Chevrolet HHR, 2005-06 Pontiac Pursuit (Canada only), 2007-08 Pontiac G5, and 2003-07 Saturn Ion. The recommended service procedures were clearly geared towards saving money and avoiding replacement of the steering column as often as possible. *See*, *e.g.*, GM-MDL2543-005567358, Aug. 20, 2007 TSB 07-02-32-007, at -7358-59 ("If the codes do not reappear after a test drive, return the vehicle back to the customer and DO NOT replace the steering column.").

172.    In October 2007, the Old GM Executive Field Action Decision Committee ("EFADC") approved a "Special Coverage" for the 2005 Pontiac G6 and Malibu/Malibu Maxx for vehicle owners who came in complaining of loss of EPS. This is particularly notable in light of the fact that these vehicles were not included in the later Cobalt EPS recall in March 2010, and ultimately not recalled until 2014. Moreover, customers were "notified" by a letter from Old GM expressly stating, "**Do not take your vehicle to your GM dealer as a result of this letter unless you believe that your vehicle has the condition as described above.**"

173.    In January 2009, a customer complained of loss of EPS in a 2005 Cobalt. Old GM investigated and found oil contamination or intrusion within the motor case in some Delta platform vehicles. In July 2009, the EPS supplier (JTEKT) identified the root cause in Delta vehicles as oil contamination or intrusion within the motor case and adopted sealed bearings as a corrective action

for use *going forward* in 2010 model year Cobalts and HHRs, with no action taken for previously manufactured Cobalts and HHR.

174.    In June 2009, Old GM issued an updated version of its August 2007 Technical Service Bulletin to dealers (but again, *not* to consumers) regarding, "Diagnostic Tips for Power Steering Inoperative/Steering Wheel Hard to Turn, Power Steering Message Displayed on DIC, DTCs C0176, C0475, C0476, C0550, U2105, U2107 Set" (GM TSB # 07-02-32-007). The Service Bulletin was expanded to apply to additional model years and included the 2005-10 Chevrolet Cobalt, 2006-10 Chevrolet HHR, 2005-06 Pontiac Pursuit (Canada only), 2007-09 Pontiac G5, and 2003-07 Saturn Ion. Still, no recall.

175.    Pursuant to 49 C.F.R. § 573.6, which requires an automobile manufacturer to "furnish a report to the NHTSA for each defect . . . related to motor vehicle safety," Old GM had a duty to disclose the safety-related defects in the Pontiac G6 and all other EPS-Defective Vehicles no later than five (5) days after discovery of said safety defect.

176.    Instead of complying with its legal obligations, however, Old GM fraudulently concealed the EPS defect from the public and continued to manufacture and sell the EPS-Defective Vehicles with known safety defects.

177.    From its inception, New GM had full knowledge of the defects with the EPS, and Old GM's failure to disclose those defects to NHTSA and the public—or, for that matter, to the Bankruptcy Court.

178.    Rather than promptly recalling the Defective Vehicles, New GM continued to fraudulently concealed the existence of the safety defects in the Defective Vehicles. Under 49 C.F.R. § 573.6, New GM had a duty no later than July 15, 2009, when it clearly was aware of the EPS defect, to disclose the defect in the Subject Vehicles. Rather than comply with its legal obligations, New GM continued to fraudulently conceal this defect from the public and the U.S. government.

179.    Numerous Old GM employees carried knowledge of the EPS defect with them into their continued employment at New GM after the July 10, 2009 Bankruptcy Sale, including Victor Bardas (the GM Design Release Engineer for the EPS system at issue); Christopher Janik (GM products investigation engineer who was assigned to lead the investigation into EPS field incidents in January 2009); and Yat-Chung "Sunny" Tang (GM Technical Lead Engineer who met with EPS supplier JTEKT in 2009-2010 regarding customer complaints of sudden EPS loss).

180.    In January 2010, NHTSA opened a Preliminary Investigation to assess the frequency, scope, and safety consequences of alleged sudden loss of EPS in 2005-2009 Cobalts, reporting 1,132 complaints, 11 crashes/fires, and one injury incident potentially related to the issue. NHTSA followed with an information request for the Cobalt and "similarly equipped peer vehicles" in February 2010.

181.    In responding to NHTSA's February 2010 request for information regarding the Cobalt and "similarly equipped peer vehicles," GM reported 1,668 complaints of loss of power assist in 2005-2009 Cobalts, and 2,759 similar complaints in the ION, Malibu, and G6. The corresponding numbers for warranty claims were 2,884 for the Cobalt and 5,313 for the peer vehicles. While New GM recalled some of the affected Delta-platform vehicles in March 2010, it did *not* recall other Delta-platform vehicles (the HHR and ION) that utilized a substantially similar steering column, motor, and control module as the Cobalt, even though Transport Canada, in issuing an information request to GM Canada regarding HHR and ION vehicles, did not "perceive a tangible or physical difference between the HHR/ION vehicles and the Cobalt/Pursuit/G6 vehicles regarding the electric power steering issue." Instead, New GM issued warranty extensions in July 2010 and instructed dealers to perform the same remedy called for by the 2010 Cobalt recall – replacement of the power steering motor – if the customer had experienced a sudden loss of power steering assist. Additional warranty extensions were issued by GM in 2012.

182. When New GM recalled MY 2005-2010 Chevy Cobalts and MY 2007-2010 Pontiac G5s for power steering issues in March 2010, the '573 Letter explained as follows:

> General Motors has decided that a defect, which relates to motor vehicle safety, exists in certain 2005-2010 model year Chevrolet Cobalt and 2007-2010 model year Pontiac G5 vehicles. Certain vehicles equipped with electric power steering may experience a sudden loss of power steering assist that could occur at any time while driving. If the power steering assist is lost, a message is displayed on the Driver Information Center and a chime sounds to inform the driver. Steering control can be maintained, as the vehicle will revert to a manual steering mode, but would require greater driver effort at low vehicle speeds.

> The remedy: "Dealers are to replace the electric power-steering motor."

183. Admittedly, New GM only issued this half-hearted recall "based on GM's desire to obtain quick resolution and closure of the government investigation," and GM spokesperson Alan Adler stated that GM had initially been planning to categorize the EPS issue as a customer satisfaction issue, "but as a result of the congressional scrutiny of Toyota and the unintended acceleration issues, it was agreed that GM should issue a safety recall before the hearings so that 'we would not get mentioned or dragged in to the Senate.'"

184. In December 2010, GM *Canada* issued a recall for EPS defects in the 2003-07 ION and the 2006-10 HHR models equipped with the same EPS motor as the 2005-2010 Cobalts and G5s recalled earlier. The recall provided "special coverage" for 10 years or 240,000 kilometers, whichever occurred first, and advised owners that they could obtain the EPS motor replacement whether or not their vehicle had experienced a loss of power steering. Unlike with the Special Coverage campaigns in the U.S., GM of Canada advised owners that "a defect, which may relate to motor vehicle safety, may exist. . ." But GM did not issue a recall in the United States, even though the Canadian and U.S. ION and HHR models were the same. Further, GM's Dynamic Steer Effort tests comparing steering effort in the Ion to the Cobalt found that the steering effort in both vehicles was "very close."

185.    Also in December 2010, NHTSA issued a notice of recall query (RQl0-004) regarding EPS system failure in MY 2004-07 IONs. NHTSA noted that the Special Coverage afforded by GM under the EPS failure described in Service Bulletin 10187 was "substantially the same as that investigated by ODI [Office of Defect Investigation] during PEl0-005 for sudden failure of the EPS assist in MY 2005 through 2010 Chevrolet Cobalt vehicles which have a substantially similar EPS system and assist electric motor and were recalled for this condition in March 2010."

186.    New GM responded to NHTSA's information requests through a series of letters in April through June 2011. In its May 20, 2011 submission, New GM represented that, "GM does not believe that this condition poses an unreasonable risk to motor vehicle safety," a stark contrast to the more recent representations of GM CEO Mary Barra.[113]  Notably, days before this submission, GM attorneys were scrambling to come up with a believable explanation as to why the recall was expanded to Ions and HHRs *in Canada* but not in the U.S.[114]

187.    Around this same time, New GM brought an arbitration action against EPS steering column assembly supplier JTEKT, alleging breach of express and implied warranties for selling New GM "EPS Columns contain[ing] defective steering assemblies or parts"[115] in the GMX001 (Cobalt) and the GMT001 (HHR). New GM explained the following in its pleadings: "Soon after the vehicles were first sold to the public, GM began to receive an unexpectedly high number of warranty claims from customers relating to the steering columns in their vehicles." New GM further lamented about having to spend more than $30 million on warranty claims relating to an "excessive noise" problem

---

[113] *See, e.g.*, 10/19/15 M. Barra Dep. at 305:3-305:8; 317:01-318:03 (stating that loss of power-steering alone constitutes a safety defect).

[114] *See* GM-MDL2543-002629787.001, May 13, 2011 email chain between Old-to-New GM executive attorneys Lawrence Buonomo, Michael Millikin, Lucy Clark-Dougherty, Deborah Nowak-Vanderhoef, and William Kemp, in which then-head of the GM Settlement Review Committee ("SRC") Lawrence Buonomo writes, "[Former GM General Counsel] Mike Millikin called with [GMNA General Counsel] Lucy [Clark-Dougherty], and confirmed that if possible he would like to get an extension on the [NHTSA] IR responses to work through issues around risk to safety and the contrast with the Cobalt and Canada."

[115] *In the Matter of the Arbitration between General Motors LLC, et al. v. JTEKT North America, Inc., et al.*, JAMS No. 1340008382, Mar. 16, 2011, GM-MDL2543-004556100, at -6101.

in the steering columns, but then the initial steering column problems were dwarfed by those that followed thereafter:

> "After spending tens of millions of dollars on warranty claims for JTEKT's defective EPS Columns caused by the excessive noise problem, GM discovered yet another — and much more serious — defect in the EPS Columns. Specifically, many owners of GM vehicles equipped with the EPS Columns reported experiencing a sudden and unexpected loss of all power steering in their vehicles. The loss of power steering was often intermittent, unpredictable, and could occur at any time while the vehicle was being driven."

New GM further noted that, although it worked with JTEKT in the Fall and Winter of 2009 to develop a modification to the motor assembly in the EPS Column to prevent the loss-of-EPS condition from occurring, "by that time more than a million GM vehicles had already been sold with the defective JTEKT parts."

188.    In September 2011, NHTSA upgraded its inquiry to an engineering analysis and reported that New GM acknowledged that it had received almost 3,500 customer reports claiming a sudden loss of power steering in 2004-2007 ION vehicles. NHTSA recorded over 17,385 complaints and warranty claims potentially related to loss of power steering assist in the 2004-07 ION, including 16 crashes and two injuries. The following month, GM engineer Terry Woychowski informed current CEO Mary Barra – then head of product development at GM – that there was a serious power-steering issue in Saturn IONs, and that it may be the same power steering issue that plagued the Chevy Cobalt and Pontiac G5. Ms. Barra was also informed of the ongoing NHTSA investigation, and GM General Counsel at the time Michael Millikin arranged a meeting with top executives and members of the GM legal department to discuss. As evidenced by the lack of recall until April 2014, no recommendations for expanding the initial recall came out of that meeting.

189.    By March 2012, New GM had received more than *18,000* customer complaints of loss of electric power steering in the 2004-07 Ion, 2004-06 Malibu, 2004-06 G6, 2006-10 HHR, and

2005-09 Cobalt, complaints that were consistent with the oil/sulfur contamination condition in the EPS motor that causes the driver to suddenly lose power-steering, as described in New GM's April 14, 2014 Part 573 Letter to NHTSA regarding Recall No. 14V-153. For example, in early 2012, NHTSA directly delivered hundreds of Vehicle Owner Questionnaires ("VOQs") to New GM regarding loss of EPS in IONs and HHRs, showing that customers were repeatedly iterating variations of the same complaint – a complaint with which New GM was very familiar by this point:

- 3/23/11,[116] 2007 Chevrolet HHR customer: "While driving at 65 miles per hour on the interstate, the power steering light beeps three times and my power steering fails causing me to almost have an accident – when the car is turned off and turned back on, the steering resets itself but only temporarily – I took it to the dealer and it's a power steering motor and is not covered under my warranty – when I started researching, I found that multiple instances of this occur – I called Chevrolet and they said that several cars with this problem and this same power steering motor have been recalled but not the HHR but I should check back later – it is impossible to drive and very dangerous."

- 5/30/11, 2008 Chevrolet HHR customer: "The electric power steering turned itself off mid turn causing a drastic understeering leading the vehicle into oncoming traffic. Upon research I found that GM recalled the exact same steering components that failed in the HHR in other GM vehicles but not the HHR. If this does not warrant serious investigation what does. The second time this happened everything was fine as we were driving straight. The problem occurred when the electric power steering turned back on mid-turn causing my wife to over turn into someone's front lawn, had anyone been in the way this would have been tragic. . . . Why hasn't there been a recall issued, this is a severe [sic] driving impairment that can cause accidents and GM doesn't seem to care. . . . Why is it GM Canada issued a recall on this part for the HHR and not the US branch?"

- 6/1/11, 2003 Saturn Ion customer: "I was traveling approximately 40 MPH when the power steering lamp came on and the power steering failed. After pulling to the side of the road, and turning the vehicle off, I restarted the vehicle and the power steering was restored for about 20 minutes. The days following this, I encountered several power steering failures until I had the power steering box replaced on May 10, 2011. . . . I strongly feel that a recall should be in place for the power steering failure, and all who had the problem corrected out of pocket, should be reimbursed at GM's expense. . . . I would not like to have human life lost before this problem is given serious consideration!"

- 6/19/11, 2006 Chevrolet HHR customer: "I was driving and just when I was on a curved street my car let me know that there was a problem with the power steering. I needed to act fast to avoid an accident due to the fact that I was on a curved street. . . . The car [is] still doing the same every day, but the main problem is that it happens randomly, so you can['] t predict when you will start having a power steering problem.  Once you turn off [sic] the car and turn it on again system works well for a while. Again, you will never

know when it will start having the problem. . . . I'm not sure if there is any replacement for this part in which I can be confident that it will never happen again."

- 6/25/11, 2009 Chevrolet HHR customer: "The HHRs are having the same power steering assist problem that exists in the Cobalt. The Cobalt is covered by a recall, but the HHR is not. I believe the HHR should have the same recall because it has the exact same component that is failing. The power steering goes out suddenly and has caused my wife to lose control of the car."

- 6/27/11, 2005 Saturn Ion customer: "While driving 60 MPH the power[-]steering light comes on and the power steering malfunctions. The vehicle becomes very difficult to drive when the power steering goes out. Have to shut the vehicle off and restart it for the power steering system to work properly. Called the dealer regarding the power steering and the dealer stated there are no open recalls on the vehicle at this time. . . . This has happened on the interstate twice an[d] on regular roadways twice in last month."

- 6/30/11, 2006 Saturn Ion customer: "Power steering indicator would come on and steering ability will disappear. . . . Car taken to dealership to be serviced under special warranty. This part should definitely be recalled."

- 7/2/11, 2007 Saturn Ion customer: "While negotiating a left turn the power steering went out almost causing my wife to hit the oncoming car."

- 7/5/11, 2004 Saturn Ion customer: "Electronic assist power steering fails without any warning. Steering becomes very difficult if not impossibly for some people which could lead to loss of control."

- 7/18/11, 2009 Chevrolet HHR customer: "During the ice storm the power steering went out in my vehicle. My husband was driving and that is the only reason we didn't have an accident. This continues to be a problem on my 2009 Chevy HHR LT."

- 8/10/11, 2010 Chevrolet HHR customer: "When driving the power steering stops functioning and the steering becomes difficult to turn. When the car is turned off and restarted the power steering is operative for a short time and then fails again."

- 10/24/11, 2009 Chevrolet HHR customer: "2009 Chevy HHR LT which is having the same problems that caused a recall on the Chevy Cobalt . . . . My power steering system fails in the middle of a turn, the LED read out says power steering and then it completely goes out, I have to either turn the vehicle off and re[-]start it or remove the fuse that is in the electrical fuse box and put it back in, this only corrects the problem temporarily, (this is so dangerous, as I might be in the middle to a curve on wet/icy roads and having the steering go out on me) There are numerous threads on line in reference to this issue with the HHR and GM has not done a recall for it in this model, this vehicle has the same steering components as the ones that have been recalled. . . . I have grand children that are in my car at any given time and I should not have to worry about. . . the steering going out while I am in a turn on a wet or icy road!"

190. In April 2012, New GM met with NHTSA regarding NHTSA Query RQ10-004/EA11-014, which concerned loss of power steering assist in 2004-07 Saturn Ions, and

specifically why the Ions only received extended warranty coverage when the 2005-09 Cobalt was fully recalled for the same failure mechanism in March 2010.

191.    In September 2012, GM Canada issued a notice of defect for certain Malibu, Malibu Maxx, G6, and Aura vehicles, although it would take almost two more years for New GM to recall those vehicles in the United States.

192.    Indeed, by the middle of 2013, both Old GM and New GM had received *thousands* of complaints involving drivers of Delta and Epsilon platform vehicles experiencing sudden loss of EPS, describing the very same manifestation of the defect.  For example:

- April 13, 2004: 2004 Chevrolet Malibu (NHTSA ODI No. 10067060):
  - WHILE DRIVING AT ANY SPEED AND WITHOUT WARNING, THE VEHICLE LOST POWER STEERING.  THIS PROBLEM HAPPENED FOUR TIMES IN FOUR MONTHS.  THE VEHICLE WAS TAKEN TO A DEALER, WHO REPLACED THE STEERING COLUMN UNIT.  ALSO, THE ABS LIGHT CAME ON AND THE BRAKES MADE A SCREECHING NOISE WHEN DEPRESSED.  THE DEALER REPLACED THE ABS MODULE AND FRONT BRAKE HUBS.  ALTHOUGH THE REPAIRS HAD BEEN DONE, THE  SAME PROBLEMS RECURRED. *AK  THERE WERE ELECTRICAL FAILURES WITH THE DASH DIMMER SWITCH AND HEADLIGHT DIMMER, THE KEYLESS ENTRY NEEDED TO BE REPLACED AND GREASE LEAKED FROM THE LEFT FRONT WHEEL.  *SC PE04031_CAT *JB[117]

- November 8, 2004: 2004 Chevrolet Malibu (NHTSA ID No. 10098645):
  - I HAVE HAD MANY PROBLEMS WITH MY 04 MALIBU. ROUGH IDLE, POWER STEERING FALIURE MANY TIMES TOOK TO DEALER 3 TIMES COULD NOT DUPLICATE, BROUGHT IN WITH POWER STEERING OUT AT IT WAS DUPLICATED, BUT COULD NOT FIGURE OUT FOR A WHILE TOLD ME TO CONTINUE TO DRIVE, NO SAFETY FACTOR.FINALLY THOUGHT THEY FIGURED OUT PUT IN A NEW STEERING COLUMN, 9,000 MILES LATER BACK TO HAVING PROBLEMS WITH POWER STEERING. ALSO PROBLEMS WITH HARD SHIFTING,AND ALSO WITH IGNITION STICKING OR CONTINUING TO TURN OVER AFTER LEETING GO OF THE KEY. I WOULD NOT RECOMEND THIS CAR TO ANYONE AND THEY SHOULD ALL BE CRUSHED.MY WIFE IS TERRIFIED OF THE CAR AND WILL NOT DRIVE.CAR IS AT DEALER RIGHT NOW WE ARE DRIVING A LOANER.  *JB EA04018_CAT[118]

- February 7, 2005: 2004 Chevrolet Malibu (NHTSA ID No. 10106630):

[117] GM-MDL2543-007207881, at sheet 1 row 11986.
[118] *Id.* at row 18945.

- o POWER STEERING WENT OUT WHILE DRIVING. CONSUMER TOOK VEHICLE TO THE DEALER ON 5 OCCASIONS, BUT DEALER WAS UNABLE TO RESOLVE THE PROBLEM. *AK THE SERVICE ENGINE SOON LIGHT ILLUMINATED. *TC *JB[119]

- May 4, 2005: 2005 Pontiac G6 (NHTSA ODI No. 10119728):
  - o STEERING SYSTEM LOCKED. THIS OCCURED ON THE HIGHWAY, GOING AROUND A RIGHT TURN AT 50MPH (UPHILL). IT RESULTED IN A COLLISION WITH THE CONCRETE BARRIER ON THE SIDE OF THE ROAD. THE ABILITY TO STEER RETURNED AFTER THE DRIVER YANKED THE WHEEL HARD. THE DRIVER FELT A POP AND THE STEERING RETURNED, BUT THERE WAS NO TIME TO REGAIN CONTROL OF THE CAR.[120]

- June 5, 2005: 2005 Pontiac G6 (NHTSA ID No. 10127111):
  - o STEERING ON THIS [VEHICLE] HAS LOCKED UP MULTIPLE TIMES, CAUSING THE [VEHICLE] TO GO OFF THE ROAD. GM HAS INVESTIGATED THE CAR AFTER THE PREVIOUS INCIDENT AND CLAIMED THERE WAS NO PROBLEM AND WILL NOT CHECK THE CAR AGAIN. MOST RECENT STEERING LOCKUP OCCURED AT 8400 MILES.[121]

- January 6, 2006: 2005 Pontiac G6 (NHTSA ID No. 10146686):
  - o STEERING LOCKS UP. DEALERSHIP HAS ATTEMPTED TO FIX IT 3-4 TIMES TO KNOW SUCCESS. WHEN STEERING LOCKS THERE IS NO WAY TO STEER THE CAR. THIS HAS HAPPENED TO ME ATLEAST 20 TIMES OVER THE PAST 3 MONTHS. 3 TIMES I HAVE ALMOST PUT THE CAR IN A DITCH, DROVE INTO ONCOMING TRAFFIC AND DROVE INTO A 4 FOOT HIGH SNOW BANK. *NM[122]

- January 11, 2006: 2005 Pontiac G6 (NHTSA ID No. 10147414):
  - o PURCHASED PONTIAC G6 GT IN APRIL 2005 SINCE FALL OF 2005 STEERING COLUMN HAS LOCKED UP NUMEROUS TIMES FOR 2 SEC INTERVALS. HAVE TAKEN IT BACK 5 TIMES FOR THIS TILL THEY REPLACED STEERING COLUMN. AS OF TODAY 1/11/06 IT WAS DROPPED OFF AT THE DEALERSHIP AGAIN FOR THE SAME PROBLEM ALONG WITH BRAKE PEDAL AND PANELS AROUND IT RATTLING. CAR ONLY HAS 13,800 MILES ON IT. *JB[123]

- May 3, 2006: 2005 Pontiac G6 (NHTSA ID No. 10159812):
  - o I HAVE HAD 7 INCIDENTS OF THE POWER STEERING IN MY PONTIAC G6 2005 SEDAN LOCKING UP OR FAILING. THIS SEEMS TO HAPPEN ON THE INTERSTATE AND IS VERY DANGEROUS. THE DEALERSHIP AND GM CLAIMS NO PROBLEMS WITH THIS ISSUE, YET THERE ARE TONS OF

---

[119] *Id.* at row 20094.
[120] GM-MDL2543-001188893, at p. 2 row 4.
[121] GM-MDL2543-301804870, at -4888.
[122] *Id.* at -4883.
[123] GM-MDL2543-300912800, at -2807.

ARTICLES AND FORUMS ON THE INTERNET WITH PEOPLE HAVING THIS EXACT PROBLEM. *JB[124]

- May 31, 2006: 2004 Chevrolet Malibu (NHTSA ID No. 10158676):
  - VEHICLE LOSES POWER STEERING CAUSING [LOSS] OF CONTROL WHILE DRIVING. THIS FIRST OCCURRED 12/7/04 AND WAS REPAIRED UNDER GM CUSTOMER SATISFACTION CAMPAIGN 04050A (RECALL). VEHICLE LOST STEERING CONTROL AGAIN WHILE DRIVING ON 2/20/06, VEHICLE WAS REPAIRED. VEHICLE LOST STEERING CONTROL, ENGINE STALLED AND BRAKES FAILED WHILE DRIVING 55 MPH ON INTERSTATE FREEWAY ON 2/27/06, VEHICLE WAS REPAIRED. VEHICLE LOST STEERING CONTROL AGAIN ON 5/11/06. VEHICLE IS UNSAFE TO DRIVE AND HAS NOT BEEN REPAIRED TO MAKE SAFE. *NM[125]

- June 12, 2006: 2006 Pontiac G6 (NHTSA ID No. 10241396):
  - RENTED THIS G6 2006 FROM ENTERPRISE RENTAL CO. MY WIFE WAS DRIVING THIS CAR WHILE HERS WAS IN THE SHOP FOR REPAIRS. SHE WAS DRIVING ON A WINDING ROAD AND THE STEERING WENT OUT. SHE LOST CONTROL OF THE CAR WHILE TRYING TO TURN THROUGH A CURVE. THE CAR FLIPPED INTO THE AIR AND ROLLED 3 TIMES BEFORE LANDING IN A DITCH. AS A RESULT SHE HAD 2 COLLAPSED LUNGS 20 BROKEN RIBS, BOTH SCAPULES WERE SHATTERED AND BROKE COLLAR BONE FROM THE SEAT BELT AND A SNAPPED RIGHT ARM. DUE TO THE LACK OF INFORMATION ON THE SO CALLED BLACK BOX THE CAUSE WAS BLAMED ON MY WIFE'S DRIVING. THIS ISSUE NEEDS TO BE ADDRESSED BEFORE SOMEONE IS KILLED, AS I ALMOST LOST MY WIFE. *TR.[126]

- April 24, 2007: 2006 Pontiac G6 (NHTSA ID No. 10169632):
  - I WAS DRIVING APPROX. 55-60 MPH WHEN THE STEERING WHEEL LOCKED UP AND I LOST CONTROL OF THE VEHICLE, CROSSING THE CENTER LANE. IT REMAINED LOCKED FOR ABOUT 30 YARDS AND THEN RELEASED. *NM[127]

- January 12, 2007: 2005 Pontiac G6 (NHTSA ID No. 10178501):
  - TL* - THE CONTACT STATED THAT THE STEERING SEIZES INTERMITTENTLY ON HIS 2005 PONTIAC GT. THE FAILURE SPEED HAS VARIED, HOWEVER, HE COULD TELL WHEN THE STEERING WHEEL WAS ABOUT TO SEIZE BECAUSE THE STEERING WHEEL WOULD VIBRATE AND SHIFT TO THE LEFT ON ITS OWN. THE FAILURE MILEAGE WAS 13,000 MILES. THE STEERING LIGHT WOULD COME ON AFTER THE FAILURE. THE CONTACT TOOK THE VEHICLE TO THE DEALER A TOTAL OF THREE TIMES BECAUSE OF THE STEERING

---

[124] *Id.* at -2810.
[125] GM-MDL2543-007207881, at sheet 1 row 31618.
[126] GM-MDL2543-002111047, at p. 2 row 177. Note that the failure date is listed as June 12, 2006, but the incident does not appear to have been recorded in Old GM's records until 2008.
[127] GM-MDL2543-003187241, at -7265.

PROBLEMS. THE DEALER COULD NOT FIND ANYTHING WRONG WITH THE VEHICLE. THE KEY BECAME STUCK IN THE IGNITION, THE DEALER REPLACED THE IGNITION. THE REPAIR INVOICE DID NOT STATE THAT THE IGNITION WAS REPLACED. THE VEHICLE OPERATED WITHOUT INCIDENT FOR 2-3 MONTHS. THE CONTACT IS NOW EXPERIENCING THE SAME FAILURE. THE CONTACT HAS THE REPAIR INVOICES. *NM[128]

- May 2, 2007: 2005 Pontiac G6 (NHTSA ID No. 10189600):
  - I WAS DRIVING TO WORK AND NOTICED THAT MY CAR HAD A MIND OF IT OWN. NEXT THING I KNEW, THE CHECK ENGINE LIGHT CAME ON AND I LOST MY POWER ASSIST. I PULL OFF TO THE SIDE OF A VERY BUSY INTERSECTION AND CALL A TOW TRUCK. NEXT THING I KNEW, THE CHECK ENGINE LIGHT WENT OFF AND I COULD DRIVE. THE DEALERSHIP IS REPLACING THE DRIVESHAFT FOR THE SECOND TIME. THE 1ST TIME IT WENT OUT AS I ON A CURVE GETTING ON THE HIGHWAY. I'M ALMOST SCARED TO DRIVE THE CAR, THERE SEEM TO BE NO WARNING. IT JUST HAPPENS!! TODAY WAS THE THIRD TIME IT HAPPEN IN LESS THAN 2 YEARS. *TR[129]

- August 12, 2007: 2005 Pontiac G6 (NHTSA ID No. 10199326):
  - MY WIFE WAS ALMOST KILLED YESTERDAY WHEN THE STEERING LOCKED UP AT 50MPH+ WHILE DRIVING DOWN THE ROAD. SHE HAS COMPLAINED OF STEERING ISSUES/NOISES/CONTROL IN THE PAST, BUT NEVER HAD IT LOCK UP COMPLETELY. THE CAR WAS STILL RUNNING, WAS DIFFICULT TO STOP, AND SHE WAS ALMOST HIT BY TWO DIFFERENT VEHICLES. THIS IS THE LAST OF DOUBLE DIGIT ISSUES WITH THIS VEHICLE. I WILL NOT TAKE IT BACK FROM THE DEALERSHIP. WHEN THE TOW TRUCK SHOWED UP THE STEERING LIGHT WENT OFF AND WORKED AGAIN. *TR[130]

- July 4, 2008: 2004 Chevrolet Malibu (NHTSA ID No. 10233186):
  - WHILE DRIVING ON THE HIGHWAY, I LOST POWER STEERING IN MY VEHICLE ALMOST CAUSING AN ACCIDENT. THIS HAS BEEN AN OCCURRING PROBLEM FOR THE LAST YEAR OR SO BUT NEVER ON THE HIGHWAY. WE HAD TAKEN THE CAR TO A SERVICE STATION AND THEY COULD NOT FIND ANY THING WRONG. *TR[131]

- June 16, 2009: 2005 Pontiac G6 (NHTSA ID No. 10274009):
  - MY POWER STEERING LIGHT HAD BEEN COMING ON INTERMITTENTLY FOR THE PAST FEW DAYS. YESTERDAY WHILE LEAVING A PARKING GARAGE THE POWER STEERING LIGHT CAME ON. I CONTINUED DRIVING AND AS I WENT TO TURN THE WHEEL, THE POWER STEERING

[128] GM-MDL2543-302541907, at -1910.
[129] GM-MDL2543-301375873, at p. 1 row 229.
[130] *Id.* at row 257.
[131] GM-MDL2543-100388385, at sheet 1 row 1648.

WENT OUT WHILE MAKING A LEFT TURN (5-8MPH). I NEARLY RAN INTO A PILLAR IN THE PARKING GARAGE. I TURNED THE CAR OFF AND BACK ON AND THE PROBLEM WENT AWAY, BUT THE POWER STEERING LIGHT STAYED ILLUMINATED. AFTER SEARCHING THE INTERNET FOR SOME TIME, I CAME ACROSS HUNDREDS OF SIMILAR PROBLEMS. A FEW OF THE SAME PROBLEMS OCCURRED WHILE PEOPLE WHERE DRIVING ON THE INTERSTATE WHICH COULD HAVE BEEN DEADLY IF SOMEONE WOULD HAVE BEEN GOING AROUND A TURN OR JUST SWITCHING LANES. I JUST DON'T UNDERSTAND WHY THERE HASN'T BEEN A RECALL TO FIX THIS PROBLEM. THE CAR INDUSTRY WANT US TO STICK BEHIND AMERICAN MADE PRODUCTS BUT ARE UNWILLING TO FIX POTENTIALLY DEADLY PROBLEMS UNTIL THE INEVITABLE OCCURS AND SOMEONE LOSSES THEIR LIFE BECAUSE OF A PROBLEM THEY KNOW ABOUT. MAYBE THAT'S WHY MANY ARE BUYING QUALITY MADE FOREIGN MADE PRODUCTS. OVER THE FIVE YEARS I HAD THE CAR I HAVE HAD NUMEROUS PROBLEMS THIS CAR HAS BEEN A MONEY PIT. THE HOOD LATCH BROKE, THE POWER WINDOW MOTOR WENT. THE ROTORS HAVE TO BE REPLACED MORE OFTEN THAN I CHANGE THE OIL ( THAT'S RIDICULOUS), THE BEARINGS WENT BAD, THE SIX DISC FACTORY CD PLAYER STOPS WORKING AND STICKS CONSTANTLY, THE BLOWER FOR THE HEATER AND AC ONLY WORKS ON HIGH, THE PANORAMIC SUNROOF LEAKS WHICH HAS CAUSED WATER TO ACCUMULATE IN THE TRUNK AND NOW THEIR IS A MILDEW SMELL ECT......... *TR[132]

- October 6, 2009: 2005 Pontiac G5 (NHTSA ID No. 10286764):
  I WAS [DRIVING] MY 2005 PONTIAC G6 WHEN I WAS TURNING INTO A BUSY INTERSECTION MY POWER STEERING LOCKED UP AND THE LIGHT ON THE DASH LIT UP, ALMOST CAUSING A HEAD ON COLLISION BY CARS DOING 50 MPH. I WAS JUST SITTING IN THE INTERSECTION BECAUSE I COULD NOT CONTROL MY CAR AFTER THAT HAPPENED ALMOST GETTING HIT BY ANOTHER 2 CARS. I TURNED MY CAR OFF AND BACK ON AND THE POWER STEERING WORKED AGAIN. TOOK IT TO THE DEALERSHIP THEY REPLACED THE POWER STEERING MOTOR BECAUSE IT WAS UNDER WARRANTY. THE STEERING WHEEL COLUMN NEEDED TO BE REPLACED BUT WASN'T UNDER WARRANT SO THEY DID NOT REPLACE IT. THEY SAID IT WORKS FOR NOW BUT IT COULD GO OUT ANYTIME IM DRIVING, WHICH CAN CAUSE AN ACCIDENT. I COULDN'T BELIEVE WHAT HAPPENED THOUGHT IT WAS A FLUKE JUST MY LUCK, ONLY TO SEE SO MANY PEOPLE HAVING THE SAY PROBLEM IN THE SAME YEAR, IN THE SAME CAR WITH THE SAME MILEAGE. THE POWER STEERING WENT OUT WITH NO WARNING. THESE CARS NEED TO BE RECALLED ASAP SOMEBODY WILL GET HURT OR EVEN KILLED BY THIS. I WAS ONLY DOING AROUND 20MPH AND ALMOST GOT HIT THREE TIMES HEAD ON AND FROM THE BACK IMAGINE IF I WAS ON THE EXPRESSWAY OR EVEN TURNING DOWN A SIDE STREET AND LOOSING

[132] GM-MDL2543-301375873, at p. 1 row 615.

THE STEERING AND RUNNING UP A CURB ENDANGERING INNOCENT BYSTANDERS. SINCE THESE ARE NEWER CARS THERE ARE SO MANY OF THESE CARS OUT THERE THAT HAVEN'T EXPERIENCED THIS YET BUT WILL. NOT ONLY PEOPLE DRIVING THESE CARS ARE IN DANGER AT ANYTIME BUT OTHER PEOPLE ARE TO. I ALMOST GOT HIT HEAD ON BY A FORD TRUCK HIS LIFE WASIN DANGER JUST AS MUCH AS MINE. HOW THESE CARS ARE NOT RECALLED YET BLOWS MY MIND?????? SO MANY PEOPLE LIVES ARE IN DANGER IM DRIVING A CAR THAT THEY SAID THAT THERE IS A POSSIBILITY THAT IT COULD HAPPEN AGAIN. ARE THEY JUST GOING TO WAIT UNTIL PEOPLE GET KILLED BY THIS IF NOT ALREADY OR COME UP WITH A SOLUTION BEFORE MORE PEOPLE LIVES ARE AT RISK. THESE CARS NEED TO BE LOOKED AT AND RECALLED ASAP. I HEARD SOMETHING ABOUT AN EXTENDED WARRANTY BUT THEY DON'T MAKE EXTENDED LIVES. RECALL ASAP RECALL ASAP. *TR[133]

- 2006 Pontiac G6 customer complaint, received by Old GM at least as early as December 4, 2008:
  - I AM WRITING TO NOTIFY YOU OF SERIOUS SAFETY CONCERNS REGARDING MY 2006 PONTIAC G6 GT. I PURCHASED MY CAR FROM LOU SOHB PONTIAC GMC IN CONYERS, GA ON NOVEMBER 6, 2006. APPROXIMATELY 6 MONTHS LATER, I BEGAN HAVING TROUBLE WITH THE POWER STEERING. THERE WERE INSTANCES WHILE TRAVELING ON THE ROAD THAT THE CAR WOULD MOMENTARILY LOSE THE POWER STEERING CAPABILITY AND THEREIN MAKES THE VEHICLE DIFFICULT TO TURN.  I WAS INVOLVED IN AN ACCIDENT ON JUNE 28, 2007. WHILE ATTEMPTING TO MAKE A LANE CHANGE THE VEHICLE'S STEERING WHEEL BECAME VERY DIFFICULT TO TURN AND [LOST] POWER STEERING AND IT RESULTED IN ME BEING STRUCK ON THE PASSENGER SIDE BY ANOTHER VEHICLE. THERE WERE NO INJURIES. THE VEHICLE WAS REPAIRED AND IT SEEMED AS I SIMPLY VIEWED IT AS ONE OF THOSE UNEXPLAINABLE INSTANCES.   ON DECEMBER 25, 2007, CHRISTMAS DAY THE VEHICLE AGAIN HAD A MOMENTARY LOSS OF POWER STEERING AS I WAS TURNING IN MY DRIVEWAY. I TOOK THE VEHICLE TO THE DEALER THE FOLLOWING WEEK AND I WAS TOLD THAT THERE WERE NO PROBLEMS AND THE STAFF LOOKED AT ME AS IF I WERE CRAZY TRYING TO EXPLAIN THAT IT JUST HAPPENS UNEXPLAINABLE AND THEN WORKS FINE AGAIN. THE STAFF AT THE DEALERSHIP DID NOT LEAVE ME ASSURED THAT IT WOULD NOT HAPPEN AGAIN. . . . AT THIS POINT, THE POWER STEERING HAS BEEN CHECKED BY BOTH GM CERTIFIED MECHANICS AND A PRIVATE MECHANIC AT COST TO ME. BOTH TIMES I WAS TOLD THAT THEY COULD NOT SEE ANYTHING WRONG THAT WOULD MAKE IT MALFUNCTION AS SUCH. I HAVE NOW GROWN FEARFUL TO DRIVE THIS VEHICLE, AS I HAD A MOMENTARY LOSS OF POWER STEERING AGAIN THIS PAST WEEKEND ON NOVEMBER 22, 2008 WHILE EXITING THE

---

[133] *Id.* at row 722.

FREEWAY HEADING 75 NORTH IN ATLANTA. THIS HAS BECOME A REAL SAFETY ISSUE.

- 2004 Chevrolet Malibu customer complaint, received by New GM on July 17, 2009 (NHTSA ID No. 10277169):
  - TL*THE CONTACT OWNS A 2004 CHEVROLET MALIBU. WHILE DRIVING LESS THAN 3 MPH, THE POWER STEERING FAILED. THE CONTACT DROVE FORWARD OUT OF A PARKING SPOT, BUT THE STEERING WHEEL WOULD NOT TURN. SHE HAD TO EXERT GREAT FORCE IN ORDER TO TURN THE STEERING WHEEL. IN ADDITION, THE CHECK ENGINE LIGHT ILLUMINATED ON THE INSTRUMENT PANEL. THE MANUFACTURER WOULD NOT ASSIST BECAUSE THERE WERE NO RECALLS FOR THE STEERING. THE MANUFACTURER REFERRED THE CONTACT TO NHTSA. THE VEHICLE HAS NOT BEEN REPAIRED. THE CURRENT AND FAILURE MILEAGES WERE LESS THAN 128,000.[134]

- 2004 Chevrolet Malibu customer complaint, received by New GM on June 17, 2010 (NHTSA ID No. 10336827):
  - TL*THE CONTACT OWNS A 2004 CHEVROLET MALIBU. WHILE ATTEMPTING A TURN AT APPROXIMATE SPEEDS OF 10-15 MPH, THE POWER STEERING FAILED CAUSING THE CONTACT TO BARELY AVOID CRASHING INTO ANOTHER VEHICLE. A POLICE REPORT WAS FILED. THE VEHICLE WAS TAKEN TO THE DEALER THREE TIMES FOR CONCERNS OF THE POWER STEERING FAILING. THE DEALER REPLACED THE POWER STEERING COLUMN, IGNITION SWITCH AND THROTTLE BODY. THE APPROXIMATE FAILURE MILEAGE WAS 50,000 AND THE CURRENT MILEAGE WAS 120,000.[135]

- 2004 Chevrolet Malibu customer complaint, received by New GM on July 22, 2010 (NHTSA ID No. 10344815):
  - WIFE STARTED UP HER CAR AFTER WORK ON JUNE 30TH, COME TO FIND OUT, THE ELECTRONIC POWER STEERING FAILED AND, GOOD THING, SHE WASN'T DRIVING WHEN IT WENT OUT OR ELSE THERE COULD HAVE BEEN AN ACCIDENT. NOW, IT FAILS EVERY ONCE AND AWHILE, STILL STEERABLE, BUT VERY HARD TO STEER. IF YOU SHUT THE CAR OFF, THEN, IT GOES A WAY FOR A WHILE BUT THEN POWER STEERING FAILS AGAIN LATER ON. WE WERE DRIVING DOWN THE INTERSTATE AND IT DID THE SAME THING WHILE GOING 75MPH. WE'RE TRYING TO RESEARCH ON IF THIS IS A RECALL OR WHAT THE PROBLEM COULD BE. SOMETHING NEEDS TO BE DONE, I'VE SEEN A LOT OF COMPLAINTS ON THE CHEVY MALIBU ABOUT THE ELECTRONIC POWER STEERING FAILING.[136]

- 2007 Pontiac G6 customer complaint, received by New GM on January 19, 2011:
  - THE CONTACT OWNS A 2007 PONTIAC G6. WHILE DRIVING

---

[134] GM-MDL2543-007207881, at sheet 1 row 58169.
[135] GM-MDL2543-002969712, at row 2109.
[136] *Id.* at row 2228.

APPROXIMATELY 5 MPH LEAVING A PARKING AREA THE VEHICLE STEERING LOCKED UP. SHE STATED THE POWERING STEERING LIGHT ILLUMINATED ON THE DASHBOARD.  SHE PULLED OVER TO THE SIDE OF THE PARKING LOT AND CALLED A FAMILY MEMBER. THE VEHICLE WAS VERY DIFFICULT TO STEER BUT SHE DROVE THE VEHICLE HOME. SHE LATER CALLED THE DEALER AND EXPLAINED THE FAILURE AND WAS ADVISED THAT THEY WOULD PICK THE VEHICLE UP. THE VEHICLE HAD NOT BEEN REPAIRED.

- 2006 Pontiac G6 customer complaint, received by New GM on September 26, 2011:
  - o I WAS PULLING OUT FROM A GAS STATION WHEN THE POWER STEERING LIGHT WENT OFF AND WITHIN 2 SECONDS ALL POWER STEERING WAS GONE. AFRAID TO DRIVE ANY FURTHER I PARKED MY CAR AND DID WHAT I NEEDED TO DO. WHENEVER I RETURNED TO TRY AND DRIVE MY CAR BACK HOME (IT SAT THERE FOR 1 1/2 HRS) THERE WAS NO PROBLEM STEERING IT. I HAVE TEEN AGE SONS WHOM DRIVE MY CAR FROM TIME TO TIME AND IF THIS HAPPENS TO THEM WHILE DRIVING THERE'S NO TELLING WHAT COULD HAPPEN. I'VE CALLED GM AND THERE'S NO RECALL ON THIS PROBLEM SO IF I WANT IT FIXED IT'S CONSIDERED MY PROBLEM NOW. I WILL NEVER PURCHASE ANOTHER GM CAR OR SUV EVER AGAIN AND WILL ALSO WARN MY FRIENDS.

- 2006 Pontiac G6 customer complaint, received by New GM on November 16, 2011:
  - o THE POWER STEERING IS FAILING AT LOW SPEEDS WHILE TURNING CORNERS.  THERE IS A LOUD THUMP THAT COMES FROM SOMEWHERE AROUND THE STEERING COLUMN OR JUST UNDER THE DASH ON THE DRIVER'S SIDE, THE POWER STEERING FAILS, AND THE DRIVER INFORMATION SYSTEM INDICATION LIGHTS AND POWER STEERING FAILURE MESSAGE APPEAR.  THIS ALWAYS HAPPENS WHEN THE CAR IS MAKING A TURN SO IT BECOMES NEARLY IMPOSSIBLE TO FINISH MAKING THE TURN BECAUSE IT IS SO DIFFICULT TO TURN THE STEERING WHEEL. . . .  THE PROBLEM FIRST STARTED OCCURRING EARLY IN 2011 AND OCCURRED APPROXIMATELY 4 TIMES DURING THE SPRING AND SUMMER. . . .  NEAR THE END OF OCTOBER 2011, THE PROBLEM BEGAN HAPPENING ALMOST CONTINUALLY. . . .  I BEGAN LOOKING INTO THE PROBLEM AND FOUND THAT THIS IS A KNOWN ISSUE TO GM.  AFTER CONTACTING THE LOCAL CHEVY DEALERSHIP AND GM, I FOUND OUT THAT GM WAS OFFERING 'SPECIAL COVERAGE' FOR THIS ISSUE BUT UNFORTUNATELY MY CAR WAS 'OUTSIDE THE PARAMETERS OF THE SPECIAL COVERAGE' BECAUSE THE COVERAGE ONLY COVERED 10 YEARS OR 100,000 MILES.  MY CAR WAS AT 122,000 MILES.  I QUESTIONED WHY A MAJOR SYSTEM OF THE CAR WAS ONLY COVERED TO 100,000 MILES AND THEY IMPLIED THAT I HAD DRIVEN MY CAR IN SUCH A WAY THAT I HAD CAUSED THIS PROBLEM.  THEY FINALLY AGREED THAT MY ISSUE 'SOUNDED SIMILAR TO OTHER INCIDENTS THAT HAD BEEN REPORTED' AND ASKED ME TO TAKE IT TO THE DEALER FOR A DIAGNOSTIC TEST.  THEY INSISTED THAT THERE

WAS NO RECALL ON MY CAR FOR THIS ISSUE, BUT FINALLY AGREED TO COVER THE COST OF THE REPAIR AS AN EXCEPTION TO THE SPECIAL COVERAGE THEY HAD OFFERED OTHER DRIVERS. I HAD TO FIGHT GM ALL THE WAY ON THIS EVEN THOUGH IT WAS A SERIOUS SAFETY ISSUE.

193.    New GM finally recalled the 2003-07 Saturn ION, certain model year Chevrolet Malibus, the 2005 Pontiac G6, and some 2006 and 2008-09 model year G6s in 2014, even though the "incidents per thousand vehicles" ("IPTV") in July 2010 for these models exceeded the incidents per thousand vehicles for the Cobalt recalled all the way back in 2010. In fact, back in June 2009, Old-to-New GM Field Performance Engineers involved with the Investigation Status Review ("ISR") committee reviewed data on field reports of loss of power steering, and this data indicated that the IPTV for the Malibu and G6 was much greater than that of the Cobalt.

194.    After announcing the March 31, 2014 recall, Jeff Boyer, New GM's Vice President of Global Vehicle Safety, acknowledged that New GM recalled only some of these same vehicle models in 2010 for the *same issue,* but that New GM "did not do enough."

195.    Recall 14V-153 provided for the following repairs based on model:

- 2004-2007 Saturn ION, 2009-2010 Chevrolet HHR, and 2010 Chevrolet Cobalts – Replace power steering motor;
- 2004-2006 Chevrolet Malibu and Malibu Maxx, 2005-2006 Pontiac G6, 2008-2009 Chevrolet Malibu, 2008-2009 Pontiac G6, and 2008-2009 Saturn Aura (3/1/2008 – 6/27/2008) – Replace torque assembly;
- 2008 Chevrolet Malibu, 2008 Pontiac G6, and 2008 Saturn Aura (2/1/2008 – 2/28/2008) – Replace torque assembly and power steering control unit;
- Saturn Aura (10/1/2007-1/31/2008) – Replace power steering motor control unit.

196.    Notably, even as the EPS issue was finally winding its way through New GM's internal field action decision-making committees in late 2013, Product Investigations Engineers were still focused on cost-cutting opportunities in the implementation of the recall procedures. For example, in December 2013, Old-to-New GM Products Investigation Engineer Eric Buddrius

highlighted the cost-cutting benefits of only replacing the torque sensor in the defective steering systems as opposed to replacing the entire steering column (a procedure that was commonly used by GM dealers when addressing individual EPS-defect-related complaints): "Currently we replace the steering column at a cost of $302.66 per column. In the attached presentation on slides 22 and 33 you can see how this cost would add up in a field action. In the aftermarket there is a torque sensor available that would be less expensive. We would like to discuss replacing only the torque sensor."

# V.
## SUCCESSOR LIABILITY ALLEGATIONS

197. General Motors Corporation ("Old GM") was founded on September 16, 1908, in Flint, Michigan, and was incorporated on October 13, 1916, in Delaware. On June 1, 2009, General Motors Corporation ("Old GM") filed a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Southern District of New York.[137]

198. On July 5, 2009, the Bankruptcy Court approved the sale of substantially all of the assets of Old GM to a predecessor of General Motors LLC ("New GM").[138] Old GM sold all of its assets to New GM in a transaction (the "363 Sale") finalized on July 10, 2009.[139]

199. Through the 363 sale, all Old GM brands, inventory, physical assets, management, personnel, vehicles and general business operations were transferred to New GM. New GM also acquired the contracts, books, and records of Old GM, as well as the goodwill and intellectual property of Old GM.

200. New GM provided no cash consideration for the 363 Sale.[140] However, New GM

---

[137] Valukas Report at 1 n.1 and Valukas Report at 131.
[138] *Id.*
[139] Valukas Report at 131-132.
[140] New GM August 7, 2009 Form 8-K, at 16; Bankruptcy Court July 5, 2009 Order (I) Authorizing Sale of Assets Pursuant to Amended and Restated Master Sale and Purchase Agreement; (II) Authorizing Assumption and Assignment

assumed more than $7 billion of debt owed by Old GM, and provided Old GM with 10% of New GM's common stock, in addition to warrants to purchase 15% of New GM's common stock.[141]

201.    Old GM's decision to file for bankruptcy, and all of the major decisions made in the course of the 363 Sale negotiations, and with respect to all the actions of Old and New GM during Old GM's bankruptcy proceedings, originated from the company headquarters at 300 Renaissance Center, Detroit, Michigan.

202.    At no time was the business enterprise of the General Motors Company interrupted, and the New GM brand was continued as the same brand as Old GM.[142] New GM is the mere continuation or reincarnation of the same business enterprise as Old GM.

203.    Before the 363 Sale, Old GM's principal executive offices were located at 300 Renaissance Center, Detroit, Michigan.[143] After the Sale, New GM's principal executive offices were located at 300 Renaissance Center, Detroit, Michigan.[144]

204.    Old GM established the General Motors Proving Grounds in Milford, Michigan in 1924, for vehicle testing; the Milford Proving Grounds property is still owned and used by New GM.

205.    Under the terms of 363 Sale, New GM assumed the majority of Old GM's dealer franchise agreements.[145] New GM also assumed certain Old GM agreements with suppliers, including substantially all of Old GM's executory contracts with direct suppliers.[146]

206.    After the 363 Sale, New GM continued to use over 111 Old GM facilities in 28 states and 89 cities in the United States, 18 locations in Canada, and locations in 56 other countries.[147]

207.    New GM retained ownership and control over nearly all of Old GM's manufacturing

---

of Certain Executory Contracts and Unexpired Leases in Connection with the Sale; and (III) Granting Related Relief ("Sale Order") at 18-19.
[141] *Id.*
[142] Valukas Report at 132 n. 577.
[143] Old GM April 27, 2009 Form 8-K.
[144] New GM August 7, 2009 Form 8-K.
[145] New GM August 7, 2009 Form 8-K; Sale Order at 5.
[146] New GM August 7, 2009 Form 8-K, at 19; Sale Order at 20.
[147] New GM August 27 Form 8-K at 32.

plants, and closed only 14.[148] New GM also assumed ownership and responsibility for over 3,600 of Old GM's U.S. dealerships.[149]

208.　After the 363 Sale, New GM continued to produce Old GM's "core" automobile brands.[150]

209.　After the 363 Sale, New GM continued the manufacture, marketing sale and warranty of such former Old GM vehicles as the Chevrolet Cobalt, the Chevrolet HHR, the Buick Allure, the Buick LaCrosse, the Buick Lucerne, the Cadillac Deville, the Cadillac DTS, the Cadillac CTS, the Cadillac SRX, the Chevrolet Impala, the Chevrolet Camaro, the Chevrolet Malibu, and the Chevrolet Monte Carlo.

210.　Saturn Corporation was established on January 7, 1985 as a subsidiary of Old GM. The Saturn Sky was first manufactured in 2006 for the 2007 model year ("MY"), and the Pontiac Solstice was first manufactured in 2005 for the 2006 MY. Old GM manufactured both of these vehicles at its Wilmington, Delaware plant, and New GM continued to manufacture market and sell these vehicles after Old GM's bankruptcy. After attempting to sell the Saturn brand to Penske, New GM announced on September 30, 2009, that it was going to wind down the Saturn brand by October 2010.[151]

211.　Adam Opel AG was founded on January 21, 1862 as a sewing machine manufacturer and produced its first automobiles in 1899. Opel, based in Russelsheim, Hesse, Germany, became a subsidiary of Old GM in 1931. The Opel/Vauxhall GT was introduced as a production model in late 1968. Production of the Opel/Vauxhall GT was shut down in 1973 only to return 34 years later as a 2007 MY vehicle for GM. The Daewoo G2X was a rebadged version of the Opel GT available in

---

[148] http://money.cnn.com/2009/07/10/news/companies/new_gm/.
[149] *Id.*
[150] New GM August 7, 2009 Form 8-K, at 1.
[151]　Valukas　Report　at　19;　http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2009/Jun/0601_PlantClosures.html; http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aioTrH.Mfo0o.

September 2007. Old GM manufactured these vehicles from 2007 until July 28, 2009 at its Wilmington, Delaware plant, and New GM continued to manufacture, market, and sell these same vehicles after Old GM's bankruptcy. New GM announced on July 21, 2014, that Opel Group, a new entity created by Adam Opel AG and New GM, would manage and maintain full responsibility for New GM's European business, including Cadillac, Chevrolet, and the Opel/Vauxhall brands.[152]

212. Old GM began production of the Chevrolet Cobalt at its Lordstown Assembly plant in Lordstown, Ohio, in 2004 for the 2005 MY. New GM continued to manufacture, market, and sell the Cobalt after Old GM's bankruptcy until New GM discontinued the brand in 2010.[153]

213. The Chevrolet HHR was manufactured at Old GM's Ramos Arizpe, Mexico plant for the 2006 MY. New GM continued to manufacture, market, and sell the Chevrolet HHR after Old GM's bankruptcy.[154]

214. Old GM introduced the Pontiac G5/Pursuit in Canada for the 2005 MY and in the U.S. for the 2007 MY. New GM continued to manufacture, market, and sell the Pontiac G5/Pursuit after Old GM's bankruptcy.[155]

215. Old GM began manufacturing the Buick LaCrosse (U.S.) (or Buick Allure in Canada) in September 2004 for the 2005 MY.[156] The last vehicle of the first-generation Buick LaCrosse was manufactured on December 23, 2008, at Old GM's Oshawa, Ontario plant. The second-generation Buick LaCrosse was unveiled at the North American International Auto Show in Detroit, Michigan in January 2009. New GM continued to manufacture, market, and sell the LaCrosse.[157]

---

[152] http://en.wikipedia.org/wiki/Opel_GT; http://en.wikipedia.org/wiki/Saturn_Sky; http://www.detroitnews.com/article/20140721/AUTO0103/307210084.

[153] Valukas Report at 18; http://www.cleveland.com/business/index.ssf/2010/06/gm_taking_some_unusual_risks_i.html.

[154] Valukas Report at 18; http://www.prlog.org/11024409-chevrolet-discontinues-the-hhr.html; http://www.autofieldguide.com/articles/lookingthe-chevy-hhr.

[155] http://www.answers.com/topic/pontiac-g5.

[156] *Ward's Automotive Yearbook 2005*. Ward's Communications, Inc. 2005. p. 115.

[157] http://www.autoblog.com/2009/01/08/detroit-preview-2010-buick-lacrosse-breaks-cover/.

216.     Old GM began production of the Buick Lucerne in 2005 for the 2006 MY.[158] New GM continued production of the Buick Lucerne model vehicle until 2011.[159]

217.     Old GM began manufacturing the Cadillac DTS in 2005 for the 2006 MY. In Old GM's bankruptcy, New GM acquired the Cadillac brand and continued to manufacture, market, and sell the Cadillac DTS until 2011.[160]

218.     The first-generation Cadillac SRX was manufactured and sold by Old GM between 2004 and 2009. New GM released the second-generation Cadillac SRX in 2010 and continued to manufacture, market, and sell those vehicles.[161]

219.     Old GM began production of the Cadillac CTS in 2002 for the 2003 MY. Old GM redesigned portions of the Cadillac CTS in 2008, and New GM completed another redesign of this model in 2014.[162] New GM continued to manufacture, market, and sell the Cadillac CTS.

220.     The Chevrolet Impala was manufactured, marketed, and sold by Old GM since 1958. Old GM manufactured, marketed, and sold the eighth-generation Impala from 2000-2005; followed by the ninth-generation Impala from 2006-2009. New GM continued to manufacture, market, and sell the ninth-generation Chevrolet Impala between 2009 and 2013. New GM performed a redesign in 2013 for the 2014 MY, and continued to manufacture, market, and sell the Chevrolet Impala.[163]

221.     Old GM began manufacturing and selling the Chevrolet Malibu in 1963 for the 1964 MY. Four generations of Malibu were manufactured, marketed, and sold by Old GM between 1964 and 1983, when the Malibu was discontinued. Old GM brought back the Malibu make in 1996 for the 1997 MY. With MY 2004, Old GM redesigned the Malibu, manufacturing,

[158] http://www.edmunds.com/buick/lucerne/.
[159] http://www.just-auto.com/news/gm-axes-cadillac-dts-and-buick-lucerne_id111499.aspx.
[160] http://www.edmunds.com/cadillac/dts/.
[161] http://www.edmunds.com/cadillac/srx/.
[162] http://www.edmunds.com/cadillac/cts/.
[163] http://www.edmunds.com/chevrolet/impala/.

marketing, and selling the second-generation Malibu until 2008. The third-generation Chevrolet Malibu was manufactured, marketed, and sold by Old GM from 2008 to 2009. New GM continued to manufacture, market, and sell the third-generation Chevrolet Malibu from July 10, 2009 through 2012. New GM continued to manufacture, market, and sell the current version of the Malibu as redesigned for MY 2013.[164]

222.　Old GM manufactured, marketed, and sold the Chevrolet Camaro model from its inception in the late 1960s until 2002, when the model was discontinued. The Chevrolet Camaro returned to the New GM lineup in 2009 for the 2010 MY, and continued to be manufactured, marketed, and sold by New GM.[165]

223.　New GM enjoyed the benefits of the Old GM brands in continuing these brands and product lines. And New GM knowingly and intentionally undertook ongoing duties to the purchasers and lessees of Old GM vehicles to ensure the safety, function, and value of these vehicles.

224.　Old GM did substantial business in Michigan, and so does New GM.

225.　Michigan hosted a significant number of Old GM's U.S. operations, and also hosts a significant number of New GM's U.S. operations.

226.　Old GM's conduct that forms the basis of Plaintiff's successor liability claims against New GM emanated from Old GM's headquarters in Detroit, Michigan.

227.　Old GM personnel responsible for the design and manufacturing of the Defective Vehicles,[166] as well as those personnel responsible for customer communications, were located at Old GM's Michigan headquarters, and were also responsible for the core decision not to

---

[164]　http://wot.motortrend.com/a-quick-history-of-the-chevy-malibu-125595.html; http://www.edmunds.com/chevrolet/malibu/.
[165]　http://www.edmunds.com/chevrolet/camaro/.
[166]　As used in this Section, the term "Defective Vehicles" collectively refers to the ISD-Defective Vehicles, the BCM-Defective Vehicles, and the EPS-Defective Vehicles.

disclose any of the defects described herein prior to Plaintiff's May 2007 crash.

228.     New GM honored the vehicle warranties and customer programs of Old GM on Old GM vehicles. On June 1, 2009, days before it was to file for bankruptcy protection, Old GM posted on its Internet website (www.gm.com) a "Customer FAQ on GM's Chapter 11 Filing," which remained accessible on New GM's website (www.gm.com) after Old GM's bankruptcy.[167] Among other things, New GM promised its customers:

> There will be no interruptions in GM's ability to take care of our customers and honor customer programs, warranties and provide replacement parts. In fact, GM has asked the Court for specific orders authorizing GM to honor customer warranties and programs as it always has. You should have total confidence that:
>
> • Our products are safe and sound;
>
> • We will honor your existing warranty;
>
> • Customer promotions and incentives will continue without interruption;
>
> • You do not need to do anything differently regarding your warranty.[168]

229.     New GM continued:

> Will New GM honor customer warranty claims?
>
> > Yes. GM will succeed and win by taking care of our customers every day. New GM will assume the obligations to support the express warranties issued by GM to its customers.[169]

230.     With respect to Old GM's loyalty program—GM Card Earnings:

> What happens to my GM Card Earnings?

---

[167] http://web.archive.org/web/20090606083403/http://www.gmreinvention.com/index.php/site/progress_reports/0601_Viability_CustomerFAQ/#; http://web.archive.org/web/20100107122701/; http://www.gmreinvention.com/index.php/site/progress_reports/.

[168] *Id.*
[169] *Id.*

> Your GM Card Earnings will continue to be honored in accordance with the Program Rules. You can keep using your Card at more than 18 million outlets where MasterCard is accepted to accumulate Earnings and redeem them toward eligible, new GM vehicles.[170]

231.    Under the 363 Sale Agreement, New GM also expressly agreed to comply with certain statutory requirements:

> From and after the Closing, Purchaser [New GM] shall comply with the certification, reporting and recall requirements of the National Traffic and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by Seller.

232.    In the Sale Agreement, New GM expressly agreed that it:

> shall be responsible for the administration, management and payment of all Liabilities arising under (i) express written warranties of Sellers [Old GM] that are specifically identified as warranties and delivered in connection with the sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by Sellers or Purchaser prior to or after the Closing and (ii) Lemon Laws.

233.    Seven out of thirteen of New GM's Directors after the 363 Sale were previously associated with Old GM:

a.    Errol B. David, Jr. had been a member of the Board of Old GM;

b.    Stephen J. Girsky had been a special advisor to the Chief Executive Officer and the Chief Financial Officer of Old GM from 2005 to 2006;

c.    Frederick A. Henderson had been a member of the Board of Old GM, and "had been associated with" Old GM since 1984;

d.    E. Neville Isdell had been a member of the Board of Old GM;

e.    Kent Kresa had been a member of the Board of Old GM and served as interim non-executive Chairman from March 29, 2009, to July 10, 2009;

---

[170] *Id.*

f.      Philip A. Laskawy had been a member of the Board of Old GM; and

g.      Kathryn Marinello had been a member of the Board of Old GM.[171]

234.    ***All twelve*** of New GM's Executive Officers after the 363 Sale were previously associated with and employed by Old GM:

a.   Walter Borst, New GM's Vice President and Treasurer, had been "associated with" Old GM since 1980 and had served as an officer of certain Old GM subsidiaries and an officer of Old GM;

b.   Nicholas S. Cyprus, New GM's Vice President, Controller and Chief Accounting Officer, had served as Old GM's Controller and Chief Accounting Officer since 2006;

c.   Frederick A. Henderson, New GM's first Chief Executive Officer, had been a member of the Board of Old GM, and "had been associated with" Old GM since 1984;

d.   Mark R. LaNeve, New GM's Vice President, U.S. Sales, had been "associated with" Old GM since 2001 and had served as an officer of certain Old GM subsidiaries;

e.   Timothy E. Lee, New GM's Group Vice President, Global Manufacturing and Labor, had been "associated with" Old GM since 1969 and had served as an officer of certain Old GM subsidiaries;

f.   Robert Lutz, New GM's Vice Chairman, Marketing and Communications, was "first associated with" Old GM in 1964 and "rejoined [Old GM] on September 4, 2001" as its Vice Chairman, Product Development;

[171] New GM August 7, 2009 Form 8-K at 35-36.

g.  Michael P. Millikin, New GM's Vice President and General Counsel until 2015, had been "associated with" Old GM since 1977 and had previously served as Old GM's Assistant General Counsel and Associate General Counsel;

h.  David N. Reilly, New GM's Executive Vice President, GMIO, had been "associated with" Old GM since 1975 and had served as an officer of certain Old GM subsidiaries;

i.  John F. Smith, New GM's Vice President, Planning and Alliances, had been "associated with" Old GM since 1968 and had previously served as an officer of Old GM;

j.  Robert E. Socia, New GM's Vice President, Global Purchasing and Supply Chain, had been "associated with" Old GM since 1975 and had previously served as an officer of Old GM and certain Old GM subsidiaries;

k.  Thomas G. Stephens, New GM's Vice Chairman, Global Product Development, had been "associated with" Old GM since 1969 and had served as Old GM's Vice Chairman, Global Product Development, since April 1, 2009; and

l.  Ray G. Young, New GM's Executive Vice President and Chief Financial Officer, had been "associated with" Old GM since 1986 and had served as Old GM's Executive Vice President and Chief Financial Officers since March 3, 2008.[172]

235.    In the 363 Sale, New GM assumed the compensation agreements of Old GM's senior executives.[173]

236.    New GM kept the same employees as Old GM and retained over 65,000 of Old

---

[172] New GM's August 7, 2009 Form 8-K at 37-38.
[173] New GM's August 7, 2009 Form 8-K at 40.

GM's employees. In fact, New GM made an offer of employment to all of Old GM's non-unionized employees and those unionized employees represented by the United Automobile Workers union ("UAW").[174]

237.     New GM retained much of Old GM's top management and key players involved in the defects at issue in this case, including, among others:

- Alan Adler served as Old GM's Safety Communications Manager in 2005 when he acknowledged an ignition switch defect in the 2005 Chevrolet Cobalt but claimed it was not a safety issue, and was also aware of airbag nondeployment incidents in the Cobalt by November 2006. He continued working in the same or similar capacity at New GM.[175]

- Gary Altman served as Old GM's Program Engineering Manager for the Chevrolet Cobalt in 2004 and continued to serve New GM as a manager until he was fired in 2014.[176]

- Kathy Anderson was an Old GM Field Performance Assessment Engineer who was assigned to gather information and assess technical issues in lawsuits and NISMs (not-in-suit matters).[177] Beginning in 2006, she investigated fatal crashes involving airbag nondeployment in a 2004 Saturn Ion and a 2005 Chevrolet Cobalt.[178] She continued to work in the same or similar capacity at New GM.[179]

- Mary T. Barra, current New GM Chief Executive Officer, began her career at Old GM in 1980 as a student at General Motors Institute.[180] She served in a number of engineering and management positions throughout Old GM and New GM prior to becoming New GM's Executive Vice President, Global Product Development, Purchasing and Supply Chain in 2013.[181] She assumed her current role with New GM on January 15, 2014.[182]

- Douglas Brown was in-house counsel at Old GM when Cobalt and Ion airbag nondeployment cases began to reach the Old GM legal staff, including Brown. He continued on in the same or similar

[174] Sale Order at 20.
[175] Valukas Report at 84-85, 140.
[176] Valukas Report at 58; http://www.newsweek.com/gm-fired-15-over-defect-killed-least-13-253685.
[177] Valukas Report at 105, 106.
[178] Valukas Report at 110, 112.
[179] Valukas Report at 141.
[180] http://www.gm.com/company/aboutGM/board_of_directors0/mary_barra.html.
[181] Id.
[182] Id.

capacity at New GM.[183]

- Eric Buddrius was an engineer in Old GM's Product Investigations unit, the primary unit charged with resolving significant engineering problems, including safety problems.[184] He continued to work in the same or similar capacity at New GM.[185]

- Lawrence Buonomo served as an attorney in Old GM's legal department from 1994-2009, and served as New GM's Executive Director of Litigation from 2009-2012.[186] New GM named him Practice Area Manager and Global Legal Process Leader— Litigation in 2012, a position in which he served until he was fired in 2014.[187]

- John R. Buttermore began his career at GM as an engineer in 1978.[188] He served Old GM as Vice President of Powertrain and Manufacturing Operations, and has served as New GM's Vice President of Manufacturing since September 2009.[189]

- William K. Chase worked for Old GM and then New GM from 1984-2009.[190] In 2005, he worked as a Warranty Engineer for Old GM where he was responsible for reducing warranty costs for vehicles produced in Lordstown, Ohio, where the Cobalt and the Pontiac G5 were produced.[191] He first learned of an ignition switch problem with the 2005 Cobalt in 2005, when he was asked to estimate the warranty impact of the problem.[192]

- Dwayne Davidson was Old GM's Senior Manager for TREAD Reporting, charged with reviewing relevant data in order for Old GM to comply with its federal safety monitoring and reporting obligations under the TREAD Act. He continued to head the TREAD reporting team at New GM.[193]

- Raymond DeGiorgio served Old GM as the Design Release

---

[183] Valukas Report at 103 & n. 419.

[184] Valukas Report at 86.

[185] Valukas Report at 153 n. 685.

[186] http://www.linkedin.com/pub/lawrence-larry-buonomo/5/978/499.

[187] *Id.; see also* http://online.wsj.com/articles/gm-dismissals-include-lawyers-lawrence-buonomo-bill-kemp-1402003050.

[188] http://investing.businessweek.com/research/stocks/people/person.asp?personId=2971371&ticker=GM&previousCapId=61206100&previousTitle=GENERAL%20MOTORS%20CO.

[189] *Id.*

[190] Chase Dep. at 6:24-7:3.

[191] Chase Dep. at 7:16-8:2, 20:14-18.

[192] Chase Dep. at 7:7-14, 8:3-8.

[193] Valukas Report at 113-14, 117, 159.

Engineer for defective ignition switches.[194] He continued to be employed by New GM in an engineering role until he was fired in 2014.[195]

- John Dolan was an electrical engineer for Old GM and continued to work in the same or similar capacity at New GM.[196]

- Brian Everest, an engineer, was an Old GM Field Performance Assessment Supervisor involved with the Cobalt airbag nondeployment investigation. He continued to work in the same or similar capacity at New GM.[197]

- Michael Gruskin was an attorney for Old GM who chaired the Settlement Review Committee and the Roundtable (both charged with approving settlements, including of claims resulting from defective ignition switches) from September 2007 to March 2012 (by which time he was of course an attorney for New GM).[198]

- William Hohmstadt was an Old GM sensing performance engineer involved in the investigation of Cobalt airbag nondeployment. He continued to work at New GM in the same or similar capacity.[199]

- William J. Kemp served as a top product safety attorney for Old GM during 2003-2013.[200] He continued to serve in New GM's legal department until his termination in 2014.[201]

- Gay Kent, an engineer, was Old GM's Director of Product Investigations, where she studied the ignition switch defect in the Chevrolet Cobalt. She continued working in the same or similar capacity at New GM.[202]

- Elizabeth Kiihr was an engineer in Old GM's Product Investigations Unit and was assigned in 2005 to investigate the ignition switch defect in the Chevrolet Cobalt. She continued to work in the same or similar capacity at New GM.[203]

- Alberto Manzor was an Old GM engineer who became involved in

---

[194] Valukas Report at 37-38.
[195] http://www.newsweek.com/gm-fired-15-over-defect-killed-least-13-253685.
[196] Valukas Report at 134, 165, 174 n.793; Dolan Dep. at 87:1-9, 186:17-188:5.
[197] Valukas Report at 114, 118-19; 134-35, 153.
[198] Valukas Report at 107, 110.
[199] Valukas Report at 134-35.
[200] Valukas Report at 85-86, 104, 147-148, 150, 153, 164-165, 171, 178, 183 and 196.
[201] Id; http://online.wsj.com/articles/gm-dismissals-include-lawyers-lawrence-buonomo-bill- kemp-1402003050.
[202] Valukas Report at 86-87, 113-14.
[203] Valukas Report at 86-88. Kiihr Dep. at 23:24-24:12.

the investigation of the Cobalt ignition switch in 2005.[204] He continued to work in the same or similar capacity at New GM.[205]

- Stephen Oakley was a Brand Quality Manager at Old GM who wrote Technical Services Bulletins concerning defective ignition switches.[206] He continued to work in the same or similar capacity at New GM.[207]

- Jaclyn Palmer was an in-house product liability attorney at Old GM who attended Roundtable meetings and was described as an "airbag lawyer."[208] She continued working in the same or similar capacity at New GM until she was terminated in 2014.

- Doug Parks was an Old GM Vehicle Chief Engineer for the Chevrolet Cobalt leading up to its launch.[209] He continued to work for New GM where, in February 2016, he became Vice President of Autonomous Technology and Vehicle Execution.[210]

- Manuel Peace was an Old GM Field Performance Assessment Engineer who investigated at least three crashes in Saturn Ion or Chevrolet Cobalt vehicles.[211] He continued to work at New GM where he remains a Senior Manager.[212]

- Lori Queen was an Old GM Vehicle Line Director involved with the Chevrolet Cobalt.[213] She continued to work at New GM in the same or similar capacity before she retired.[214]

- Mark L. Reuss began his career with Old GM as an engineering intern in 1983.[215] Having held numerous management positions in engineering for GM, he served as President of GM North America from 2009-2013.[216] He currently serves New GM as Executive Vice President, Global Product Development, Purchasing and Supply Chain, having assumed the role from Barra.[217]

---

[204] Valukas Report at 83-84.

[205] Manzor Dep. at 301:15-302:6.

[206] Valukas Report at 92-93.

[207] Oakley Dep. at 223:8-23, 274:1-20.

[208] Valukas Report at 108, 113-114, 140-141; GM-MDL2543-000660577.

[209] Valukas Report at 57-60, 81-84.

[210] https://www.boardroominsiders.com/executive-profiles/1000807/General-Motors- Corporation/Douglas-L.-(Doug)-Parks.

[211] Valukas Report at 110, 112, 124-126.

[212] https://www.linkedin.com/in/manuel-peace-94bb398.

[213] Valukas Report at 63-64.

[214] Queen Dep. at 139:24-140:11.

[215] http://www.gm.com/company/corporate-officers/mark-reuss.

[216] *Id.*

[217] *Id.*

- Michael J. Robinson joined Old GM in 1984, and moved up to become North American General Counsel in 2008.[218] He continued to serve in New GM's legal department, becoming New GM's Vice President of Environment, Energy and Safety Policy in September 2009, holding that position until he was fired in 2014.[219]

- Keith Schultz was Manager of Internal Investigations at Old GM's Product Investigations Unit, in which capacity he was involved with the Cobalt/Ion airbag nondeployment issue.[220] He continued to work at New GM in the same or in a similar capacity.[221]

- James Sewell was an Old GM Engineer who authored an August 2001 pre-production report regarding stalls in a pre- Ion prototype vehicle.[222] He continued to work for New GM in the same or in a similar capacity as a Performance Engineer.[223]

- John Sprague was an Old GM Field Performance Assessment Engineer tasked with supporting Old GM's product liability defense team.[224] He continued to work at New GM in the same or in a similar capacity.[225]

- Lisa Stacey was an Old GM Field Performance Assessment Engineer involved in the investigation of airbag nondeployment in Chevrolet Cobalts.[226] She continued to work at New GM in the same or in a similar capacity.[227]

- David Trush was the Old GM Design Engineer for the ignition cylinder and key of the 2005 Chevrolet Cobalt.[228] He continued to work for New GM in the same or in a similar capacity where he remains a Design and Release Engineer to this day.[229]

- Douglas Wachtel was a manager in Old GM's Product Investigations Unit.[230] He continued to work for New GM in the

[218] http://green.autoblog.com/2009/09/04/general-motors-announces-mike-robinson-as-new- environment-vp/.

[219] *Id*; http://fortune.com/2014/06/06/report-names-top-gm-workers-fired-over-gm-safety- probe/.

[220] Valukas Report at 113-14, 118-19.

[221] GM-MDL2543-402369642.

[222] Valukas Report at 42-43.

[223] Sewell Dep. at 10:10-15, 16:7-17:5; https://www.linkedin.com/in/james-sewell-03312112.

[224] Valukas Report at 9, 126.

[225] Valukas Report at 141.

[226] Valukas Report at 132, 134-135.

[227] Stacey Dep. at 11:3-6, 13:24-14:1.

[228] Trush Dep. at 11:1-3, 20:11-16, 21:10-17.

[229] Trush Dep. at 16:10-14, 95:8-17. https://www.linkedin.com/in/david-trush-1a6442b.

[230] Valukas Report at 114, 120.

same or in a similar capacity.[231]

- Chester N. Watson served as General Auditor for Old GM and New GM from 2003 through 2010.[232]

- Terry J. Woychowski was with Old GM since 1978, serving in various engineering positions including Global Vehicle Chief Engineer.[233] He held the position of Vice President of Global Quality and Vehicle Launch for New GM until retiring in June 2012.[234]

238.    New GM kept the same logos and brand marketing as Old GM. Old GM unveiled its "Mark of Excellence" logo in 1966.



239.    The words "Mark of Excellent were removed in the late 1970's, but what remained of the logo is still in use today.



240. On August 24, 2009, New GM announced the removal of its logo from all of its vehicles starting with the 2010 model year; however, New GM continued to use this logo on its websites and marketing materials.

241. New GM has also maintained the logos and branding for Chevrolet and Cadillac, after acquiring these brand assets post-bankruptcy. The Chevrolet bowtie was introduced in late 1913 containing the "Chevrolet" name within the bowtie. Old GM continued to use the bowtie logo after it purchased Chevrolet in 1918.



242. Around 2000, the Chevrolet name was removed from the logo, and, despite slight design variations to the bowtie, the logo and brand remained the same as used by New GM.



243. The iconic Cadillac crest was first unveiled in 1906. Though there have been slight varying designs of the crest, the Cadillac logo consisting of a silver, gold, red, and blue crest surrounded by a wreath has remained conceptually the same since 1982.



244. In January of 2014, New GM announced it was removing the Cadillac wreath from the logo and widening the crest for a more streamlined appearance.



245. New GM undertook the same manufacturing operations as Old GM. New GM continued the product lines of Old GM. The totality of the transaction between the predecessor and successor corporations demonstrates a basic continuity of the predecessor corporation's business. Indeed, the purpose of the bankruptcy transaction funded by taxpayer dollars was to save and continue the Old GM brand, the Old GM name, the Old GM product line, and to ensure the continuation or reincarnation of the same business enterprise as New GM. The fraudulent concealment of material facts begun under Old GM was continued, carried on, and furthered by New GM and its agents.

246.     New GM continued the business of General Motors as evidenced by the continuity of management, personnel, physical location, assets, and general business operations of Old GM.

247.     New GM expressly and impliedly assumed the obligations of Old GM to manufacture non-defective vehicles by warranting to the Class and the public that the GM brand would remain in operation as a continuation of the same company. At all relevant times, New GM held itself out to the Class, and to the world, as the effective continuation of Old GM.

248.     So, for example, after the 363 Sale, New GM stated, "We believe that continuity in our Senior Leadership Group is in our best interests and those of our stockholders."[235]

249.     After the 363 Sale, New GM released a commercial in which New GM Chairman and Chief Executive Officer Ed Whitacre stated "a lot of Americans didn't agree with giving GM a second chance."[236]

250.     After the 363 Sale, New GM stated its "long-term profitability depends on" New GM's "ability to restore consumers' confidence in us."[237]

251.     Old GM ceased its ordinary business operations and was dissolved by terms of Old GM's bankruptcy. Old GM became Motors Liquidation Company, and remained a legal entity for the sole purpose of liquidating its remaining assets and liabilities.[238] Old GM dissolved on December 15, 2011.[239]

---

[235] New GM's August 7, 2009 Form 8-K at 51, 71.
[236] New GM April 2010 Commercial, available at https://www.youtube.com/ watch?v=jbXpV0aqEM4.
[237] New GM's August 7, 2009 Form 8-K at 21.
[238] New GM's August 7, 2009 Form 8-K at 1, Sale Order at 18.
[239] Old GM December 15, 2011 Form 8-K at 2.

# VI.
## CLAIMS AGAINST GENERAL MOTORS, LLC BROUGHT BY PLAINTIFF

## COUNT I - Negligence, Gross Negligence, Recklessness, and/or Fraud by Concealment of the Right to File a Claim Against Old GM in Bankruptcy.

252.     The Plaintiff re-alleges as if fully set forth, each and every allegation set forth herein.

253.     As the bankruptcy court found, "As of June 2009, when the entry of the Sale Order was sought, Old GM had enough knowledge of the Ignition Switch Defect to be required … to send out mailed recall notices to owners of affected Old GM vehicles." New GM necessarily had this same knowledge from day one of its existence, as the bankruptcy court found that "at least 24 Old GM personnel (all of whom were transferred to New GM), including engineers, senior managers and attorneys, were informed or otherwise aware of the Ignition Switch Defect prior to the Sale Motion."

254.     As a result, upon entry of the Sale Order And Sale Agreement by which New GM acquired substantially all the assets of Old GM, New GM knew that: (a) millions of vehicles contained the defects described herein; (b) Old GM should have, but did not, institute a recall of vehicles containing the defects described herein prior to the Sale Order; (c) prior to the Sale Order, the defects herein had caused injuries and deaths; and (d) immediately after the Sale Order, a recall was required to remedy the defects described herein to prevent additional deaths and injuries.

255.     In September of 2009, the bankruptcy court entered the Bar Date Order, establishing November 30, 2009, as the deadline (the "Bar Date") for proof of claims to be filed against Old GM.

256.     Plaintiff did not receive constitutionally sufficient notice of the defects described herein prior to the entry of the Sale Order or the passage of the Bar Date. *In re Motors Liquidation Co., et al.*, 529 B.R. at 574. No recall occurred between July 10, 2009 and November 30, 2009, and neither the direct mail notice nor the publication notion sent in connection with the Sale Motion mentioned the defects described herein.

257.     New GM owed Plaintiff a duty to disclose its knowledge of the defects described herein prior to the passage of the Bar Date.

258.     New GM had a duty to disclose the defects described herein because the information was known and/or accessible only to New GM who had superior knowledge and access to the facts, and New GM knew or should have known that the facts were not known to or reasonably discoverable by the Plaintiff. These negligently, grossly negligently, or recklessly omitted and/or concealed facts were material because they directly impacted the safety of the Defective Vehicles purchased or leased by the Plaintiff, who had a limited period of time in which to file a claim against the manufacturer of the vehicles, Old GM.

259.     The Plaintiff was unaware of these material facts and would not have acted as he did if he had known of these facts. Plaintiff's actions were justified. New GM was in exclusive control of the material facts and such facts were not known to the public or to the Plaintiff.

260.     New GM breached this duty and/or concealed its knowledge of the ignition switch defect. As a result, the Plaintiff did not receive notice of the defects described herein prior to the passage of the Bar Date.

261.     In 2011, the bankruptcy court approved a Chapter 11 Plan under which the General Unsecured Creditors' Trust ("GUC Trust") would distribute the proceeds of the bankruptcy sale to, among others, the holders of allowed claims.

262.     On April 15, 2015, the bankruptcy court found that the Named Plaintiffs were deprived of due process because they did not receive constitutionally sufficient notice of the ignition switch defect prior to the passage of the Bar Date. While the court found that these vehicle owners may seek leave to file late claims, it ruled that the doctrine of equitable mootness bars late-filing claimants from tapping into the GUC Trust assets.

263.     New GM's negligence, gross negligence, recklessness, and/or fraudulent concealment and suppression of the ignition switch defect and the defects described herein between the July 10, 2009 Sale Order and Nov 2009 Bar Date prevented Plaintiff from filing timely proof of claim against Old GM.

264.     But for New GM's negligence, gross negligence, recklessness, and/or fraudulent concealment of the ignition switch defect and the defects described herein, the Plaintiff would have filed proof of claims against Old GM before the Bar Date.

265.     The Plaintiff was injured as a direct result of New GM's negligence, gross negligence, recklessness, and/or fraudulent concealment and suppression of the ignition switch defect and the defects described herein before the Bar Date because she lost her chance to file proof of claim against Old GM and seek payment from the GUC Trust. But for New GM's concealment of the defects between July 10, 2009 and November 30, 2009, Plaintiff would have filed timely proof of claim against Old GM and would have recovered from the GUC Trust.

266.     Accordingly, New GM is liable to the Plaintiff for his damages in an amount to be proven at trial.

267.     Such damages shall include, at a minimum, the difference between the amount that would have been paid by the GUC Trust on a timely filed proof of claim and the amount recoverable from the GUC Trust as a result of the bankruptcy court's equitable mootness ruling

(*i.e.*, \$0.00).

268.     It was foreseeable that if New GM did not disclose the defects described herein, the Plaintiff would suffer injury and such injuries were reasonably foreseeable to New GM.

269.     The Plaintiff could not through the exercise of reasonable diligence have prevented the injuries caused by New GM's negligence, gross negligence, recklessness, and/or fraudulent concealment.

270.     New GM's acts and omissions, when viewed objectively from the actor's standpoint, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others. New GM nevertheless proceeded with conscious indifference to the rights, safety and welfare of others.

271.     New GM's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the Plaintiff's rights and well-being to enrich New GM. New GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT II - Negligence, Gross Negligence, Recklessness

272.     Under the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement wherein New GM acquired certain Old GM assets, New GM assumed liability for crashes involving Old GM vehicles causing personal injury, loss of life or property damages.  New GM also acquired knowledge of Old GM's activities with respect to the ISD via the mind of the employees, officers, managers, books and records obtained and/or acquired as a result of the June 26, 2009 Amended and Restated Master Sale and Purchase Agreement and subsequent Sale Order. In addition, or in the alternative, New GM is liable in accordance with the 2nd Circuit Court of Appeals' July 2016 Opinion, *In Matter of Motors Liquidation Co.*, 829 F.3d 135 (2d Cir. 2016),

*cert. denied sub nom. Gen. Motors LLC v. Elliott*, 137 S.Ct. 1813, 197 L.Ed.2d 758 (2017). Thus, the duties of Old GM are part of the foundation for the liability assumed by New GM. Further, as identified herein, Plaintiff has claims for stemming from a crash involving an Old GM vehicle that caused personal injury and property damage and New GM is therefore liable to the Plaintiff. Finally, as discussed above and below, New GM is liable under Alabama successor liability law.

273.    Old GM owed Plaintiff a duty to design, manufacturer, fabricate, assemble, inspect, market, distribute, sell, and/or supply products in such a way as to avoid harm to persons using them such as the Plaintiff.

274.    Old GM owed Plaintiff a duty to detect known safety defects in GM-brand vehicles.

275.    Old GM owed the Plaintiff a duty, once it discovered the defects described herein, to provide thorough notice of the defects, including a warning that the defective vehicles should not be driven until appropriate repair procedures were developed and performed.

276.    Old GM owed the Plaintiff a duty, once it discovered the defects described herein, to ensure that appropriate repair procedures were developed and made available to drivers.

277.    Old GM breached the duties identified herein.

278.    Old GM's breach of duties identified herein directly and proximately caused Plaintiffs' injuries and damages.

279.    Old GM and New GM knew that customers, such as the Plaintiff, expect that they will employ all reasonable efforts to detect safety defects and warn drivers of their existence.

280.    Old GM's efforts to discover, provide notice of, and provide repair procedures for safety related defects exist for the benefit of the Plaintiff and other drivers of GM-brand vehicles. Old GM was aware that by providing maintenance and repair information and assistance, including through its authorized dealerships, it had a responsibility to the Plaintiff and other drivers to take

reasonable measures, including warning Plaintiff of the safety defect and providing an adequate repair procedure.

281.    New GM is liable to Plaintiff for the negligence of Old GM based on applicable successor liability law.

282.    It was foreseeable that if Old GM did not provide appropriate notice of the defect, Plaintiff and others would be endangered.

283.    Plaintiff's injuries were reasonably foreseeable to Old GM.

284.    Plaintiff could not through the exercise of reasonable diligence have prevented the injuries caused by Old GM's negligence, gross negligence, and recklessness.

285.    Old GM's acts and omissions, when viewed objectively from the actor's standpoint, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.  Old GM and New GM after it nevertheless proceeded with conscious indifference to the rights, safety and welfare of others.

286.    As will be shown at trial, all the foregoing knowledge of Old GM in all the preceding paragraphs was inherited by or is imputable to New GM within the meaning of the Orders, Judgments, and/or Decisions of the United States Bankruptcy Court for the Southern District of New York in *Motors Liquidation Company, et al., f/k/a General Motors Corp., et al.*, Case No. 09-50026 (REG).

**COUNT III - Fraud by Non-Disclosure**

287.    Plaintiff re-alleges as if fully set forth, each and every allegation set forth herein.

288.    As set forth above, Old GM and New GM intentionally concealed or failed to disclose material facts related to the defects described herein from the Plaintiff, the public, and NHTSA for more than a decade.  Indeed, Old GM failed to timely disclose serious and potentially

life-threatening defects in the Defective Vehicles within such time and in such manner as to prevent Plaintiff's injuries.

289.     As is also set forth above, Old GM and New GM possessed knowledge of the defects in Plaintiff's vehicle and other Old GM and New GM vehicles with the same defects and the need to undertake multiple design steps to resolve the defect conditions to prevent injury and economic harm.  This knowledge was based, in part, on the information from records, files, reports and other documents and materials regarding the defective ignition switch maintained by Old GM, all of which were included in the assets purchased by New GM during the bankruptcy sale.

290.     Throughout their relevant times of separate existence, Old GM and New GM intentionally concealed or failed to disclose material facts related to the defects described herein from Plaintiff, the public, and NHTSA.

291.     Old GM had a duty to disclose the material facts to Plaintiff, and Old GM knew: (1) that Plaintiff was ignorant of the material facts that Old GM did not disclose and/or intentionally concealed; and (2) Plaintiff did not have an equal opportunity to discover the material facts that Old GM did not disclose and/or intentionally concealed.  Old GM's fraud, fraudulent concealment and fraudulent non-disclosure were all components of the Subject Incident of the Plaintiff.

292.     By failing to disclose these material facts, Old GM intended to induce Plaintiff to take some action or refrain from acting.

293.     Plaintiff relied on Old GM's non-disclosure, and Plaintiff was injured as a result of acting without knowledge of the undisclosed facts.

294.     New GM is liable under principles of Alabama successor liability law. For the failures of Old GM described above that contributed to or were causally connected to the injuries sustained by Plaintiff.[240]

## COUNT IV - Strict Liability

295.     Plaintiff re-alleges as if fully set forth, each and every allegation set forth in this Amended Complaint.

296.     At all relevant times, Old GM and New GM were engaged in the design, testing, manufacture, distribution, and sale of automobiles, including the Defective Vehicles.

297.     In particular, Old GM designed, tested, manufactured, distributed, and/or sold Plaintiff's defective 2004 Chevrolet Malibu LS.

298.     Plaintiff's defective 2004 Chevrolet Malibu LS and other Old GM vehicles as well as New GM vehicles were defective due to the Ignition Switch Defect, the BCM Defect, and/or the EPS Defect at the time the vehicles were manufactured or sold by Old GM and New GM, from when the vehicles left Old GM's and/or New GM's control.

---

[240] *See In re Gen. Motors LLC Ignition Switch Litig.*, 14-MC-2543 (JMF), 2017 WL 6509256, at *2-3 (S.D.N.Y. Dec. 19, 2017), *on reconsideration in part*, 14-MC-2543 (JMF), 2018 WL 1989572 (S.D.N.Y. Apr. 25, 2018) (internal citations omitted) ("[T]here is no dispute that New GM continued Old GM's business and operations by, *inter alia*, assuming franchise agreements, maintaining contracts with suppliers, retaining their principal executive offices, and continuing to produce Old GM's automobiles. Second, pursuant to a liquidation plan, Old GM dissolved nine months after New GM acquired the bulk of its assets. Third, New GM assumed critical liabilities, including product liability, warrant, and recall obligations, as well as responsibilities under employee benefit plans, in order to continue normal business operations. And finally, after the sale of Old GM, New GM held itself out as the continuation of Old GM by, for example, maintaining the logos of well-known automobile brands. At a minimum, Plaintiffs demonstrate that there are genuine issues of material fact with respect to each of the factors in Alabama's [mere continuation exception] multi-factor test."); *see also In re Gen. Motors LLC Ignition Switch Litigation*, 2017 WL 3382071, at *9 (Aug. 3, 2017) (noting the parties' agreement that the substantive laws of the state of Alabama would apply to the analysis of Alabama successor liability claims). In the alternative, New GM is subject to one or more of the other successor liability theories under Alabama law, including but not limited to the continuity-of-enterprise exception and the *de facto* merger exception. *See In re Gen. Motors LLC Ignition Switch Litig.*, 14-MC-2543 (JMF), 2017 WL 6509256, at *2-3 (S.D.N.Y. Dec. 19, 2017), *on reconsideration in part*, 14-MC-2543 (JMF), 2018 WL 1989572 (S.D.N.Y. Apr. 25, 2018).

299.    The Defective Vehicles were expected to and did reach users and consumers without substantial change in the condition in which said Vehicles were sold.

300.    As a result of the defects described herein, Plaintiff's defective 2004 Chevrolet Malibu LS and other Old GM and New GM vehicles with that defect were unreasonably dangerous, as defined by ordinary consumer expectations, to persons who use or might reasonably be expected to be affected by those vehicles.

301.    Plaintiff's defective 2004 Chevrolet Malibu LS and other Old GM and New GM vehicles with the hazardous conditions described herein were in a defective condition, creating risk of harm to users or consumers, including Plaintiff.

302.    Plaintiff was within the class of persons who used or could have reasonably been affected by the defective 2004 Chevrolet Malibu LS.

303.    The defects set forth herein directly and proximately caused Plaintiff's injuries.

304.    As identified herein, Plaintiff has a claim for May 2007 crash involving an Old GM vehicle that caused personal injury, loss of life or property damages and New GM is therefore liable to Plaintiff for Old GM's design defects and failure to warn of and repair the defects described herein under principles of Alabama successor liability law.

305.    Plaintiff's injuries and losses were directly and proximately caused by Old GM's designing, manufacturing, fabricating, assembling, inspecting, marketing, distributing, selling, and/or supplying Plaintiff's 2004 Chevrolet Malibu LS in a defective condition for which New GM is strictly liable to Plaintiff pursuant to Restatement (Second) of Torts § 402A, for which New GM is liable under principles of Alabama successor liability law.

306.    Plaintiff's injuries were directly and proximately caused by Old GM's designing, manufacturing, fabricating, assembling, inspecting, marketing, distributing, selling, and/or

supplying the Subject Vehicle without proper and adequate warnings, instructions, and/or guidelines for safe use for which New GM is strictly liable to Plaintiff under principles of Alabama successor liability law.

307. New GM is liable for same under principles of Alabama successor liability law the failures of Old GM described above that contributed to or were causally connected to the injuries sustained by Plaintiff.

308. In addition, or in the alternative, New GM is liable in accordance with the 2nd Circuit Court of Appeals' July 2016 Opinion, *In Matter of Motors Liquidation Co.*, 829 F.3d 135 (2d Cir. 2016), *cert. denied sub nom. Gen. Motors LLC v. Elliott*, 137 S.Ct. 1813, 197 L.Ed.2d 758 (2017).

## VII.
## SUCCESSOR LIABILITY

309. Plaintiff re-alleges as if fully set forth, each and every allegation set forth herein.

310. Alabama law applies to Plaintiff's successor liability claims, as, *inter alia*, the accident and injury occurred in Alabama, and the place of vehicle purchase was Alabama.[241]

311. Under applicable Alabama law, for all of the grievances described herein, New GM is liable to Plaintiff under principles of successor liability because New GM is a mere continuation of Old GM, as evidenced by the fact that, *inter alia*, "[T]here is no dispute that New GM continued Old GM's business and operations by, *inter alia*, assuming franchise agreements, maintaining contracts with suppliers, retaining their principal executive offices, and continuing to produce Old GM's automobiles. Second, pursuant to a liquidation plan, Old GM dissolved nine months after

---

[241] *See In re Gen. Motors LLC Ignition Switch Litigation*, 2017 WL 3382071, at *9 (Aug. 3, 2017) (noting the parties' agreement that the substantive laws of the state of Alabama would apply to the analysis of Alabama successor liability claims).

New GM acquired the bulk of its assets. Third, New GM assumed critical liabilities, including product liability, warrant, and recall obligations, as well as responsibilities under employee benefit plans, in order to continue normal business operations. And finally, after the sale of Old GM, New GM held itself out as the continuation of Old GM by, for example, maintaining the logos of well-known automobile brands."[242]

312.    In addition, or in the alternative, New GM is liable to Plaintiff under the *de facto* merger exception and/or the "continuity of enterprise" exception to traditional successor liability rules because, *inter alia*, (1) there was a continuation of management, personnel, and business operations from Old-to-New GM; (2) the purchasing corporation assumed all obligations necessary to continue the normal, ordinary business operations of "General Motors" and/or the "GM" automotive brand; and (3) "the Alabama Supreme Court has held that the mere-continuation exception and the continuity-of-enterprise exceptions are synonymous."[243]

.

# VIII.
## DAMAGES

313.    Plaintiff re-alleges as if fully set forth, each and every allegation set forth herein.

314.    Plaintiff prays for damages against the Defendant in a sum of money in excess of the jurisdictional amount of Seventy-Five Thousand Dollars ($75,000.00) plus costs and any such other relief to be deemed just and equitable to which he is entitled.

315.    Plaintiff's bodily injuries were directly and proximately caused by Old GM's and Defendant New GM's conduct and omissions.  Accordingly, Plaintiff is entitled to reasonable and

---

[242] *In re Gen. Motors LLC Ignition Switch Litig.*, 14-MC-2543 (JMF), 2017 WL 6509256, at *2-3 (S.D.N.Y. Dec. 19, 2017), *on reconsideration in part*, 14-MC-2543 (JMF), 2018 WL 1989572 (S.D.N.Y. Apr. 25, 2018) (internal citations omitted).

[243] *Id.* at 3 n. 1 (citing *Brown v. Econ. Baler Co.*, 599 So. 2d 1, 3 (Ala. 1992) for the assertion that Alabama courts also refer to the "mere continuation of the transferor" exception as the "continuity of the enterprise test").

proper compensation for the following legal and actual damages:

    a.  Past and future medical expenses;

    b.  Past and future pain and suffering;

    c.  Past and future disfigurement and loss of function;

    d.  Prospective medical care and medication costs;

    e.  Past lost wages and future lost wage-earning capacity; and

    f.  Property damage to her vehicle sustained in the crash.

## IX.
## PUNITIVE DAMAGES[244]

316.    Plaintiff re-alleges as if fully set forth, each and every allegation set forth herein.

317.    Plaintiff would further show that the clear and convincing evidence in this case will prove that Old GM acted with reckless disregard of the health and safety of others in that when it knew or should have known that there was the extreme risk of danger vis-a-vis the use and operation of the Subject Vehicle and other Old GM and New GM vehicles with the defects described herein, all of which Old GM and New GM had a duty to warn about and provide an adequate remedy therefor, but nevertheless proceeded with indifference to the rights, safety, or welfare of others, including Plaintiff.

318.    Plaintiff would further show that Old GM knew or ought to have known, in light of the surrounding circumstances, that Old GM conduct would naturally and probably result in injury or damage and that Old GM continued the conduct with malice or in reckless disregard of the consequences, from which malice may be inferred.

---

[244] As the Court's ruling is currently on appeal regarding whether punitive damages are available against New GM for Old GM's conduct *In re: Motors Liquidation Company, et al.,* Appeal No.: 1:17-cv-06088-JMF, ECF No. 60, Plaintiff maintains her right to assert a punitive damages claim against New GM in the present action. Moreover, Plaintiff maintains that her punitive damages claim is validly asserted on the basis of the "mere continuation" and/or *de facto* merger principles of successor liability under Alabama law.

319.     Alternatively, Plaintiff would further show that the clear and convincing evidence in this case will prove that Old GM acted intentionally and with malice in that when it knew or should have known that there was the extreme risk of danger vis-a-vis the use and operation of the Subject Vehicle as well as other similarly defective Old GM and New GM vehicles with the defects described herein, all of which Old GM and New GM had a duty to warn about and provide an adequate remedy therefor, but Old GM and New GM nevertheless proceeded with indifference to the rights, safety, or welfare of others, including the Plaintiff.

320.     Such misconduct was malicious, intentional, knowingly and/or grossly negligent, thereby justifying an award of punitive damages in an amount sufficient to punish Defendant for its wrongdoing and to deter Defendant and others similarly situated from engaging in similar misconduct in the future.

321.     Plaintiff would show that the amount to be awarded to him as punitive damages has a value well in excess of the minimum jurisdictional limits of this federal Court and in excess of that required for federal court jurisdiction in diversity of citizenship cases, for which exemplary damages he here and now sues.

## X.
## PRE-JUDGMENT INTEREST FOR PLAINTIFF'S DAMAGES

322.     Plaintiff respectfully asserts the request to be allowed to have the elements of damages considered separately and individually for the purpose of determining the sum of money that will fairly and reasonably compensate Plaintiff for the injuries and damages incurred, and to be incurred, and that each element of Plaintiff's damages be considered separately and individually, segregating the past and future losses, so that pre-judgment interest due Plaintiff may be computed.

## XI.
## JURY DEMAND

323.    Plaintiff requests a trial by jury.

## XII.
## PRAYER

324.    For the foregoing reasons, the Plaintiff prays that the Defendant be cited to appear and answer herein, and that upon final hearing of the cause, judgment be entered for the Plaintiff against Defendant for actual damages, as alleged, and exemplary damages, subject to proof and the limitations of the Orders, Judgments, and/or Decisions of the United States Bankruptcy Court for the Southern District of New York in *Motors Liquidation Company, et al., f/k/a General Motors Corp., et al.*, Case No. 09-50026 (REG); together with pre-judgment interested (from the date of injury through the date of judgment) at the maximum rate allowed by law; post-judgment interest at the legal rate, costs of court; and such other and further relief to which Plaintiff may be entitled at law or in equity.

Dated: July 23, 2018                          Respectfully Submitted,

                                              HILLIARD MARTINEZ GONZALES LLP
                                              By: /s/ Robert C. Hilliard
                                              Robert C. Hilliard
                                              State Bar No. 09677700
                                              Federal ID No. 5912
                                              719 S. Shoreline Boulevard
                                              Corpus Christi, TX 78401
                                              Telephone No.: (361) 882-1612
                                              Facsimile No.: (361) 882-3015
                                              -and-
                                              Thomas J. Henry
                                              State Bar No. 09484210
                                              Federal ID No. 12980
                                              tjh@tjhlaw.com
                                              THOMAS J. HENRY INJURY
                                              ATTORNEYS

521 Starr St.
Corpus Christi, Texas 78401
Telephone No.: (361) 985-0600
Facsimile No.: (361) 985-0601

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document as served upon the attorney of record for each other party through the Court's electronic filing service on July 23, 2018, which will send notification of such filing to the e-mail addresses registered.

By: /s/ Robert C. Hilliard
Robert C. Hilliard
HILLIARD MARTINEZ GONZALES LLP
State Bar No. 09677700
Federal ID No. 5912
719 S. Shoreline Boulevard
Corpus Christi, TX 78401
Telephone No.: (361) 882-1612
Facsimile No.: (361) 882-3015